# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

ROYCE SOLOMON, JODI BELLECI, MICHAEL LITTLEJOHN, and GIULIANNA LOMAGLIO, *individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

AMERICAN WEB LOAN, INC., AWL, INC., MARK CURRY, MACFARLANE GROUP, INC., SOL PARTNERS, MEDLEY OPPORTUNITY FUND II, LP, MEDLEY LLC, MEDLEY CAPITAL CORP., MEDLEY MANAGEMENT, INC., MEDLEY GROUP, LLC, BROOK TAUBE, SETH TAUBE, DHI COMPUTING SERVICE, INC., MIDDLEMARCH PARTNERS, and JOHN DOES 1-100,

Defendants.

Civil Action No. 4:17-cv-00145-RAJ-RJK

## AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................1

II.     PARTIES ....................................................................................................................5

        A.    PLAINTIFFS.....................................................................................................5

        B.    DEFENDANTS..................................................................................................5

              1.    The Payday Lender Defendants ................................................................5

              2.    The Medley Defendants ..........................................................................11

        C.    NON-DEFENDANT INTERESTED PARTIES................................................16

III.    JURISDICTION AND VENUE ................................................................................34

IV.     FACTUAL ALLEGATIONS ....................................................................................34

        A.    Usury Laws Generally....................................................................................34

        B.    Usury Law Avoidance Schemes.....................................................................35

              1.    Defendant Curry's Rent-a-Bank Scheme ...............................................35

              2.    Defendant Curry's Rent-a-Tribe Scheme ...............................................36

                    a.    Financial Backing and Control of Defendant Curry's
                          Rent-a-Tribe Scheme ....................................................................46

                    b.    American Web Loan Online Systems "Powered By
                          GOLDPoint Systems" ...................................................................56

                    c.    American Web Loan is not an "Arm of the Tribe" ........................57

        C.    Defendant's Lending Practices Through the American Web Loan
              Enterprise.......................................................................................................63

              1.    Deceptive Marketing of Loans ...............................................................64

              2.    Concealment of Critical Information About Class Members'
                    Loans During the Application Process.....................................................66

        D.    PLAINTIFF SOLOMON'S LOAN FROM AMERICAN WEB LOAN .................69

E.   PLAINTIFF BELLECI'S LOAN FROM AMERICAN WEB LOAN ......................70

F.   PLAINTIFF LITTLEJOHN'S LOAN FROM AMERICAN WEB LOAN ...............73

G.   PLAINTIFF LOMAGLIO'S LOAN FROM AMERICAN WEB LOAN ................76

H.   PURPORTED ARBITRATION CLAUSES IN PLAINTIFFS' LOAN
     AGREEMENTS ARE VOID AND UNENFORCEABLE ......................................81

V.    CLASS ALLEGATIONS ................................................................................85

VI.   CLAIMS FOR RELIEF ................................................................................89

COUNT ONE
VIOLATIONS OF RICO, 18 U.S.C. § 1962(c), COLLECTION OF UNLAWFUL DEBT
(AGAINST DEFENDANTS AMERICAN WEB LOAN, CURRY,
MACFARLANE GROUP, SOL, MEDLEY, BROOK TAUBE AND
SETH TAUBE) ............................................................................................89

COUNT TWO
VIOLATIONS OF RICO, 18 U.S.C. § 1962(d), RICO CONSPIRACY
(AGAINST DEFENDANTS CURRY, AMERICAN WEB LOAN,
MACFARLANE GROUP, SOL, MEDLEY, BROOK TAUBE, SETH TAUBE,
GOLDPoint, and MIDDLEMARCH) ..............................................................91

COUNT THREE
VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT
(AGAINST DEFENDANTS CURRY, AMERICAN WEB LOAN,
MACFARLANE GROUP, SOL, MEDLEY, BROOK TAUBE,
SETH TAUBE, and GOLDPoint) ..................................................................93

COUNT FOUR
VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(3)
FAILURE TO DISCLOSE FINANCE CHARGE
(AGAINST DEFENDANT AWL, INC.) ...........................................................96

COUNT FIVE
VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(4)
FAILURE TO DISCLOSE FINANCE CHARGE EXPRESSED AS AN
ANNUAL PERCENTAGE RATE
(AGAINST DEFENDANT AWL, INC.) ...........................................................97

COUNT SIX
VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(5)
FAILURE TO DISCLOSE THE TOTAL OF PAYMENTS
(AGAINST DEFENDANT AWL, INC.) ...........................................................98

COUNT SEVEN
VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(6)
FAILURE TO DISCLOSE NUMBER, AMOUNT, AND DUE DATES OR PERIOD
PAYMENTS SCHEDULED TO REPAY THE TOTAL OF PAYMENTS
(AGAINST DEFENDANT AWL, INC.) ........................................................................100

COUNT EIGHT
VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638 (a)(1)
FAILURE TO DISCLOSE THE IDENTITY OF THE CREDITOR
(AGAINST DEFENDANT AWL, INC.) ........................................................................101

COUNT NINE
UNJUST ENRICHMENT
(AGAINST ALL DEFENDANTS ..................................................................................102

PRAYER FOR RELIEF .............................................................................................103

JURY DEMAND .......................................................................................................104

Plaintiffs Royce Solomon, Jodi Belleci, Michael Littlejohn, and Giulianna Lomaglio (collectively, "Plaintiffs"), by and through their attorneys, on behalf of themselves and the Class defined below, allege the following based on the research of counsel, publicly available articles, reports, and other sources, a reasonable inquiry under the circumstances, and upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on their personal knowledge:

## I.      INTRODUCTION

1.      This action is brought on behalf of individuals who have been victimized by an unlawful, predatory online lending scheme involving an entity called American Web Loan, defined herein.  American Web Loan was created in a brazen attempt by Defendant Mark Curry ("Curry") to circumvent state and federal laws that protect American consumers from abusive short-term lending practices.

2.      Under this scheme, people needing cash on an emergency basis or to meet other serious financial challenges have been, and continue to be, charged extortionately high interest rates for short-term loans of $300 to $2,500.  The interest rates on these loans can be as high as 726.13%, which is far beyond legal limits.  Shockingly, these astronomical and unlawful interest rates are not disclosed to borrowers during the loan application process.

3.      Moreover, borrowers receive false, misleading, or no information regarding other key loan terms, including but not limited to the loan repayment schedule, finance charges, and total amount of payments due.  Notably, borrowers are not informed of the applicable terms until *after* they receive a loan.  People applying for a loan from American Web Loan also are not informed that disputes regarding their loans are subject to an unconscionable and unenforceable arbitration provision and choice of law provisions that disclaim the application of all state and

federal law in favor of the law of the Otoe-Missouria Tribe of Indians, a small Native American tribe located in rural Oklahoma that purports to own and operate American Web Loan.

4.     On the surface, the various participants in this illegal lending scheme, including American Web Loan and its various financial and operational backers (including, but not limited to, entities and individuals identified among the Defendants below), might not look like the popular-culture image of a menacing "loan shark" from an old film noir or gangster movie.  Indeed, American Web Loan and the other participants in the scheme shroud themselves in a veneer of apparent business legitimacy suggested by, among other things (a) a slick website and mobile app; (b) the use of electronic funds transfers; (c) an anonymous-looking office building in the suburbs of Kansas City, Kansas; (d) the involvement of at least one Wall Street hedge fund and other corporate investors; and (e) a series of complexly layered transactions and corporate structures that indicate the involvement of highly sophisticated corporate law firms and investment banks.

5.     Notwithstanding this attempt at corporate gloss, American Web Loan and its backers and affiliates have been perpetrating a scheme that preys on economically vulnerable individuals by charging unlawful, triple-digit interest rates for short-term loans of $300 to $2,500 and otherwise engaging in deceptive and predatory practices that conceal the true terms of those loans and make it extraordinarily difficult for borrowers to escape their grip.  This is nothing less than high-tech loan sharking designed for the digital age.

6.     The unlawful online payday lending scheme that ensnared Plaintiffs and members of the Class is a prime example of what is known as a "rent-a-tribe" lending operation.  In "rent-a-tribe" schemes, payday lenders attempt to circumvent state and federal law by issuing high interest loans in the name of a Native American tribal business entity that purports to be shielded by the principle of tribal sovereign immunity.  As alleged herein, however, the tribal lending entity

is nothing but a front for the illegal lending scheme; all substantive aspects of the payday lending operation (*e.g.*, financial backing, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections) are performed by individuals and entities that are unaffiliated with the Native American tribe.  In exchange for "renting" its sovereign immunity to the individuals and entities running the payday lending scheme, the cooperating Native American tribe receives a fraction of the revenues generated, a mere 1% in the case of American Web Loan.

7.      Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct in two federal criminal trials to date.

- On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted two individuals responsible for running a network of tribal lending operations, Scott Tucker and Timothy Muir, on all fourteen felony counts brought against them.  In that case, *United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y) (the "Tucker Criminal Matter"), Tucker and Muir were convicted of, among other things, multiple counts involving participation in a $3.5 billion Racketeer Influenced and Corruptions Act ("RICO") enterprise through the collection of unlawful debts and violations of the federal Truth in Lending Act.[1]

- On November 27, 2017, a jury in the U.S. District Court for the Eastern District of Pennsylvania convicted two individuals responsible for running "rent-a-bank" and "rent-a-tribe" payday lending schemes, Charles M. Hallinan and Wheeler K. Neff, on seventeen felony counts.  In that case, *United States v. Hallinan, et al.*, No. 2:16-cr-00130-ER (E.D.

---

[1] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (available at https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial-35-billion-unlawful-internet-payday).

Pa.) (the "Hallinan Criminal Matter"), Hallinan and Neff were convicted on multiple RICO and other felony counts related to the collection of unlawful debts in a scheme that generated more than $688 million in revenue between 2008 and 2013.[2]

While the particular individuals and Native American entities at the heart of the Tucker Criminal Matter and the Hallinan Criminal Matter are different from the Defendants and other interested parties here, the underlying schemes in the Tucker Criminal Matter and the Hallinan Criminal Matter are substantially identical to what Plaintiffs allege herein: payday lenders taking advantage of people by charging unlawfully high interest rates, often exceeding 700%, through sham entities that purport to be operated by Native American tribes but, in reality, are controlled by non-tribal individuals and entities that control and manage all substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation.

8.      The unlawful "rent-a-tribe" online payday lending model, including the enterprise alleged herein, exploits the financial vulnerability of people who find themselves with an urgent need for cash, generating enormous profits for payday lenders and their financial backers, which include Wall Street hedge funds, private equity funds, and Silicon Valley venture capital investors.

9.      Plaintiffs assert claims against the individuals and entities that participated in the RICO enterprise, referred to herein as the "AWL Payday Lending Organization" (defined below), through the collection of unlawful debts, and various co-conspirators that entered into agreements in furtherance of the collection of unlawful debts.  Plaintiffs also assert claims under the Electronic Funds Transfer Act in connection with the use of automatic funds transfers to receive loan funds

---

[2] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (available at https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case).

and make loan payments and the Truth in Lending Act in connection with the failure to disclose multiple material loan terms to Plaintiffs and members of the Class during the loan application process.

## II. PARTIES

### A. PLAINTIFFS

10. Royce Solomon ("Solomon") is a resident of Virginia who took out a loan from American Web Loan on or about December 19, 2016. Mr. Solomon resides within this judicial district and division.

11. Jodi Belleci ("Belleci") is a resident of Nebraska who took out a loan from American Web Loan on or about May 23, 2017.

12. Michael Littlejohn ("Littlejohn") is a resident of South Carolina who took out a loan from American Web Loan on or about June 3, 2017.

13. Giulianna Lomaglio ("Lomaglio") is a resident of California who took out a loan from American Web Loan on or about May 23, 2017.

### B. DEFENDANTS

#### 1. The Payday Lender Defendants[3]

14. Defendant American Web Loan, Inc. purports to be a corporation formed under the laws of the Otoe-Missouria Tribe of Indians ("Otoe" or the "Tribe") with a principal place of business located in Red Rock, Oklahoma, which is the location where the Tribe is headquartered. According to its website (https://www.americanwebloan.com), American Web Loan, Inc. uses a different mailing address of 2128 N. 14th Street, Box 130, Ponca City, Oklahoma 74601.

---

[3] The term "Payday Lender Defendants" in this sub-heading is used for the sole purpose of distinguishing these Defendants from the Medley Defendants (described herein) and the non-Defendant Interested Parties. This grouping is in no way intended to suggest that the Medley Defendants (defined herein) do not act as a lender-in-fact or otherwise exercise management and control over the unlawful online payday lending scheme alleged herein.

15.     Defendant AWL, Inc. purports to be a corporation formed under the laws of the Tribe.  According to its website, AWL, Inc. maintains a place of business located at 112 Paradise Drive, Suite B, Red Rock, Oklahoma 74651.  Other public records indicate that Defendant AWL, Inc. maintains a business address at 8151 Highway 177, Red Rock, Oklahoma 74651, which is identified as the mailing address for the Tribe on its website.  According to Plaintiffs' loan agreements and other public records, AWL, Inc. maintains a place of business with the mailing address of 2128 N. 14th Street, Box 130, Ponca City, Oklahoma 74601, which is the address identified on the website https://www.americanwebloan.com.  As alleged herein, according to an October 11, 2016 UCC filing from the District of Columbia, three entities controlled by Defendant Mark Curry hold a security interest in "all assets" of Defendant AWL, Inc. (except for certain tribal trust property and equity interests in tribal entities) under a September 21, 2016 security agreement.

16.     Unless otherwise specified, Defendant American Web Loan, Inc. and Defendant AWL, Inc. are collectively referred to herein as "American Web Loan" or "AWL."  American Web Loan is the nominal lender on loans taken out by Plaintiffs and members of the Class (defined herein).  American Web Loan also was the nominal lender on loans marketed to and taken out by members of the Class in the name of Clear Creek Lending, a fictitious or d/b/a entity of Defendant American Web Loan Inc.  As alleged herein, however, American Web Loan is not the lender-in-fact for those loans.  Rather, American Web Loan was created for the purpose of facilitating an unlawful online payday lending scheme devised by Defendant Mark Curry and operated, in fact, by Curry, various entities controlled by or affiliated with Curry, and other individuals and entities not affiliated with the Tribe.  According to the Westlaw database of business records, UCC filings and other sources indicate that "American Web Loan" has a business address of 6950 W. 56th

Street, Mission, Kansas 66202, which is the same address as Defendants MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.

17.     Defendant Curry is a resident of San Juan, Puerto Rico. According to public records, Defendant Curry maintains multiple additional residences in the United States, including in Henderson, Nevada, Washington, DC, Kansas City, Kansas, and Kansas City, Missouri. Curry is the founder of and currently serves as the Chief Executive Officer ("CEO") of Defendant SOL Partners, serves on the Boards of Directors of Defendants AWL, Inc. and American Web Loan, Inc., and founded and served as the CEO of Defendant MacFarlane Group. As alleged herein, Defendant Curry is the mastermind of the American Web Loan "rent-a-tribe" scheme and continues to be in *de facto* control of the online payday lending operation, personally and/or through entities that he owns or controls. In addition to his role as CEO of Defendant SOL Partners—which controls key lending functions of the American Web Loan enterprise— Defendant Curry owns or controls three Delaware corporations, First Infinity Holdings, Inc., First Mountain Holdings, Inc., and First CM Holdings, Inc. (collectively, the "September 2016 Shell Corporations"), each of which were incorporated on September 13, 2016 and jointly hold security interests in virtually all of the assets of Defendant AWL, Inc. and another entity created by the Tribe called Red Stone, Inc., whose mailing address is identified in public records as the Tribe's primary mailing address, 8151 Highway 177, Red Rock, Oklahoma 74651. According to public filings made in the District of Columbia, the contact addresses for the September 2016 Shell Corporations is the same as Defendant SOL Partners: 53 Palmeras Street, Floor 14, San Juan, Puerto Rico 00901.

18.     Defendant MacFarlane Group, Inc. ("MacFarlane Group") is a Nevada Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.

Defendant MacFarlane Group, Inc. appears to be the successor-in-interest to an entity known as MacFarlane Group, LLC, which had a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202 and which, according to at least one online corporate directory, operated a website with the address www.macfarlanegp.com, which currently (as of the date that this amended complaint was filed) re-directs to an American Web Loan website, www.awlinc.com.

19.     MacFarlane Group was founded by Defendant Curry to operate the illegal payday lending scheme alleged herein, as the successor to non-Defendant Interested Party Geneva Roth. At times relevant to the claims herein, Defendant Curry served as MacFarlane Group's CEO. Defendant MacFarlane Group handled virtually all aspects of American Web Loan's operations, including the financing and funding of the payday loans and the provision of all substantive lending functions, including but not limited to, loan marketing, application processing, underwriting, loan servicing, and collections.

20.     On October 12, 2016, the Tribe announced that it had acquired an entity called "MacFarlane Group," purportedly taking over certain "support services" used in connection with online payday lending, namely, "software development, marketing, and call center support."  The terms of the purported acquisition were not disclosed.  Based on records from the Nevada Secretary of State, the Tribe acquired an interest in Defendant MacFarlane Group, Inc. on September 22, 2016; the forwarding address for service of process was changed to an entity and address belonging to the Tribe: Red Stone, Inc., 8151 Highway 177, Red Rock, Oklahoma 74651.  Beyond this nominal change, the Tribe does not appear to have acquired ownership of any particular MacFarlane Group assets, business operations, or functions, including but not limited to MacFarlane Group's roles with respect to financing, underwriting, loan servicing, and collections for the American Web Loan enterprise.  Moreover, Nevada Secretary of State Filings indicate that

Defendant Curry has ongoing positions of authority at MacFarlane Group, Inc.; specifically, Curry remains identified as the Secretary and Treasurer of Defendant MacFarlane Group, Inc. The price of the purported acquisition and the amount and source(s) of any financing used by the Tribe also were not disclosed.[4]

21. Defendant SOL Partners ("SOL") was founded by Defendant Curry in approximately 2012 and provides various consulting services to clients in the online financial services industry. SOL-controlled or -affiliated entities were, along with Defendant MacFarlane Group, responsible for providing certain financing and various lending functions to the American Web Loan unlawful debt scheme. According to its website, Defendant SOL is headquartered at the El Caribe Office Building, 53 Palmeras Street, Floor 14, San Juan, Puerto Rico 00901. The address of Defendant SOL's headquarters is the contact address for the September 2016 Shell Corporations (with Defendant Curry identified as the contact person).

22. Defendant DHI Computing Service, Inc., d/b/a GOLDPoint Systems ("GOLDPoint"), is a Utah corporation with its principal place of business located at 1525 W. 820 N, Provo, Utah 84601. GOLDPoint provides software and related services to customers in the lending industry including a "lending suite" that facilitates online loan originations, loan servicing, collections, accounting, reporting, and marketing. GOLDPoint provides various services to American Web Loan and Defendants necessary to the operation of the American Web Loan online payday lending operation. Among other things, the web page through which American Web Loan borrowers can access their accounts, check loan balances, and make online payments

---

[4] Plaintiffs understand, based on representations made in the Memorandum in Support of Motion to Transfer to the Newport News Division by AWL, Inc., American Web Loan, Inc. and Red Stone, Inc., filed in *Hengle, et al. v. Curry, et al.*, No. 3:18-cv-100-REP (E.D. Va.), and submitted to this Court, *see* ECF No. 34-1 at 3 n.4, that Red Stone, Inc. purports to be the successor-in-interest to Defendant MacFarlane Group.

(https://myaccount.americanwebloan.com) states that it is "Powered By GOLDPoint Systems," and includes a link to the GOLDPoint website, goldpointsystems.com. Based on the company's description of its business operations on its website, Defendant GOLDPoint provides additional services and support to the American Web Loan online payday lending operation, including but not limited to services that support American Web Loan in connection with loan originations, loan servicing, collections, accounting, and reporting. On or about May 8, 2014, Defendant GOLDPoint entered into an On-Line Computer Service Agreement with Defendant MacFarlane Group (the "GOLDPoint Contract") to provide technological services necessary for the operation of the American Web Loan online payday lending scheme alleged herein. On or about October 27, 2016, the GOLDPoint Contract was amended to extend the contract's term until May 31, 2019 to provide for a new pricing schedule and the assignment of MacFarlane Group's interest in the contract to Defendant AWL, Inc.

23.    Defendant Middlemarch Partners ("Middlemarch") is, according to its website, middlemarchllc.com, "a merchant banking firm that provides the capital raising and M&A advisory services of an investment bank and the investment capabilities of a private equity investor," that "focuses on financial services." Middlemarch Partners provided assistance to Defendant Curry and/or Curry-controlled entities in connection with efforts to raise the lending capital necessary to finance unlawful loans made through American Web Loan. Middlemarch Partners authored, and/or assisted Defendant Curry and/or Curry-controlled entities in presenting, investor presentations including the 2013 Middlemarch Presentation (defined herein) and the Middlemarch Solicitation (defined herein). Defendant Middlemarch Partners is headquartered at 125 Park Avenue, Suite 1700, New York, NY.

24.     Defendants John Doe 1 through John Doe 100 (the "John Doe Defendants") are individuals and entities whose identities and addresses are presently unknown to Plaintiffs.   In addition to Defendants and the non-defendant interested parties identified herein, the John Doe Defendants provide financial or operational support for the unlawful American Web Loan payday lending scheme described herein.

### 2.     The Medley Defendants

25.     Defendant Medley Opportunity Fund II, LP (the "Medley Fund" or the "Fund") is a Delaware limited partnership with a principal place of business located at 280 Park Avenue, 6th Floor East, New York, New York 10017.   The Medley Fund is a pooled investment fund that was launched in December 2010 to provide loans to "middle market private borrowers, with a focus on senior secured loans."   According to public filings made with the U.S. Securities and Exchange Commission ("SEC"), as of June 30, 2017, the Medley Fund was fully invested and actively managed with $409 million in fee earning assets under management.   As alleged herein, the Medley Fund provides financial backing for, and exerts financial control over, Defendant Curry's American Web Loan scheme.   Defendants Brook Taube and Seth Taube control Defendant Medley Fund through, *inter alia*, their roles as Managing Partners of the Fund and members of the Fund's Investment Committee.   According to a July 2012 presentation provided to an investor in the Medley Fund, the "Medley Team" responsible for running the Fund was comprised of personnel from Defendant Medley Capital Corp. and/or related entities, including Defendants Brook Taube and Seth Taube.

26.     Defendant Medley LLC is a Delaware corporation with a principal place of business located at 280 Park Avenue, 6th Floor East, New York, New York 10017.   In its most recent Form 10-K filing, signed by Defendants Brook Taube and Seth Taube as Co-Chief

Executive Officers and Co-Chairmen, Medley LLC refers to Defendant Medley Fund in a proprietary manner, *e.g.*, calling it "*our* second long-dated private fund," describing the Medley Fund's management as being through partnership structures "*organized by us*," and noting that "*we manage* two permanent capital vehicles" including Defendant Medley Fund (emphasis added). Medley LLC and its affiliates exert control over Defendant Medley Fund and the entity that serves as the nominal general partner of the Medley Fund. The management of Defendant Medley Fund overlaps or is substantially under common control with Defendant Medley LLC, including but not limited to control through Defendants Brook Taube and Seth Taube. Defendant Medley LLC is controlled by Defendant Medley Group LLC, which controls the ownership of 80.07% of Medley LLC's "LLC Units."

27. Defendant Medley Capital Corp. ("MCC") is a Delaware corporation with a principal place of business located at 280 Park Avenue, 6th Floor East, New York, New York 10017. Senior management and personnel of MCC overlap with the management and personnel of Defendant Medley Fund. MCC senior management hold key management positions at the Medley Fund, including as Managing Partners, members of the Investment Committee, Chief Financial Officer, and other key positions. MCC senior management represented Defendant Medley Fund in meetings with Medley Fund investors, and key MCC personnel – Defendants Brook Taube and Seth Taube – were asked to respond to at least one investor's inquiry regarding the Medley Fund's investment in the American Web Loan payday lending scheme. In its most recent Form 10-K filing, signed by Defendant Brook Taube as Chief Executive Officer and Chairman, and by Defendant Seth Taube as Director, Defendant MCC defines "Medley" to include a group comprised of various entities including Defendants Medley LLC, Medley Management, Inc., and Medley Group LLC. *All* of the forty-five "Senior Professionals" identified on the MCC

website are also identified as the forty-five "Senior Professionals" on the website of Defendant Medley Management, Inc.; professional biographies refer to individuals' positions at "Medley." In addition to these significant connections, on its website, MCC states that it is "externally managed" by a subsidiary of Defendant Medley Management, Inc.

28.     Defendant Medley Management, Inc. ("MMI") is a Delaware corporation with a principal place of business located at 280 Park Avenue, 6th Floor East, New York, New York 10017.  In its most recent Form 10-K filing, signed by Defendants Brook Taube and Seth Taube as Co-Chief Executive Officers and Co-Chairmen, MMI states that its "sole asset is a controlling equity interest in Medley LLC."  In that same filing, MMI refers to Defendant Medley Fund in a proprietary manner, *e.g.*, stating that "*[w]e launched* . . . [Defendant Medley Fund], *our* second long-dated private fund, in 2010," describing the Medley Fund's management as being through partnership structures "organized *by us*," and noting that "*we manage* two permanent capital vehicles" including Defendant Medley Fund (emphasis added).  The management of MMI is under common control with Defendants Medley Fund, Medley LLC, MCC, and Medley Group LLC, including but not limited to control by Defendants Brook Taube and Seth Taube.  Moreover, MMI's most recent Form 10-K filing states that it is a "controlled company" under New York Stock Exchange Rules as a result of Defendant Medley Group LLC's over 97% control over MMI. *All* of the forty-five "Senior Professionals" identified on the MMI website are also identified as the forty-five "Senior Professionals" on the website of Defendant MCC; professional biographies refer to individuals' positions at "Medley."

29.     Defendant Medley Group LLC ("Medley Group") is a Delaware limited liability company with a principal place of business located at 280 Park Avenue, 6th Floor East, New York, New York 10017.  Medley Group is wholly owned by Defendants Brook Taube and Seth Taube,

who control Defendants Medley Fund, Medley LLC, MCC, and MMI.  Medley Group LLC holds

97.6% of the combined voting power of Defendant MMI's common stock, can elect all of MMI's

board of directors, and thereby has the power to control MMI's management and affairs.  As a

result of Medley Group's control of MMI, Medley Group also has the power to control the

management and affairs of Defendant Medley LLC, an entity in which Medley Group owns an

approximately 80% share of the "LLC Units" and, by extension, Defendant Medley Fund.

30.      Unless otherwise specified, Defendants Medley Fund, Medley LLC, MCC, MMI,

and Medley Group, which share significantly overlapping management and personnel, and which

hold themselves out as part of a common corporate family or as otherwise functionally and

operationally indistinguishable from one another, are collectively referred to herein as "Medley"

or the "Medley Defendants."  As alleged herein, Medley provides substantial financial backing

for, and exerts financial control over, the American Web Loan enterprise.

31.      In doing business, the Medley Defendants hold themselves out as – and are

understood by others in the business community to be – a unified "Medley" corporate family, with

a common identity, common leadership and personnel, common operations, a common business

headquarters, and other common attributes.  In addition to other commonalities alleged herein,

Medley's websites feature the same blue, all-capitals "MEDLEY" logo, link to each other, and

include the same rosters of personnel.  In connection with Medley's investment in the American

Web Loan online payday lending scheme, while the investment may have been made in the name

of Defendant Medley Fund, Medley personnel and others familiar with the transaction refer to the

investment having been made through "Medley," "Medley Capital," or some other common

descriptor.

32.     For example, according to excerpted deposition testimony of Brian Dohmen ("Dohmen"), a Senior Managing Director at Medley LLC (who also holds the same position at MCC and MMI and serves as those entities' Head of Direct Lending & Origination) that was given in other litigation on April 15, 2014, Dohmen's responsibility is "for sourcing new deal activity and managing a team of 14 people . . . locating middle market deals for *Medley* to invest in" (emphasis added).  When asked to clarify if he meant to say "for Medley Capital LLC to invest in," Dohmen testified: "[t]hat's for the *Medley family of funds*" (emphasis added), a group that he defined to include, among others, "Medley Capital Corporation" and "Medley Opportunity Fund II and various managed accounts, which I don't know off the top of my head."

33.     Dohmen further testified that Medley does not specifically "source" investment deals for any particular fund.  Rather, Medley's investments are centrally assigned to various funds: "[w]e have a firm-wide allocation policy."   Other portions of the Dohmen deposition transcript refer to the evaluation of Medley's 2011 investment in Defendant MacFarlane Group by the "Medley investment committee."

34.     This unitary view of Medley was shared by the investment banker who had been working with Defendant MacFarlane Group to secure $50 million in financing for the American Web Loan payday lending operation in 2011.  According to deposition excerpts from Thomas Ablum ("Ablum") of the firm Ablum Brown & Company given in other litigation, Ablum and his firm had been communicating with "Medley Capital" about the investment in MacFarlane Group.  To Ablum, Defendant Medley Fund and "Medley Capital" were indistinguishable from one another: "[f]or our purposes, it's the same entity."   Ablum further testified that, notwithstanding the legal formalities that may have been applied to various "Medley" entities, he considered them

to be one and the same: "It is controlled by and it is under Medley Capital.  That's the way we do business in our industry."

35.     Defendant Brook Taube is a resident of New York.  Brook Taube is a co-founder of Medley and, as alleged herein, controls the Medley Defendants through his positions as an officer, director, and/or other controlling party of those entities.

36.     Defendant Seth Taube is a resident of California.  Seth Taube is a co-founder of Medley and, as alleged herein, controls the Medley Defendants through his positions as an officer, director, and/or other controlling party of those entities.  On at least one occasion, on July 24, 2012, Defendant Seth Taube provided an "educational presentation" to an investor in Defendant Medley Fund that included distribution of a presentation entitled "Medley Opportunity Fund II LP Summer 2012" (the "Medley Presentation"), pages of which are excerpted or otherwise described herein.  The Medley Presentation, which described the approximately two year old Defendant Medley Fund to its investors, touts Medley's "[s]uccessful track record over 10 years investing and managing 4 direct lending portfolios."

37.     Collectively, Defendants Brook Taube and Seth Taube are referred to as the "Taubes" herein.  Unless otherwise alleged, conduct of the Medley Defendants is attributable to and Taubes as a result of their domination and control over Medley.

## C.     NON-DEFENDANT INTERESTED PARTIES

38.     The Otoe-Missouria Tribe of Indians (the "Tribe") is a federally recognized Native American tribe headquartered in Red Rock, Oklahoma.  The Tribe has approximately 3,000 enrolled members, the majority of which live off-reservation, in the state of Oklahoma.  As alleged herein, Defendant Curry's payday lending operation pays entities associated with the Tribe 1% of the revenues generated by American Web Loan in exchange for the Tribe's enactment of tribal

laws and creation of tribal business organizations that attempt to shield the online payday lending operation from state and federal law.

39.     John R. Shotton ("Shotton") is the Chairman of the Tribal Council of the Tribe and has held that position since 2007.  As the principal leader of the Tribe, Shotton was involved in the Tribe's cooperation with Defendant Curry regarding the creation of American Web Loan and the steps taken by the Tribe to enable and facilitate the online payday lending scheme through the creation of tribal laws and business entities.  Shotton nominally holds a position in the leadership of Defendant American Web Loan, having held the title "Secretary/Treasurer" of American Web Loan as of August 2013.  Shotton's status in the leadership of American Web Loan is further demonstrated by his role as a party (or the individual acting on behalf of the Tribe or its entities) in various litigation and enforcement actions concerning the Tribe's involvement in American Web Loan.  Recently, the Connecticut Department of Banking imposed a civil penalty of $700,000 against Shotton in connection with unlawful lending by American Web Loan and another payday lending entity affiliated with the Tribe in the state of Connecticut.  Shotton is a resident of Oklahoma.

40.     Charles Moncooyea ("Moncooyea") served as the Vice Chairman of the Tribal Council of the Otoe-Missouria Tribe at the time the Tribe and Defendant Curry agreed to cooperate in the American Web Loan scheme in approximately late 2009 until early 2010.  In his capacity in the leadership of the Tribe, Moncooyea was involved in the Tribe's efforts to enable and facilitate the online payday lending scheme through the creation of necessary tribal laws and business entities.  At certain times relevant to the claims set forth herein, Moncooyea served as the nominal leader of American Web Loan.  According to a November 24, 2014 investigative report published by Bloomberg News (the "Bloomberg Report"), after the formation of American Web Loan in

17

February 2010, Moncooyea was "put in charge of the company."  Moncooyea is a resident of Oklahoma.

41.     James Hopper ("Hopper") is the Vice President of Lending Operations at American Web Loan and has served in that position since July 2013.  According to an executive profile on Bloomberg, Hopper is identified as being "responsible for all core company operations" at American Web Loan and a former Tribal Council Treasurer for the Tribe.  Hopper is a resident of Oklahoma.

42.     Ted Grant ("Grant) is Vice Chairman of the Otoe-Missouria Tribal Council and has served in that position since approximately November 2, 2012.  Grant serves as a Director of Defendants American Web Loan, Inc. and AWL, Inc.

43.     The Geneva Roth Companies is a designation used by Defendant Curry to refer to various business entities that he owned or controlled in connection with his payday lending business, including Geneva Roth Ventures and Geneva Roth Capital (and potentially other entities whose names include some iteration of "Geneva Roth").  The Geneva Roth Companies share or shared a common business address with Defendant MacFarlane Group, 6950 W. 56th Street, Mission, Kansas 66202.  As alleged herein, the name Geneva Roth Companies appears in an investor presentation that details the structure of the American Web Loan "rent-a-tribe" scheme. According to that presentation, the Geneva Roth Companies were the predecessors to Defendant MacFarlane Group and, as of 2010, the Geneva Roth Companies had transferred all of their employees and management to Defendant MacFarlane Group and "now only holds limited assets." The Geneva Roth Companies have not been named as Defendants only to the extent that they do not appear to be currently registered as legal business entities in any state.

44.     Oakmont Funding, Inc. ("Oakmont") is a Delaware Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.  Oakmont is located at the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Oakmont provides financing for American Web Loan's online payday lending operation with an investment of $2.9 million in a "'COL' [choice of law] loan portfolio."  Oakmont is not named as a defendant herein solely due to the representation of its counsel, who provided Plaintiffs with a document purporting to evidence the dissolution of Oakmont on or about January 31, 2012, signed by Defendant Curry as Oakmont's "Authorized Officer."  Oakmont is, however, identified as a debtor on an amended Delaware UCC filing made by Defendant Medley Fund on or about August 5, 2016; that security interest was not terminated as of the date that Plaintiffs filed their Complaint in this action.

45.     Dinero Investments, Inc. ("Dinero") is a Delaware Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.  Dinero is located at the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Dinero provides financing for American Web Loan's online payday lending operation with an investment of $287,000 in a "'COL' [choice of law] loan portfolio."  Dinero is not named as a defendant herein solely due to the representation of its counsel, who provided Plaintiffs with a document purporting to evidence the dissolution of Dinero on or about January 31, 2012, signed by Defendant Curry as Dinero's "Authorized Officer."  Dinero is, however, identified as a debtor on an amended Delaware UCC filing made by Defendant Medley Fund on or about June 27, 2016; that security interest was not terminated as of the date that Plaintiffs filed their Complaint in this action.

46.     Chieftain Funding, Inc. ("Chieftain") is a Delaware Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.  Chieftain is located at the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Chieftain provides financing for American Web Loan's online payday lending operation with an investment of $283,000 in a "'COL' [choice of law] loan portfolio."  Chieftain is not named as a defendant herein solely due to the representation of its counsel, who provided Plaintiffs with a document purporting to evidence the dissolution of Chieftain on or about January 31, 2012, signed by Defendant Curry as Chieftain's "Authorized Officer."  Chieftain is, however, identified as a debtor on an amended Delaware UCC filing made by Defendant Medley Fund on or about June 27, 2016; that security interest was not terminated as of the date that Plaintiffs filed their Complaint in this action.

47.     Dant Holdings, Inc. ("Dant") is a Delaware Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.  Dant is located at the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Dant provides financing for American Web Loan's online payday lending operation with an investment of $87,000 in a "'COL' [choice of law] loan portfolio."  Dant is not named as a defendant herein solely due to the representation of its counsel, who provided Plaintiffs with a document purporting to evidence the dissolution of Dant on or about January 31, 2012, signed by Defendant Curry as Dant's "Authorized Officer."  Dant is, however, identified as a debtor on an amended Delaware UCC filing made by Defendant Medley Fund on or about June 27, 2016; that security interest was not terminated as of the date that Plaintiffs filed their Complaint in this action.

48.     Centurion Funding is an entity identified in an investor presentation as providing
an investment in the financing of American Web Loan through a "choice of law" loan portfolio of
$1.8 million and an additional $2.3 million credit facility. Centurion Funding is not named as a
defendant in this action solely because Plaintiffs have been unable to determine if this is the name
of a legal business entity or if this name was used by Defendant Curry as a pseudonym to conceal
the identity of one of the investors in American Web Loan. Centurion Funding is, however,
identified as a debtor on an amended Delaware UCC filing made by Defendant Medley Fund on
or about June 27, 2016; that security interest was not terminated as of the date that Plaintiffs filed
their Complaint in this action.

49.     TGI Investments is an entity identified in an investor presentation as providing an
investment in the financing of American Web Loan through a "choice of law" loan portfolio of
$2.7 million. TGI Investments is not named as a defendant in this action solely because Plaintiffs
have been unable to determine if this is the name of a legal business entity or if this name was used
by Defendant Curry as a pseudonym to conceal the identity of one of the investors in American
Web Loan. TGI Investments may have been mis-identified in the investor presentation and may,
in fact, be an entity called "TG Investments, Inc."  An entity called "TG Investments, Inc." is
identified as a debtor on an amended Delaware UCC filing made by Defendant Medley Fund on
or about June 29, 2016; that security interest was not terminated as of the date that Plaintiffs filed
their Complaint in this action.

50.     Smith Haynes & Watson LLC ("SHW") is identified in at least one investor
presentation as the "Exclusive Collection Agency" serving the American Web Loan operation.
SHW has a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202,
which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and

several other entities affiliated with Defendant Curry. Defendant Curry controls the operations of SHW. According to the Westlaw database of business records, Defendant Curry is identified as having the following titles at SHW: Owner, CEO, Individual Manager, Treasurer, Assistant Treasurer, and Manager. SHW is not named as a defendant herein solely due to the representation of its counsel, who provided Plaintiffs with a document purporting to evidence the dissolution of SHW on or about May 31, 2012, signed by Defendant Curry as SHW's "Authorized Person." SHW is, however, identified as a debtor on an amended Delaware UCC filing made by Defendant Medley Fund on or about June 27, 2016; that security interest was not terminated as of the date that Plaintiffs filed their Complaint in this action.

51.     American Web Loan Service, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, on or about June 27, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their Complaint in this action.

52.     AWL Processing, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on

publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, on or about June 27, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their complaint in this action.

53. Crimson Resources, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, on or about June 27, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their complaint in this action.

54. Crosslight Solutions, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, on or about June 27, 2016, Defendant Medley

Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their complaint in this action.

55.     FSI Funding Partners, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein.  However, on or about June 28, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their complaint in this action.

56.     Genesis Partners Funding, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein.  However, on or about June 28, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their complaint in this action.

57.     PS3 Holdings LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein.  However, on or about December 20, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Missouri Secretary of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their complaint in this action.

58.     Sienna Global Funding, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein.  However, on or about June 29, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their complaint in this action.

59.     Telepayment Solutions, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with

Defendant Curry.  This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein.  However, on or about June 27, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity.  According to an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein), Defendant Curry provided an authorized signature as the "Member" of this entity.

60.     The Bakery Partners, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein.  However, on or about June 29, 2016, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity; this secured interest was not terminated as of the date that Plaintiffs filed their complaint in this action.

61.     MMP is an entity or group of entities – including entities with the names MMP Partners LLC and MMP of Delaware LLC – with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  MMP has

not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, on or about February 20, 2015, Defendant Medley Fund filed UCC financing statements with the Delaware Department of State to perfect security interests in entities called MMP Partners LLC and MMP of Delaware, LLC. Defendant Medley Fund filed UCC financing statement amendments for those secured interests on June 28, 2016. Defendant Medley Fund filed terminations of those UCC financing statements on March 3, 2017, the same date that Medley Fund terminated interests in numerous "Integrated Commerce" entities, as alleged herein.

62.    "Integrated Commerce," which includes various entities organized as limited liability companies with names such as Integrated Commerce, LLC, Integrated Commerce of Hawaii, Integrated Commerce of Idaho, Integrated Commerce of Illinois, Integrated Commerce of Missouri, Integrated Commerce of Nevada, Integrated Commerce of New Mexico, Integrated Commerce of Ohio, Integrated Commerce of South Carolina, Integrated Commerce of South Dakota, Integrated Commerce of Texas, Integrated Commerce of Utah, and Integrated Commerce of Wisconsin, is an entity/group of entities with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. Defendant Curry appears to control Integrated Commerce based on having signed – as the sole member of management – the application of a foreign limited liability company registration for Integrated Commerce, LLC on or about December 18, 2014. Integrated Commerce has not been named as a defendant in this action for the sole reason that, based on publicly available information known to

date, Plaintiffs are unable to determine the nature of this entity's (or these entities') role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, Defendant Medley Fund appears to have made a loan to, or held some other secured interest in, Integrated Commerce. On or about June 28, 2016, Defendant Medley Fund filed UCC financing statement amendments with the Delaware Department of State to perfect secured interests in various Integrated Commerce entities. All of those UCC filings appear to have been terminated by Defendant Medley Fund on or about March 3, 2017, which is the same date on which Medley Fund filed UCC terminations regarding secured interests in MMP Partners LLC and MMP of Delaware, LLC.

63. Beacon Global Management LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. This entity is identified as a debtor to Defendant Medley Fund (as the secured party "Medley Opportunity Fund II LP, As Administrative Agent") on a Nevada UCC financing statement filed on or about December 20, 2011. On or about February 2, 2015, Defendant Medley Fund filed a Nevada UCC amendment, purporting to terminate its secured interest in Beacon Global Management LLC. According to an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein), Beacon Global Management LLC signed, by its "Member," Defendant Curry, on behalf of an entity called "Bullet Hole Software LLC," which

provided underwriting and decision services software to American Web Loan (and likely preceded Defendant GOLDPoint in that capacity).

64. American Web Loan Holdings, LLC ("AWLH") is or was a Delaware limited liability company with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. On or about December 19, 2012, Defendant Curry (as sole officer and Managing Member of AWLH) registered AWLH as a foreign limited liability company with the Nevada Secretary of State. AWLH was, according to an unverified document provided by Medley's counsel after Plaintiffs filed their initial Complaint in this action, the borrower on a loan issued by Defendant Medley Fund and various unspecified "Lenders" pursuant to a Credit Agreement dated as of December 22, 2011. According to the unverified document provided by Medley's counsel, on or about January 30, 2015, AWLH and Defendant Curry requested repayment of a loan from Defendant Medley Fund with a total outstanding balance of $31,941,229.33. The unverified document was signed on behalf of Defendant Medley Fund by Richard T. Allorto, who serves as Chief Financial Officer for all of the Medley Defendants. In correspondence dated February 14, 2018, Medley's counsel represented that the loan referenced in the unverified document was "a loan to AWL." AWLH has not been named as a defendant in this action for reasons including but not limited to: (a) based on publicly available information known to date, Plaintiffs are unable to determine the precise nature of AWLH's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein; and (b) Nevada Secretary of State records indicate that Defendant Curry terminated AWLH's registration as a foreign limited liability company on or about October 20, 2016, and it is not clear whether AWLH remains a registered business entity

or a going concern. According to a document provided by Medley's counsel that appears to be a Delaware Secretary of State UCC filing made by Defendant Medley Fund (as "Medley Opportunity Fund II LP, as Administrative Agent") dated February 2, 2015, Defendant Medley fund purported to have terminated its secured interest in AWLH on or about the date of that filing; the termination includes the parenthetical notation "(AWLH Facility)."

65. Circular Movement, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity on or about December 20, 2011; this secured interest was amended in September 2014 and terminated on or about February 5, 2015. According to an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein), Defendant Curry provided an authorized signature as the "Member" of this entity.

66. HCLC of Nevada, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this

entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity on or about December 20, 2011; another secured interest was recorded in September 2014 and both appear to have been terminated on or about February 5, 2015. According to an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein), Defendant Curry provided an authorized signature as the "Member" of this entity.

67. Legacy Holding Management, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity on or about December 20, 2011; another secured interest was recorded in September 2014 and both appear to have been terminated on or about February 5, 2015. According to an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein), Defendant Curry provided an authorized signature as the "Member" of this entity.

68. Mutual Enterprises Current, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant

MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity on or about December 20, 2011; another secured interest was recorded in September 2014 and both appear to have been terminated on or about February 5, 2015. According to an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein), Defendant Curry provided an authorized signature as the "Member" of this entity.

69.     Powerhouse Marketing, LLC is an entity identified in an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein). Defendant Curry provided the authorized signature for this entity as "Member." This entity has not been named as a defendant in this action for the sole reason that, there appear to be multiple entities doing business with the name Powerhouse Marketing and, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein.

70.     Sigma Technologies, Inc. is a Nevada Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole

reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity on or about December 20, 2011; another secured interest was recorded in September 2014 and both appear to have been terminated on or about February 5, 2015. According to an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein), Defendant Curry provided an authorized signature as the Chief Executive Officer of this entity.

71.     Sentinel Resources, LLC is an entity with a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry. This entity has not been named as a defendant in this action for the sole reason that, based on publicly available information known to date, Plaintiffs are unable to determine the nature of this entity's role in the American Web Loan online payday lending scheme and/or the AWL Payday Lending Organization described herein. However, Defendant Medley Fund filed a UCC financing statement amendment with the Delaware Department of State to perfect a secured interest in this entity on or about December 20, 2011; another secured interest was recorded in September 2014 and both appear to have been terminated on or about February 5, 2015. According to an unverified document purporting to be from Defendant Medley Fund, provided by Medley's counsel and dated January 30, 2015 (described in ¶ 64 herein), Sentinel Resources, LLC signed on behalf of Beacon Global Management, LLC, by Defendant Curry as the "Member" of the entity.

### III.    JURISDICTION AND VENUE

72.    This Court has subject matter jurisdiction over this dispute pursuant to 18 U.S.C. § 1965.  This Court also has federal question jurisdiction under 28 U.S.C. § 1331, and jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

73.    This Court has personal jurisdiction over Defendants because their activities directed at and in the Commonwealth of Virginia, conducted both directly and through their alter egos, as alleged herein, give rise to the claims in this action.  This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b)

74.    Venue is proper in this Court pursuant to 18 U.S.C. § 1965.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff Solomon is a resident of this District and this Division and a substantial part of Plaintiffs' claims occurred in Virginia.

### IV.    FACTUAL ALLEGATIONS

#### A.    Usury Laws Generally

75.    Prohibitions on usury and other limitations on excessive interest rates can be traced back to the origins of human civilization, before the concept of money was invented.  According to University of Utah law professor and senior adviser to the Consumer Financial Protection Bureau ("CFPB"), Christopher Peterson, the ancient Babylonians set a cap on the amount of grain that could be charged as interest, recognizing the considerable danger to families from becoming trapped in debt that cannot be repaid.  Professor Peterson also observed, in a 2012 article published in the Washington & Lee Law Review, that "[e]arly American leaders held usurious lenders in contempt," and "[a]ll of the thirteen original American colonies aggressively regulated consumer loans with annual interest rate caps of between eight and five percent, with six percent being most typical."

76.     While public policy shifts in the twentieth century led to a relaxation of many state interest rate caps, most states still have strict laws against usury and regulate or prohibit high interest, short term consumer loans.  In addition, other federal and state laws protect consumers from excessive interest rates and other predatory lending practices.  The rationale underpinning these contemporary consumer protection laws parallels the ancient Babylonians' concern with excessive interest rates: people facing an urgent need for cash should be protected from lenders who would unfairly take advantage of a person's difficult financial situation and potentially trap that person in crushing debt.

**B.     Usury Law Avoidance Schemes**

77.     Predatory lenders, including "payday" lenders and other unscrupulous individuals and entities, have long sought ways around state interest rate caps and other laws intended to protect Americans from high-interest, short-term loans.[5]  Those efforts took off starting in the 1980s and 1990s, after a handful of states eliminated their interest rate caps.

**1.     Defendant Curry's Rent-a-Bank Scheme**

78.     Payday lenders devised a scheme to exploit those few states' permissive laws and make high-interest loans to borrowers throughout the United States at rates far greater than allowed in the borrowers' home states.  That scheme, known in the money lending industry as the "rent-a-bank" model, typically involved a partnership between a payday lender and a federally chartered bank located in a state with no interest rate cap.  While the payday lender or other "non-depository institution" is subject to the laws of the state in which the borrower resides (including that state's

---

[5] The terms "payday loan" and "payday lender" do not have set definitions.  *See, e.g.*, CFPB, *What is a payday loan*, available at https://www.consumerfinance.gov/ask-cfpb/what-is-a-payday-loan-en-1567/.  As used herein, the terms "payday loan" and "payday lender" are used in connection with relatively small, short-term loans made to individuals at interest rates that exceed other types of high cost consumer borrowing (for example, credit cards, which charge interest rates ranging from 12% to 30%).

interest rate cap), federal preemption allows a federally regulated bank to charge whatever interest rates are permitted in *the bank's* home state.

79.     The "rent-a-bank" scheme was predicated on a pretense that the bank would be acting as the "lender" when, in reality, the payday lender performed substantially all of the lending functions, including the marketing, funding, servicing, and collection of the loans.  The bank's role was to do nothing more than serve as the nominal lender, effectively "renting" its federal charter to the payday lender.  Significantly, the bank in the "rent-a-bank" scheme had no financial interest in the loan transactions other than the fees it received from the payday lender.  Since the payday lender funded the loans and bore the economic risk of loan defaults, it was the *de facto* lender.

80.     By the mid- to late-2000s, federal and state regulators were cracking down on "rent-a-bank" operations as improper attempts at an end-run around state interest rate caps and other restrictions on payday lending.  One of those unlawful operations involved an online lending entity called "LoanPoint USA," which sought to exploit the lack of an interest rate cap under Utah law and charge borrowers across the country triple-digit interest rates for short-term loans.  LoanPoint USA was created by Defendant Curry and run through entities called Geneva Roth Capital and Geneva Roth Ventures, two Curry-controlled companies that shared a name with a fictional shell company owned by the villain in the 1987 movie, "Wall Street," Gordon Gekko (known for the infamous line, "greed is good").  LoanPoint USA appears to have ceased operations after Curry and the Geneva Roth entities settled enforcement actions brought by regulators in at least six states.

## 2.     Defendant Curry's Rent-a-Tribe Scheme

81.     Starting in approximately 2009, as it was becoming clear that the days of the "rent-a-bank" scheme were numbered, Defendant Curry began to pursue a new strategy intended to keep his illegal online payday lending operation one step ahead of law enforcement.  Under this new

law avoidance scheme, which would become known as "rent-a-tribe," Defendant Curry, entities that he controlled, and other financial backers would attempt to cloak their online payday lending operation in the mantle of a Native American tribe's sovereign immunity. Payday loans would be made in the name of an entity to be called American Web Loan that would be established by a cooperating Native American tribe.

82. Although American Web Loan would serve as the nominal lender, Curry-owned and/or affiliated entities would provide all of the substantive operations for the enterprise including, among other things, marketing and lead generation, application processing, underwriting, technical support, electronic funds transfers, loan servicing, and collections. Moreover, funding for the loans would be provided by Curry-owned and affiliated entities, as well as other investors. In exchange for enacting tribal laws and creating the business entities required to enable and carry out this scheme, Defendant Curry's payday lending operation would provide the cooperating tribe with a cut of the revenues generated by American Web Loan.

83. In concept, the "rent-a-tribe" scheme is substantially similar to the unlawful "rent-a-bank" model. The key difference is that, rather than attempting to exploit an apparent loophole in federal preemption by lending in the name of a federally chartered bank located in a state with no interest rate cap, "rent-a-tribe" lending seeks to operate completely outside of state and federal law. By making loans in the name of an entity that purports to be an instrumentality of a Native American tribe, the payday lending operation attempts to hide behind the principle of tribal sovereign immunity that, in certain instances, shields business operations of Native American tribes from the application of state and federal law.

84. For American Web Loan, this pretense is belied by the fact that Defendant Curry, entities he controls, and other outside investors completely control and fund the payday lending

Case 4:17-cv-00145-RAJ-RJK   Document 41   Filed 03/09/18   Page 42 of 109 PageID# 489

operation. Moreover, unlike the exploitation of existing federally chartered banks and existing state laws in the "rent-a-bank" model, Defendant Curry's "rent-a-tribe" scheme required a cooperating tribe to construct an entire legal and business system from scratch through the adoption of made-to-order tribal laws and the creation of business entities whose purpose was to enable and serve the payday lending operation.

85.     Defendant Curry outlined the structure of the American Web Loan scheme in a slide presentation with the names Geneva Roth Companies and American Web Loan on the cover page (the "Geneva Roth Presentation"). The Geneva Roth Presentation, which Curry used to pitch the scheme to potential investors and/or potential cooperating Native American tribes, indicates that the cooperating tribe and any specially created tribal entities would have no meaningful role in the operation of American Web Loan, similar to the bank in a "rent-a-bank" scheme.

86.     As shown in the slide below from the Geneva Roth Presentation, every aspect of the lending process would be controlled or directed by Curry-controlled entities, including Geneva Roth entities and Defendant MacFarlane Group. Moreover, all of the financing behind the lending operation was to be provided by Curry-affiliated entities and other outside investors, with no financial backing from the tribe. The sham nature of the operation was highlighted by the use of a particularly candid term in the Geneva Roth Presentation to describe the loans to be issued through American Web Loan: "Choice of Law Loans."



87.     Another slide in the Geneva Roth Presentation, shown below, indicates that Defendant MacFarlane Group (wholly owned by Defendant Curry) would have 100% ownership of or control over the venture capital financing for the operation, the loan servicing entity to be created, and the software needed to perform the necessary loan underwriting and approval functions.  Moreover, the slide shows an additional deceptive aspect of the scheme:  the tribal entity would "hold" the American Web Loan loans for a brief period, 14 days, before "selling" the loans to a Curry-controlled servicing entity that would bear the risk of losses associated with the loans.

Case 2:18-cv-02747-MSG Document 17-4 Filed 09/14/18 Page 45 of 110



88.     In late 2009, Defendant Curry approached the Otoe, a Native American tribe headquartered in the rural community of Red Rock, Oklahoma, to discuss Curry's payday lending business and his proposal for the establishment of American Web Loan.  According to the Bloomberg Report, the Otoe's former treasurer, Bat Shunatona, stated that Defendant Curry met with the Tribe's leadership in Oklahoma and "put on a dog-and-pony show about how good they [Curry's payday loans] are, how much money they were bringing in."

89.     To the economically struggling Otoe, who had few opportunities for economic development and were reliant upon income from casino operations that faced increasing competition – thereby threatening the Tribe's ability to continue making quarterly payments of approximately $800 to its members – Curry's offer had considerable appeal.  The Tribe was eager to receive whatever money Curry's payday lending operation might provide, and it would cost the Tribe essentially nothing to become involved.  As reported in the Bloomberg Report, the Tribe's

governing "council asked few questions during Curry's presentation and granted a license to American Web Loan in February 2010." In exchange for Defendant Curry's purchase of the Tribe's sovereignty to provide a front for his payday lending operation, the entities associated with the Tribe receive 1% of the revenues from the American Web Loan scheme.

90.     Just as Defendant Curry had outlined in the Geneva Roth Presentation, the Tribe and its specially created entities have no substantive involvement in the operation or funding of American Web Loan. According to the Bloomberg Report, Moncooyea, a former vice chairman of the Tribe who was involved in entering into the deal with Curry and who was "put in charge" of American Web Loan, stated that, "[a]ll we wanted was money coming into the tribe … [a]s time went on, I realized that we didn't have any control at all." Moncooyea, purportedly the head of a multi-million-dollar online lender, described the reality of his extremely limited role at American Web Loan: "I didn't do much at all, just looked at the checks and passed them on." Moreover, as described in the Bloomberg Report, Moncooyea became disappointed with the Tribe's lack of a substantive role in the operation, lamenting that rather than gaining experience in the lending business, "[w]e were just a pawn."

91.     Starting in 2010, after the Tribe took the steps necessary to launch American Web Loan, Defendant Curry's payday lending business began its migration under the umbrella of American Web Loan and another Otoe-established entity called Clear Creek Lending. As alleged herein, Clear Creek Lending was a fictitious or "d/b/a" business name used by American Web Loan that appears to have been discontinued or otherwise merged into American Web Loan at some point before January 2015.

92.     Promptly after it was set in motion, Defendant Curry's plan for the American Web Loan "rent-a-tribe" scheme proved to be incredibly successful. According to a September 2013

slide show presented to potential investors by Defendant MacFarlane Group, which was prepared and circulated with the assistance of Defendant Middlemarch Partners (the "2013 Middlemarch Presentation"), a New York-based merchant bank, Curry's payday lending operation increased loan originations by nearly 71% between 2010 and 2011, from $35 million in 2010 to $59.7 million in 2011.  According to the 2013 Middlemarch Presentation, loan originations had risen to $63.1 million in 2012 and were on track to grow to $85.4 million in 2013 – an increase of 144% since implementation of the "rent-a-tribe" scheme.  The 2013 Middlemarch Presentation also touted that Defendant MacFarlane Group's "rent-a-tribe" lending generated strong growth in revenues and pre-tax income, with combined annual growth rates of 12% and 20%, respectively, and projected 2013 revenues of $144.3 million and projected 2013 pre-tax income of $17.5 million.

93.     The 2013 Middlemarch Presentation was provided to various hedge funds, private equity firms, and other potential investors in an effort to secure $60 million in financing, an amount that would double the lending capital available to the American Web Loan payday lending scheme. The structure of the American Web Loan operation that was detailed in the 2013 Middlemarch Presentation was substantially identical to what Defendant Curry had outlined in the Geneva Roth Presentation: Curry-owned or affiliated entities providing all funding and lending functions for loans made through a nominal lender affiliated with the Tribe.  By the time of the 2013 Middlemarch Presentation in September 2013, Defendant MacFarlane Group – and another Curry-owned company, Defendant SOL – had replaced various Geneva Roth entities (as their *de facto* or legal successors) in terms of providing the substantive functions for the American Web Loan lending operation, including loan marketing, origination, underwriting, and servicing.  In addition, the MacFarlane Group and SOL provided the necessary funding for the operation with their own capital and capital raised from other investors that were unaffiliated with the Tribe.  Below are

slides from the 2013 Middlemarch Presentation highlighting the limited nature of the Tribe's role in the scheme and the management and control over the payday lending operation by the MacFarlane Group, including with respect to loan marketing, origination, underwriting, servicing, and infrastructure that includes proprietary software and systems that support MacFarlane's capabilities.



94.     As of September 2013, Defendants' online payday lending scheme had been marketed to the public under two "brands" depending on the size and terms of the loans offered. The "American Web Loan" brand (based on the name of the business entity established by the Tribe in February 2010) offered relatively smaller loans of between $500 and $1,400, with repayment terms of up to six months.  The "Clear Creek Lending" brand (using the name that the Tribe established as a fictitious, d/b/a name of American Web Loan on September 4, 2013) offered loans of greater than $1,400, with repayment terms of between six and eighteen months.  Those and other terms, including the astronomically high interest rates charged in connection with those loans, were provided to potential investors in the 2013 Middlemarch Presentation.  Moreover, the 2013 Middlemarch Presentation clearly revealed the sham nature of the "rent-a-tribe" online

payday lending scheme to potential investors by referring to the American Web Loan and Clear Creek Lending loans as "MacFarlane Installment Loan Offerings" – *not* loan offerings of the Tribe.

### Summary of MacFarlane Installment Loan Offerings

| | American Web Loan | Clear Creek Lending |
|---|---|---|
| Loan Size | Loan size range between $500-$1,400 | Loans greater than $1,400 |
| Term | 0-6 months with balloon payment | 6-18 months fully amortizing |
| Rate Structure/ payments | 500-700%/interest only and balloon principal payment | 200-600 %/fully amortizing |
| Refinance Options | Amortizing w/ balloon | Amortizing |

STRICTLY PRIVATE & CONFIDENTIAL                                    13                          MIDDLEMARCH
                                                                                              PARTNERS

95.     Defendants discontinued using the brand name Clear Creek Lending in connection with their unlawful online payday lending scheme sometime before January 2015 and have since offered all of their online payday loans under the single name of American Web Loan.  This decision coincided with the October 24, 2014 announcement of an enforcement action by the Connecticut Department of Banking against Clear Creek Lending, Shotton, and another online payday lending entity affiliated with the Tribe (the "Connecticut Enforcement Action").  The Connecticut Enforcement Action sought to, among other things, stop American Web Loan and the Tribe's other lending entities from offering loans in Connecticut at rates above the state's 12% interest rate cap, and to impose financial penalties related to those unlawful loans.

### a. Financial Backing and Control of Defendant Curry's Rent-a-Tribe Scheme

96.    At least one major Wall Street investor has chosen to join in the financing and direction of Defendant Curry's "rent-a-tribe" online payday lending scheme.  As reported in the Bloomberg Report, Defendant Medley Fund, a New York hedge fund, has provided financial backing for American Web Loan since initially making a $22.9 million loan to the Curry-owned MacFarlane Group in approximately December 2011 to finance and grow the American Web Loan "Choice of Law" loan portfolio.[6]  The Medley Fund continues to provide financing in support of the American Web Loan scheme.

97.    In providing initial financing for the scheme, Medley retained a first lien security interest on substantially all assets of MacFarlane Group and/or American Web Loan. Consequently, Medley maintained control over the necessary funds to facilitate, carry out, and continue the American Web Loan scheme.

98.    While Medley touted having successfully closed a "$22,900,000 Senior Secured 1st Lien Asset-Based Credit Facility" in December 2011 to Medley Fund investors in the Medley Presentation, Medley was circumspect regarding the recipient of this financing.  Rather than identifying the name of the borrower or referring to tribal-affiliated payday lending (or even payday lending more generically), Medley identified the transaction with the benign-sounding description, "Online Consumer Finance Platform," as shown below:

---

[6] Per correspondence received from Medley's counsel on February 14, 2018, after the filing of Plaintiffs' initial complaint, Defendant Medley Fund admitted that it "made a loan to AWL." In follow-up correspondence, Medley's counsel provided unverified documentation purporting to describe the repayment of a loan to one particular entity, ALWH (*see* ¶ 64, *supra*).  It is not clear if this "loan to AWL" or the loan to AWLH was *in addition to* the loan to Defendant MacFarlane Group described in the Bloomberg Report, or if the loan that Medley reportedly made to MacFarlane Group was in some manner assumed by or transferred to Defendant American Web Loan.  Medley Fund appears to have made other loans to different Curry-affiliated entities, including but not limited to Integrated Commerce, LLC.

# Closed & Committed Transactions



**Javlin Specialty Finance**

Sector: Specialty Finance

$20,000,000
Senior Secured 1ˢᵗ Lien
Asset-Based Credit Facility

April 2011



**Cenegenics LLC**

Sector: Healthcare & Wellness

$21,000,000
Senior Secured 1ˢᵗ Lien
Credit Facility

July 2011



**Astral Brands, Inc.**

Sector: Consumer Products

$18,600,000
Senior Secured 1ˢᵗ Lien
Credit Facility

August 2011



**Online Consumer Finance Platform**

Sector: Consumer Finance

$22,900,000
Senior Secured 1ˢᵗ Lien
Asset-Based Credit Facility

December 2011



**Fifth Season Financial, Inc.**

Sector: Insurance

$20,000,000
Senior Secured 1ˢᵗ Lien
Asset-Based Credit Facility

February 2011



**GJS LLC**

Sector: Consumer Services

$19,000,000
Senior Secured 1ˢᵗ Lien
Credit Facility

June 2011



**Gemcap Solutions**

Sector: Financial Services

$21,000,000
Senior Secured 2ⁿᵈ Lien
Asset-Based Credit Facility

September 2011

**MEDLEY**

Confidential. Do not copy or distribute. 24

99.     The Medley Presentation included performance numbers for various Medley Fund investments, including the investment in the so-called "Online Consumer Finance Platform," indicating that Medley's investment in the American Web Loan scheme provided the highest cash yield and gross contractual internal rate of return of any investment in the Fund's portfolio:

## Origination Summary & Pipeline

**The following two pages show closed, closing, approved and pipeline investments with pricing and returns**

| ($ millions) | Sector | Structure | | Pricing | | Gross Contractual Return | | Gross Return w/ Equity | |
|---|---|---|---|---|---|---|---|---|---|
| | | Size | Security | Cash Yield | PIK | IRR[1] | MOI | IRR[1] | MOI |
| 1 | Cenegenics | $21.0 | Senior - 1st Lien | 10.0% | 2.5% | 14.4% | 1.56x | 14.9% | 1.59x |
| 2 | Javlin Financial | 20.0 | Senior - 1st Lien | 12.0% | 5.0% | 18.7% | 1.89x | 24.6% | 2.60x |
| 3 | Fifth Season | 20.0 | Senior - 1st Lien | 10.0% | 4.0% | 15.1% | 1.77x | 17.3% | 1.94x |
| 4 | GJS | 19.0 | Senior - 1st Lien | L+9.0%[2] | 3.0% | 15.1% | 1.57x | 15.1% | 1.57x |
| 5 | Plews & Edelmann | 4.0 | Senior - 2nd Lien | 12.0% | 3.0% | 16.7% | 1.56x | 32.9% | 2.72x |
| 6 | Astral Health & Beauty | 18.6 | Senior - 1st Lien | L+11.0% | 2.0% | 16.9% | 1.73x | 16.9% | 1.73x |
| 7 | The Legacy Companies | 30.0 | Senior - 2nd Lien | 12.0% | 3.0% | 17.4% | 1.89x | 17.9% | 1.93x |
| 8 | Gemcap | 21.0 | Senior - 2nd Lien | L+10.0% | 0.0% | 12.6% | 1.60x | 25.3% | 2.44x |
| 9 | Home Market Foods | 15.0 | Senior - 2nd Lien | L+10.0%[4] | 2.0% | 16.2% | 1.88x | 16.2% | 1.88x |
| 10 | Coyne Textile Services | 18.0 | Senior - 2nd Lien | L+12.0% | 3.0% | 18.2% | 2.01x | 18.2% | 2.01x |
| 11 | Online Consumer Finance Platform[6] | 22.9 | Senior - 1st Lien | 15.0% | 0.0% | 25.6% | 1.61x | 25.6% | 1.61x |
| 12 | Memorial MRI & Diagnostic | 22.0 | Senior - 1st Lien | 12.0%[3] | 2.0% | 15.2% | 1.69x | 26.4% | 2.56x |
| 13 | AUL Corporation | 16.4 | Senior - 1st Lien | L+10.0% | 2.5% | 15.9% | 1.88x | 16.6% | 1.93x |
| 14 | Santa Cruz Nutritionals | 10.0 | Senior - 1st Lien | 11.5% | 3.5% | 16.3% | 1.49x | 16.3% | 1.49x |
| 15 | Gulf Coast Asphalt Company | 25.0 | Senior - 2nd Lien | L+11.0%[2] | 4.0% | 17.0% | 1.78x | 17.0% | 1.78x |
| | Weighted Average | 18.9 | | 12.6%[5] | 3.7% | 16.7% | 1.72x | 20.2% | 2.01x |
| | Sub Total | $282.9 | | | | | | | |

| | |
|---|---|
| Senior - 1st Lien | 54% |
| Senior - 2nd Lien | 46% |

1.  The gross projected IRR does not take into consideration the effect of base management fees, incentive fees or accrued fund related expenses. There can be no assurance that these returns will be achieved and actual results may differ significantly. Total represents weighted average and includes the benefit of loan origination and administration fees paid by the borrower.
2,3,4.  Subject to a LIBOR floor of 1.00%, 1.50% and 2.00%, respectively.
5.  Represents weighted average and includes the impact of LIBOR floors and forward LIBOR curve assumptions according to industry standards.
6.  Contractual return includes 4.0% upfront fee and an original issue discount of 12.6%.

**MEDLEY** ——————————————————————— *Confidential. Do not copy or distribute.18*

100. In the Medley Presentation, the Medley Defendants describe the extensive evaluation, monitoring, and oversight that they (including the Taubes) provide over all of the companies in which the Medley Fund invests, including MacFarlane Group/American Web Loan. Medley's efforts begin with gaining a full understanding of the investment through the underwriting process, which includes a review of business plans, "financial, industry, legal, credit and regulatory analysis," and other due diligence that includes meetings with management, site visits, financial analyses, and analyses of tax and legal structures. Medley's outline of this process includes the following two slides:

# Investment Process

· **Consistent and diligent approach to all investment and portfolio management processes**

| Sourcing | – 25 investment professionals<br>– Significant repeat and referral deal flow<br>– Avoid broadly marketed and syndicated transactions<br>– Over 60 deals closed in last 7 years |
|---|---|
| **Due Diligence and Structuring** | – Rigorous in-house financial, industry, legal and business diligence<br>– Third-party appraisal, audit and industry specific analysis<br>– Background and tax compliance checks<br>– Engage outside legal counsel with industry specific expertise |
| **Monitoring and Exit** | – Weekly contact and quarterly visits with borrowers<br>– Proprietary reporting and monitoring as well as independent valuation<br>– Rigorous collateral valuation, cash monitoring and anti-fraud protection<br>– 15 investment professionals with deep workout experience |

**MEDLEY** — *Confidential. Do not copy or distribute. 11*

# Underwriting Process: *Structure*

| | Investment Team | FA&O[1] | Investment Committee |
|---|---|---|---|
| **Action Items** | • Issue comprehensive DD list<br><br>• Initiate third party reports (background checks, earnings quality, market reports)<br><br>• Negotiate term sheet and engage counsel<br><br>• Financial/credit analysis, site visit, customer/supplier calls, tax/legal structure analysis<br><br>• Prepare detailed summary of all diligence findings for investment committee meeting | • Draft internal fund documents (participation agreements, formation docs)<br><br>• Finalize tax and legal structure<br><br>• Analyze effect on fund liquidity<br><br>• Oversee and execute funding | • Assist in diligence process<br><br>• Confirm tax and legal structure given fund affiliates<br><br>• Approve final legal docs and terms not covered in the initial term sheet (eg covenants)<br><br>• Provide follow-up DD requests after investment committee meeting and subsequent funding approval |
| **Deliverables** | ✓ Detailed sensitivity analysis<br>✓ Executed term sheet/commitment letter<br>✓ Satisfactory completion of DD list and background checks<br>✓ Third party reports, customer checks<br>✓ Preliminary legal documents and structural check<br>✓ Investment committee memo, closing memo and funds flow memo | ✓ Internal fund documents<br>✓ Approval of final legal and tax structure<br>✓ Investment funding<br>✓ Funds flow | ✓ Participation in site visits, meetings with management, financial analysis<br>✓ Review of results of final DD and lead investment committee discussion<br>✓ Execution of final legal documents<br>✓ Execution of funding request and closing memo |
| **Team** | • Investment Committee member, senior investment professional (Sr. VP/Principal), junior investment professional (VP/Associate)<br><br>• Outside counsel and consultants (valuation and background check firm) | • CFO, Controller, Compliance Officer<br><br>• Fund Counsel (Seward & Kissel) | • Andrew Fentress<br><br>• Brook Taube<br><br>• Seth Taube |

1. Financial, Accounting & Operations team.

**MEDLEY** — *Confidential. Do not copy or distribute. 36*

101.    The Medley Presentation also describes the extensive and ongoing monitoring that Medley does for each of its investments under the mantle of "Risk Management," including "[r]igorous oversight" that includes, among other things, weekly calls with its borrowers, review of financial statements and cash reconciliation on a monthly basis, and quarterly on-site visits:

## Risk Management

### Portfolio Construction

**Broad diversification**
 – Sector / industry
 – Collateral
 – Position size

**Careful structuring**
 – UCC (lien) filings
 – Cash control agreements
 – Covenants
 – Insurance

**Rigorous due diligence**
 – Systematic underwriting process
 – Multiple stages of approval
 – Third-party financial review
 – Independent appraisals

### Asset Management

**Rigorous oversight**
 – Weekly borrower calls
 – Monthly financials, cash reconciliation
 – Quarterly onsite visits
 – Active covenant monitoring

**External checks and balances**
 – Independent valuation and collateral analysis
 – Loan servicing – Deutsche Bank
 – Fund administration – SEI
 – External forensic accounting team
 – Outside legal counsel

**MEDLEY** ——————————————— *Confidential. Do not copy or distribute. 12*

102.    Another slide in the Medley Presentation provides further detail about Medley's financial monitoring of its investments (including references to Medley's collection and analysis of borrower information with its "AMS" financial reporting and records system) and also notes the participation of the Fund's Investment Committee, including the Taubes, in key oversight activities including "[a]ctive participation in account management."

103.    The Medley Presentation further details Medley's "hands-on approach" to account management, monitoring of its investments, and coordination with the management and leadership of the companies in which it invests.  As noted in the following slide, Medley's approach includes "frequent interaction with management, attending board of directors' meetings, . . . and developing portfolio company strategy with equity investors."

## Account Management Process

**Account Management Overview**

Medley's monitoring process includes frequent interaction with management, attending board of directors' meetings, consulting with industry experts, working with third-party consultants and developing portfolio company strategy with equity investors. Each investment team evaluates monthly financial reporting packages from portfolio companies that detail operational and financial performance. Monthly data is entered into a proprietary, centralized, electronic database.

Additionally, each investment team continually monitors future liquidity and covenant compliance. Medley believes this hands-on approach helps in the early identification of any potential problems.

| Monthly Activity | Internal Review Process | External Review Process |
|---|---|---|
| · Update financial reporting | · Weekly all-hands deal call | · Independent valuation analysis |
| · Update asset management system (AMS) | · Monthly credit scoring by PM | · Loan servicing – Deutsche Bank |
| · Management calls and site visits | · Monthly portfolio review with each deal team | · Fund administration – SEI |
| · Update macro leading indicators | · Determine appropriate action items | |
| · Industry trends and press releases | | |

**MEDLEY** ———————————————————— *Confidential. Do not copy or distribute. 42*

104.    As part of its "Risk Management" efforts, described *supra*, Medley engages in "[c]areful structuring" of its portfolios through the use of "UCC (lien) filings" to perfect its secured interests in the companies in which it invests. On December 20, 2011, Defendant Medley Fund filed multiple UCC financing statements with the Delaware Department of State to perfect its secured interests in a multitude of entities associated with the American Web Loan online payday lending scheme, including entities identified as non-defendant interested parties herein. Medley has continued to hold secured interests in those and other associated entities and, in fact, Defendant Medley Fund filed numerous UCC financing statement amendments with the Delaware Department of State on or around June 27, 2016 and on subsequent dates. Those amended UCC financing statements were in effect (not terminated) as of the date that Plaintiffs filed their complaint in this action and remain in effect.

105.     Other investors also provide financial backing to the MacFarlane Group for American Web Loan's "Choice of Law" loan portfolio, including but not limited to the eight entities that Defendant Curry listed in the Geneva Roth Presentation.  The investors identified in the Geneva Roth Presentation include: Centurion Funding, TGI Investments, Geneva Roth Capital, Oakmont, Dant, Chieftain, Dinero, and Geneva Roth Ventures.  Not all of those names appear to be legally registered business entities, and six of the entities (Oakmont, Dant, Chieftain, and Dinero, as well as the two Geneva Roth entities) are either controlled by Defendant Curry or share a common business address with the MacFarlane Group and other Curry-controlled entities in Mission, Kansas.  Since it is unlikely that Defendant Curry's personal funds are the sole source of the approximately $30 million in venture capital financing provided by the investor entities identified in the Geneva Roth Presentation (or the source of the $50 million in financing that Defendant MacFarlane Group sought in 2011), the most plausible explanation for those and other entities and their close connections to Curry is that they are nothing more than shell companies created to mask the identities of other investors in the American Web Loan scheme.

106.     Moreover, non-defendant entities described herein and/or other as-yet unknown entities likely provide financing for the scheme given that MacFarlane Group was seeking $50 million in capital in 2011, only $22.9 million of which would have been satisfied by the loan made by Medley through Defendant Medley Fund.  To the extent that MacFarlane Group/American Web Loan did not reduce its capital requirements, and to the extent that Medley was to serve a similar role to the one contemplated for Cyan in the transaction that fell apart prior to Medley's participation in late 2011 (as alleged herein), Medley likely took on the responsibility for securing additional financing for MacFarlane Group/American Web Loan through a syndicated loan or loans in which another lender or group of lenders ultimately provided the funds.  This additional

role for Medley appears to be contemplated by UCC filings made by Defendant Medley Fund (including those referenced herein), which identify the secured party as "Medley Opportunity Fund II LP, as Administrative Agent." This additional designation, "Administrative Agent," would appear to indicate that Defendant Medley Fund was not acting solely on its own behalf – the UCC filings were also made to protect secured interests of other unidentified entities or individuals.

107.   Additional investors beyond Medley and the non-defendant interested party entities identified in the Geneva Roth Presentation – individuals and entities among the as-yet unknown John Doe Defendants – likely have provided, and continue to provide, the necessary financial support for the American Web Loan online payday lending scheme. Indeed, in early 2017, Defendant Curry, through and with the assistance of Defendant Middlemarch, issued another investor solicitation for an investment opportunity with the code name "Project Palomino" (the "Middlemarch Solicitation"). Based on the description and business history of "Project Palomino" set forth in the Middlemarch Solicitation, the investment opportunity described therein clearly involves the MacFarlane Group or some other Curry affiliated payday lending entity.

108.   The Middlemarch Solicitation "seeks up to $90 million of debt to refinance and expand [the American Web Loan payday lending scheme's] $45 million debt facility" in order to "double or triple its loan portfolio size over the next three to four years." Moreover, the Middlemarch Solicitation notes explosive growth in Curry's illegal scheme since the 2013 Middlemarch Presentation, with revenues increasing from $154.7 million in 2014 to $183.4 million in 2016. The Middlemarch Solicitation projects revenues from Curry's illegal scheme to climb from $234.3 million in 2017 to $272.1 million in 2020.

109.   Although Defendant Curry has succeeded in securing the necessary outside funding to finance American Web Loan's lending activity, at least one potential investor withdrew its

interest in participating in the scheme.  In early 2011, Defendant MacFarlane Group worked with the Chicago-based investment banking firm Ablum Brown & Company to pitch an investment in the MacFarlane Group to dozens of hedge funds, private equity investors, and others including a New-York based middle-market commercial lender, Cyan Partners, LP ("Cyan").  Cyan initially committed to making a $50 million debt investment in the MacFarlane Group in April 2011.  However, Cyan wound up walking away from the deal later that year due to concerns about the nature of the loans being made by the MacFarlane Group through American Web Loan.  As described in deposition testimony and other evidence from litigation involving Defendant MacFarlane Group, the Medley Defendants stepped in to provide the necessary financing to MacFarlane Group and/or American Web Loan as of approximately December 2011.

110.    Cyan's concern about the MacFarlane Group/American Web Loan payday lending scheme was not the only investor voice of concern about financing online payday loans through American Web Loan.  One investor in Defendant Medley Fund, a California public pension fund (the "California Fund"), expressed concern about Medley's participation in the scheme upon learning more about the "Online Consumer Finance Platform" that had been identified in the Medley Presentation.  In an email dated May 7, 2013, a California Fund board member requested an explanation from the California Fund's external money manager (emphasis added):

> I recommend you have [someone from the external money manager firm] explain the first loan on the MOF II Original Summary and Pipeline to American Web Loan Holdings, LLC, American Web Loan, which is a tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians, our rate of return *and the rate charged to the customer*.  *It appears we are giving a reasonable loan to a group which is charging an unreasonable rate*.

The California Fund's external money manager forwarded the board member's email to Defendants Brook Taube and Seth Taube for a response.  Defendant Seth Taube provided a response to the question on May 9, 2013, side-stepping the California Fund's concern about the

"unreasonable" interest rates that American Web Loan was charging borrowers; Seth Taube's email signature indicated an affiliation with Medley LLC.

        **b.**    **American Web Loan Online Systems "Powered By GOLDPoint Systems"**

111.    In contrast to a traditional bank or a lender with a "brick-and-mortar" storefront, an online lender requires a presence on the internet that can handle substantially all customer-facing aspects of the operation. Among other things, the American Web Loan online payday lending scheme requires maintaining a website or other online application that allows potential customers to apply for loans and submit information in connection with the loan application process, and that provides an account portal for customers to review their loan balances, make payments, and perform other loan-related functions. Defendant GOLDPoint provides these necessary services to the AWL payday pending enterprise alleged herein.

112.    On or about May 8, 2014 Defendant GOLDPoint entered into the GOLDPoint Contract with Defendant MacFarlane Group. Pursuant to the GOLDPoint Contract, GOLDPoint is to provide data processing and related services including the generation of reports (including certain daily reports by 7:00 a.m. each day), maintenance of computer and communications systems in order to receive loan-related data from MacFarlane Group, and development and hosting of necessary websites (where the content of sites "shall be subject to approval by [GOLDPoint]"). The GOLDPoint Contract includes an "Exhibit A" pricing schedule setting forth the pricing arrangements under the contact that are based, in significant part, on the volume of loans originated and the number of active loan accounts, including certain per-application and per-closed loan fees, monthly fees based on the numbers of active accounts.

113.    On or about October 27, 2016, the GOLDPoint Contract was amended to extend the term through May 31, 2019, update the "Exhibit A" pricing schedule, and assign the interests

of Defendant MacFarlane Group to Defendant AWL, Inc. Notably, the "Assignment and Assumption" clause in the October 27, 2016 amendment described the purported transition from MacFarlane Group to AWL, Inc.:

> As of October 3, 2016, Red Stone, Inc. ("Red Stone"), a wholly-owned corporation formed under the laws of the Otoe Missouria Tribe of Oklahoma, a federally recognized tribe ("Tribe"), has merged with and is the surviving corporation with [MacFarlane Group]. . . . As of October 6, 2016, Red Stone, [sic] transferred all assets to AWL, Inc. ("AWL"), a wholly-owned corporation formed under the laws of the Tribe.

114. As alleged herein, certain of American Web Loan's loan account web pages including the borrower account and payment pages at the site myaccount.americanwebloan.com, state that they are "Powered By GOLDPoint Systems," demonstrating that GOLDPoint is, in fact, providing the technology, systems, and services necessary to enable the American Web Loan online payday lending scheme to collect unlawful debts through, among other things, the online interfaces and payment systems used by consumers.

### c.    American Web Loan is not an "Arm of the Tribe"

115. American Web Loan purports to be a "tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians . . . operating within the boundaries of the Otoe-Missouria Reservation." The Tribe has taken the position that since American Web Loan is a tribally created, wholly owned business entity of the Tribe, the principle of tribal sovereign immunity applies to shield American Web Loan from the application of state and federal law. For several reasons and as alleged herein, American Web Loan was devised by Defendant Curry to perpetrate an illegal lending scheme and is substantially operated and controlled by entities outside of the Tribe. Therefore, American Web Loan is *not* a legitimate arm of the Tribe and tribal sovereign immunity does *not* shield American Web Loan or any other Defendants from liability in connection with the unlawful online payday lending scheme.

116.    At least one state has examined the question of whether American Web Loan operates as a legitimate arm of the Tribe and has concluded that it is not.  After nearly three years of administrative and judicial adjudication, the principal financial services regulator in the State of Connecticut has determined that American Web Loan is not an arm of the Tribe.  On June 14, 2017, the Commissioner of the Connecticut Department of Banking issued a Restated Order and Ruling on Motion to Dismiss in the Connecticut Enforcement Action (the "Connecticut Ruling"). According to the Connecticut Ruling, neither American Web Loan's fictitious d/b/a entity, Clear Creek, nor a separate online payday lender operated by the Tribe called Great Plains Lending, are arms of the Tribe.  Among the Connecticut Ruling's Findings of Fact are the following facts:

13.   The Secretary of the Tribal Council of the Tribe issued a certificate of Incorporation to American Web Loan, Inc. on February 10, 2010 (AR 98).

14.   The Tribal Council approved a resolution registering "Clear Creek Lending" as a fictitious name of American Web Loan, Inc. on September 4, 2013 (AR 101-102).

117.    The Connecticut Ruling found, with respect to the question of whether American Web Loan/Clear Creek is an "arm of the tribe," that:

Respondent Clear Creek failed, by any reasonable measure, to satisfy its burden of proof and to provide any meaningful or reliable evidence that Clear Creek is an arm of the Tribe.  Even if the documents relating to Clear Creek that were submitted by Respondents outside the scope of a hearing are given consideration, there is no evidence that Clear Creek's relationship with the Tribe warrants the extension of tribal sovereign immunity to the entity Clear Creek.

118.    Notably, Connecticut's two federally recognized Native American tribes, the Mohegan and Mashantucket Pequot tribes, support the Connecticut Enforcement Action.  The tribes' chairmen appeared alongside the Governor of Connecticut and a key state legislator at an April 13, 2015 press conference to condemn predatory rent-a-tribe online payday lending.  During the press conference, the tribes' chairmen publicly stated that they had rejected similar offers by outside payday lenders who wanted to exploit the tribes' sovereignty to issue illegal, high-interest

loans. Kevin Brown, chairman of the Mohegan tribe, was blunt in his assessment that tribal sovereignty provides no justification for the exploitation of consumers: "[d]enying this business pursuit in the state of Connecticut is not about tribal sovereignty or welfare or business, it is about protecting consumers in the state of Connecticut."

119.   While the documents submitted by the Tribe in response to the Connecticut Enforcement Action (which were found not to support "arm of the tribe" status) are not publicly available, Plaintiffs have identified numerous facts that demonstrate that American Web Loan (including, specifically, Defendant American Web Loan, Inc. and Defendant AWL, Inc.) is nothing more than a sham "front" for the online payday lending operation created by Defendant Curry and operated by him, entities that he controls, and other financial backers.

120.   As alleged herein at ¶¶ 17, 78-94 herein, Defendant Curry devised the American Web Loan online payday lending operation in 2009 and sought the cooperation of a Native American tribe to facilitate the scheme. Shortly after presenting the idea to the Otoe, the Tribe created tribal laws and organizations for the purpose of enabling Defendant Curry's scheme. *See* ¶¶ 82, 84, 91; *see also* ¶¶ 38-40.

121.   The Tribe plays no substantive role in the operation of American Web Loan. As alleged at ¶¶ 85-87, 92-94 herein, the Geneva Roth Presentation and the Middlemarch Presentation detail how Curry and Curry-controlled or affiliated entities provide all of the substantive lending functions for American Web Loan, with the Tribe-created AWL entity(ies) acting solely as the nominal lender. Moreover, as Moncooyea, who had been "put in charge" of American Web Loan, stated in the Bloomberg Report, his role was limited to "just look[ing] at the checks and pass[ing] them on," with the Tribe. (¶ 90.) The sham nature of the Tribe's involvement is further evidenced by the fact that it receives a mere 1% of the operations' revenues. *See* ¶¶ 6, 38, 89. Moreover, the

Tribe has sought to protect its own members from American Web Loan's predatory lending practices by making American Web Loan loans unavailable to members of the Tribe. *See* ¶ 128.

122.    To the extent that Defendant AWL, Inc. purports to be a separately created entity that serves as the nominal lender in Plaintiffs' loan agreements, it also is not a legitimate "arm of the Tribe" for the same reasons that Defendant American Web Loan, Inc. is not an "arm of the Tribe." There is no difference in the limited roles played by any of the American Web Loan entities. Further, Defendant AWL, Inc. is not a legitimate "arm of the Tribe" because it is under the control of Defendant Curry and/or entities owned by Curry. As alleged at ¶¶ 15, 17 herein, the Curry-controlled September 2016 Shell Corporations hold a security interest in substantially all of the assets of Defendant AWL, Inc. Defendant Curry is identified as the point-of-contact for the September 2016 Shell Corporations on UCC filings that describe their security interest in AWL, Inc., and the September 2016 Shell Corporations all share a common mailing address with the company where Defendant Curry currently serves as founder and CEO, and which is referenced in the Middlemarch Presentation as performing substantive lending activity on behalf of the American Web Loan scheme: Defendant SOL. *See* ¶¶ 17, 21, 93.

123.    Similarly, to the extent that Defendant MacFarlane Group claims that it should be considered an "arm of the Tribe" following the Tribe's purported October 13, 2016 acquisition of "MacFarlane Group," Defendant MacFarlane Group should not be considered an "arm of the Tribe." Among other things, there is no indication that the Tribe acquired any assets from Defendant MacFarlane Group and/or whether there were any other transactions that may have transferred ownership of any aspects of the MacFarlane Group's business to Defendant SOL or other Curry-controlled entities. Moreover, to the extent that any operations of Defendant MacFarlane Group were nominally acquired by the Tribe or a tribal entity, Defendant Curry and/or

entities controlled by Defendant Curry, continue to maintain control over Defendant MacFarlane Group and its operations – and/or whatever entity(ies) are currently performing the substantive lending functions for American Web Loan.

124.    Given the central role played by Defendant MacFarlane Group in Defendant Curry's "rent-a-tribe" scheme (as detailed in the Geneva Roth Presentation and the 2013 Middlemarch Presentation, as well as in the history of "Project Palomino" in the Middlemarch Solicitation), it is completely implausible that Curry would have simply given away the proverbial "golden goose" that, in 2016 alone, generated more than $183 million in annual revenues and was projected to receive more than $270 million in revenues in 2020. It is equally implausible that the Tribe, which was receiving only 1% of the operation's revenues and otherwise economically struggling, would have had sufficient capital to purchase the entirety of Defendant MacFarlane Group (and, by extension, the other Defendants' interests in the enterprise) without some source of substantial financing. Moreover, it is implausible that sophisticated investors – including the Medley Defendants and investors that include, but are not limited to, Oakmont, Dinero, Chieftain, Dant, other non-Defendant interested parties and any other as-yet unknown entities providing financial backing to and/or exercising control over the enterprise – would allow the enterprise's chief architect, Defendant Curry, to walk away completely from the enterprise he founded.

125.    The timing of the formation of the September 2016 Shell Corporations, the September 21, 2016 security agreement(s) involving Defendant AWL, Inc. and the tribal entity called Red Stone, Inc., and the announcement of the Tribe's purported acquisition of the MacFarlane Group in October 2016, demonstrates that any "acquisition" of the MacFarlane Group was a sham and that Defendant Curry and entities he controls continue to exert control over the substantive lending functions of American Web Loan. The Middlemarch Solicitation further

demonstrates this, noting, in 2017, after the purported acquisition, that: (a) Curry founded his company in 2002 "as a state rate exportation lender that later transitioned its entire business to a sovereign nation loan servicing model in late 2009"; (b) Curry's company is currently "a top-five fintech company" that "operates from three locations in the U.S." and uses "proprietary underwriting, loan origination and collections systems developed over the past decade"; and (c) Curry, "the owner of the business[,] is prepared to invest alongside interested investors to ensure alignment."  Nowhere does the Middlemarch Solicitation indicate that the MacFarlane Group was acquired by the Tribe or that Defendant Curry has relinquished any control over the enterprise.  Moreover, pursuant to the "Assignment and Assumption" section of the October 27, 2016 amendment to the GOLDPoint Contract, the purported tribal entity called Red Stone, Inc. was promptly folded into Defendant AWL, Inc. – an entity that, as alleged herein, Defendant Curry continues to control: "As of October 6, 2016, Red Stone, [sic] transferred all assets to AWL, Inc. ('AWL') . . . ."

126.    Additional evidence that American Web Loan is not an "arm of the tribe" includes the fact that Defendant AWL, Inc. has registered as a foreign for-profit corporation in at least two states.  AWL, Inc. registered as a foreign for-profit corporation with the Texas Secretary of State on December 22, 2016.  Defendant Curry is identified as a Director of AWL, Inc. in the Texas filing, along with Directors Teddy Grant, John Shotton, Jim Hopper, Brian McGowan, and Vincent Ney.  The Texas registration includes an additional designation for a fictitious name "TX AWL, Inc."  Shortly after filing the Texas registration, on or about January 24, 2017, AWL, Inc. filed a registration as a foreign for-profit corporation with the Kansas Secretary of State, signed by non-defendant interested party Ted Grant as President of AWL, Inc.  Kansas is and has been a key focal point of the operations of the American Web Loan scheme, including as the location of MacFarlane

Group and numerous other entities controlled by Defendant Curry with the same headquarters address in Mission, Kansas. According to the January 24, 2017 Kansas filing, AWL, Inc. sought to be recognized as a "Foreign-For-Profit Corporation" in Kansas to differentiate itself from a Kansas entity called AWL, LLC. On or about December 19, 2017, AWL, Inc. filed a "Business Entity Amendment to Withdraw From Kansas" with the Kansas Secretary of State, signed by Ted Grant as "Authorized Officer" of AWL, Inc. In that withdrawal, AWL, Inc. stated that it "surrenders its authority to transact business in the state of Kansas and withdraws therefrom."

**C.     Defendants' Lending Practices Through the American Web Loan Enterprise**

127.    From American Web Loan's inception in February 2010 and continuing through the present, Defendants have made online payday loans in the name of American Web Loan to individual borrowers throughout the United States at unlawful triple-digit interest rates. Defendants have determined to offer loans issued in the name of AWL to residents of 45 states and the District of Columbia. The only states in which AWL loans are not available are Arkansas, Connecticut, Georgia, New York, and Washington. The exclusion of those five states appears calculated to avoid lending in states with heightened regulatory scrutiny and associated risk. At least three of those states, Connecticut, New York, and Washington, are states in which financial or banking regulators have sought to take various actions against American Web Loan's lending practices. Another of those states, Arkansas, previously targeted Defendant Curry and his Geneva Roth/Loan Point USA payday lending operation.

128.    There are two additional limitations that apply to the availability of online payday loans from American Web Loan. As stated by Moncooyea in the Winter 2010 issue of the Tribe's newsletter: "[American Web Loan] is not available to Otoe-Missouria tribal members or the military." The fact that members of the Tribe cannot take out a loan from American Web Loan is

telling.  The Tribe does not want its own members, even those who may be faced with an urgent

need for cash, to be victimized by the American Web Loan scheme.

1.      **Deceptive Marketing of Loans**

129.    Defendants market American Web Loan loans to individuals in several ways,

including through direct mail solicitations.  AWL loans are presented to potential borrowers as a

responsible, quick, and easy way for people to obtain cash on a short-term basis.  For example,

Plaintiffs received a "pre-approval" notice in the mail from American Web Loan.  The notice,

designed to look like a check payable to the recipient, announces that the person has been "pre-

approved" for a certain dollar amount that can be provided "in as little as 1 day."



130.    The "pre-approval" notice is targeted at people who may find themselves short on

cash due to unexpected situations and promises that American Web Loan can "help" with a short-

term loan that can be used however the person wants.  According to the "pre-approval" notice, all

that the person has to do is go online and enter the "pre-approval code" provided, and the money

he or she needs can be deposited in a bank account "as soon as tomorrow."  The borrower is

promised flexible terms, including the ability to "choose a monthly or bi-monthly term," no early

repayment penalties, no hidden fees, and other choices in payment terms.  There is, however, no information about the interest rate that would be charged on this "pre-approved" loan, nor is there any disclosure that that interest rate is illegal under the law of the borrower's home state. Moreover, the use of the term "bi-monthly" is deceptively ambiguous in that it implies the option of having a payment due every two months (and not, as borrowers have been surprised to find, payments that are due every two weeks), particularly when following the term "monthly" in the particular sentence.



131.    Borrowers who go to the web address listed in the "pre-approval" notice, https://www.americanwebloan.com/money, are prompted to enter their pre-approval code and the last 4 digits of their Social Security number to "access your pre-approved offer."  Otherwise, borrowers who access the "home page" on the American Web Loan website are prompted to start their application by selecting the desired loan amount with a slider (in amounts from $300 to

$2,500), entering their approval code (if applicable), and providing their last name, email address, and last 4 digits of their Social Security number.

       **2.**    **Concealment of Critical Information About Class Members' Loans During the Application Process**

132.    The online loan application process on the American Web Loan website involves entering various details of the borrower's personal information and the account information for a bank account into which funds can be deposited – and from which payments to American Web Loan can be withdrawn.  Prior to submitting the application, borrowers are directed to click through and verify certain information and to digitally "sign" for the loan using an electronic signature authorization.  At no point in the online application process are borrowers alerted to crucial facts concerning their loan including, for example: the annual percentage rate to be charged on the loan; the total amount of finance charges; and the total amount of payments to be made (principal plus interest) on the loan.  Further, while borrowers are informed about what the amount of their periodic payment will be, it is not made clear to the borrower how often those payments are due; for example, whether the amount is a monthly payment amount or a payment that is due weekly or every two weeks.  Borrowers also are not informed of language, discussed *infra*, purporting to require arbitration and the exclusive application of Otoe law.

133.    After receiving the loan from American Web Loan, Plaintiffs and members of the Class were surprised to find that they were expected to make payments every two weeks or on a weekly basis, not a monthly basis as they expected (and as suggested in AWL's marketing materials), significantly increasing their actual repayment burden.  For a borrower who saw a particular payment amount presented during the application process and understood that to be a monthly payment, the fact that the payment was actually due every two weeks would mean that their effective monthly payment was more than doubled.  This dramatic difference in the actual

amount of the borrower's monthly debt burden is particularly problematic for people who are already stretched thin on their incomes and struggling to budget their monthly expenses – and who found themselves seeking short-term cash from American Web Loan in the first place. Borrowers in this circumstance who call the telephone number provided by American Web Loan seeking to adjust their payment schedules to monthly payments are told that the loan terms cannot be changed.

134. A principal reason for borrowers' confusion is that they only receive copies of the full loan agreements governing their loans *after* the loan is provided, if they receive them at all. Since the actual loan agreements are not shown to borrowers during the application process, borrowers could not have reviewed those agreements in their entirety before electronically "signing" them. In fact, to the extent that the loan agreements purport to be "signed" using digital signatures from the borrowers, those signatures were not entered in a similar way to how one would sign in the appropriate blanks on a paper form. Whatever the means of securing borrowers' authorization to use their digital signatures, those signatures were not "signed" on the actual loan documents in the places that they appear.

135. In addition to concealing the terms of the AWL loan agreements during the application process, American Web Loan makes it difficult for borrowers to obtain the facts about their loans and the terms and conditions that govern them even after the loan is made. While borrowers are provided with access to an online account access system, copies of their loan agreements are not made available through that system. There is a "my documents" link within the online account access system. However, no loan documents (including the purportedly signed loan agreement) can be found at that location. In fact, Plaintiffs do not recall ever having seen copies of their loan agreements until after specifically requesting them from American Web Loan.

136.    Borrowers' loan agreements – which were not provided until after the loans were made – include a table with the title, "FEDERAL TRUTH-IN-LENDING DISCLOSURES" (a "TILA Box").  Federal law requires that credit terms be disclosed to consumers in a clear, conspicuous, and meaningful way *before any credit is extended* so that consumers fully understand the terms and costs of loans, and are otherwise protected against unfair or unlawful lending practices.  While the TILA Box included in borrowers' AWL loan agreements appears to provide required information about the loan – including the interest rate as an annual percentage rate, the finance charge (*i.e.*, the total amount of the loan's costs), and the total amount of payments due under the agreement – that information was *not* provided to borrowers before they took out their loans.  Borrowers' loan agreements also contain payment schedules for their loans, which show each payment due date and the amount due on that day.  Those schedules, which indicate whether payments are due each month, every two weeks, or every week, also were not provided to borrowers before they took out their loans.

137.    Additional material information in the loan agreements is withheld from borrowers during the loan application process.  At no point during the loan application process are borrowers alerted to the fact that their legal rights would be severely limited as a result of taking out a loan from American Web Loan.  For example, Plaintiffs were not informed that: (a) the loan was subject to the laws of the Tribe and that the law of the Tribe would be the *only* governing law; (b) consumer protections provided by the borrower's home state (including applicable interest rate caps) do not apply; (c) the borrower was waiving his or her rights to file a claim in state or federal court and could only assert his or her rights through arbitration or, if arbitration were waived, in a Tribal court located on the Tribe's land; and (d) the borrower was waiving his or her rights to participate in a class action.

### D.      PLAINTIFF SOLOMON'S LOAN FROM AMERICAN WEB LOAN

138.      On or about December 19, 2016, Mr. Solomon went to the American Web Loan website and took out a $500 loan from American Web Loan.  At the time he applied for the loan, Mr. Solomon was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of payments he would owe.  Mr. Solomon also was not advised of any purported choice of law or arbitration provisions that might apply to the loan.

139.      After receiving his loan, Mr. Solomon was provided with a copy of his loan agreement.  He only received a copy of the loan agreement after calling to request it from American Web Loan.  Mr. Solomon had never seen this loan agreement before, and had not previously been informed that he was going to be charged an annual percentage rate of 726.13%, or that he would be expected to pay $1,543.16 in finance charges for a $500 loan.  Those and other key terms are shown in the following TILA Box that, while included in the loan agreement received from American Web Loan, was not provided to Mr. Solomon at any point during the loan application process.

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 726.13          % | $ 1,543.16 | $  500.00 | $ 2,043.16 |

140.      During the online loan application process, Mr. Solomon was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct

deposit/ACH transfer. The $500 that Mr. Solomon borrowed was deposited into his credit union account approximately one day after he completed his online loan application.

141. On or about January 6, 2017, a first loan payment of $157.18 was automatically withdrawn from Mr. Solomon's credit union account via ACH transfer. Thereafter, approximately five additional payments of $157.18 were automatically debited from Mr. Solomon's credit union account every two weeks.

142. Absent certain exceptions, no one may make a loan to a resident of the Commonwealth of Virginia at an annual percentage rate greater than 12% unless the lender has obtained a consumer finance license from the Commonwealth.

143. At the time Mr. Solomon took out his loan from American Web Loan, neither American Web Loan nor any other Defendant had obtained a consumer finance license from the Commonwealth of Virginia; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of American Web Loan.

144. Under Virginia law, if a lender is not exempt from the 12% interest rate cap and has not obtained a consumer finance license, and nonetheless contracts to make a consumer loan and charges, contracts for, or receives interest or other compensation in excess of 12% per year, then the loan is deemed to be null and void and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

145. Mr. Solomon's loan was unlawful and void under Virginia law, and the 726.13% interest rate charged was more than 60 times greater than the maximum allowable interest rate.

**E. PLAINTIFF BELLECI'S LOAN FROM AMERICAN WEB LOAN**

146. On or about May 23, 2017, Ms. Belleci was faced with an urgent need for $1,200. After running online searches, Ms. Belleci found the American Web Loan website, which offered instant approvals on loans that could be deposited into a bank account the next day.

147.    On or about May 23, 2017, Ms. Belleci submitted an online application through the American Web Loan website to request a $1,200 loan.  Shortly after submitting the online application, Ms. Belleci received a telephone call from a representative of American Web Loan on or about May 23, 2017.  Ms. Belleci was told that she was authorized to receive a loan of up to $1,500, but she confirmed her request to borrow only the $1,200 that she needed.

148.    At the time she applied for the loan, Ms. Belleci was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of payments she would owe. Ms. Belleci also was not advised of any purported choice of law or arbitration provisions that might apply to the loan.

149.    After receiving her loan, Ms. Belleci was provided with a copy of her loan agreement.  She only received a copy of the loan agreement after calling to request it from American Web Loan.  Ms. Belleci had never seen this loan agreement before, had not previously been informed that she was going to be charged an annual percentage rate of 595.06%, or that she would be expected to pay $4,085.55 in finance charges for a $1,200 loan.  Those and other key terms are shown in the following TILA Box that, while included in the loan agreement received from American Web Loan, was not provided to Ms. Belleci at any point during the loan application process.

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 595.06    % | $ 4,085.55 | $ 1,200.00 | $ 5,285.55 |

150.    During the online loan application process, Ms. Belleci was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.  The $1,200 that Ms. Belleci borrowed was deposited into her bank account on May 24, 2017, one day after she completed her loan application.

151.    When Ms. Belleci spoke with an American Web Loan representative on or about May 23, 2017, Ms. Belleci asked whether she could make loan payments manually through an online payment system instead of having loan payments automatically withdrawn from her bank account.  Ms. Belleci was told that she could not make online payments and that only automatic payments were permitted.

152.    On or about June 2, 2017, an initial loan payment of $264.32 was automatically withdrawn from Ms. Belleci's checking account via ACH transfer.  Thereafter, four additional payments of $264.32 were automatically debited from Ms. Belleci's checking account every two weeks, on June 16, June 30, July 14, and July 28, 2017.  The automatic withdrawals of $264.32 every two weeks were timed to match the frequency of Ms. Belleci's paychecks.

153.    On or about August 10, 2017, Ms. Belleci sought to pay off her loan from American Web Loan and close her account.  She was unable to pay off her loan online and had to call an American Web Loan telephone number to do so.  Ms. Belleci was shocked to learn that, on August 10, 2017, her loan payoff balance was $1,336.57 – *more than the amount she had borrowed two and a half months earlier*.  This was particularly infuriating since Ms. Belleci had made a total of $1,321.60 in payments (five payments of $264.32) and found herself still owing more than the amount she borrowed in the first place.  On or about August 10, 2017, Ms. Belleci authorized a payment of $1,336.57 to pay off her loan from American Web Loan and close her account.  Ms. Belleci paid a total of $2,658.17 for a $1,200 loan.

154.     Absent certain exceptions, no one may make a loan to a resident of Nebraska at an annual percentage rate greater than 6%, with a 16% annual percentage rate cap applicable to loans made pursuant to a valid contract.  Under Nebraska law, usury applies to loans with interest rates that exceed the 16% contractual maximum interest rate.

155.     While, in certain limited circumstances, Nebraska permits "payday lending" at interest rates that may exceed the state's usury cap, none of those circumstances apply to loans made by American Web Loan.  Among other things, only lenders that are licensed by the state may issue payday loans in Nebraska.

156.     At the time Ms. Belleci took out her loan from American Web Loan, neither American Web Loan nor any other Defendant had obtained a license from the state of Nebraska; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of American Web Loan.

157.     Under Nebraska law, if a lender is not exempt from the 16% interest rate cap and has not obtained a valid license, and nonetheless contracts to make a consumer loan and charges, contracts for, or receives interest or other compensation in excess of 16% per year, then the loan is deemed to be null and void and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

158.     Ms. Belleci's loan was unlawful and void under Nebraska law, and the 595.06% interest rate charged was more than 37 times greater than the maximum allowable interest rate.

F.     **PLAINTIFF LITTLEJOHN'S LOAN FROM AMERICAN WEB LOAN**

159.     An American Web Loan "pre-approval" notice was sent to Plaintiff Littlejohn via U.S. mail on or about June 1, 2017, informing Mr. Littlejohn that he had been "pre-approved" for a loan of $1,500.  The "pre-approval" notice indicated that the amount of Mr. Littlejohn's payment on the loan would "vary depending on if you choose a monthly or bi-monthly term."

160.    On or about June 3, 2017, Mr. Littlejohn went to the American Web Loan website and took out a loan from American Web Loan in the amount of $1,500.  In the process of applying for the loan, Mr. Littlejohn was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of payments he would owe.  Mr. Littlejohn also was not advised of any purported choice of law or arbitration provisions that might apply to his loan.

161.    At the time he applied for the loan, Mr. Littlejohn understood that he would be required to repay the loan through monthly payments in the amount of $170.38.

162.    After receiving his loan, Mr. Littlejohn was shocked to learn that he was expected to make *weekly* payments of $170.38 to American Web Loan for 51 weeks, with an additional, final payment of $156.31 due in the 52nd and final week of the loan term.  As a result of this materially different loan repayment schedule, Mr. Littlejohn's loan repayment obligations would have been the equivalent of a monthly payment of approximately $737.14.

163.    After receiving his loan, Mr. Littlejohn was provided with a copy of his loan agreement.  He only received a copy of the loan agreement after calling to request it from American Web Loan.  Mr. Littlejohn had never seen this loan agreement before, and he had not previously been informed that he was going to be charged an annual percentage rate of 597.35%, or that he would be expected to pay $7,345.69 in finance charges for a $1,500 loan.  Those and other key terms are shown in the following TILA Box that, while included in the loan agreement received from American Web Loan, was not provided to Mr. Littlejohn at any point during the loan application process.

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 597.35 % | $ 7,345.69 | $ 1,500.00 | $ 8,845.69 |

164.    During the online loan application process, Mr. Littlejohn was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.  The $1,500 that Mr. Littlejohn borrowed was deposited into his bank account on or about Tuesday, June 6, 2017, two business days after he completed his loan application.

165.    On or about June 9, 2017, an initial loan payment of $170.38 was automatically withdrawn from Mr. Littlejohn's bank account via ACH transfer.  This initial payment was withdrawn only four days after Mr. Littlejohn received the loan funds in his bank account. Thereafter, approximately six additional payments of $170.38 were automatically withdrawn from Mr. Littlejohn's bank account on a weekly basis, on or about June 16, June 23, June 30, July 7, July 14, and July 21, 2017.  The unexpected weekly automatic withdrawals drained Mr. Littlejohn's bank account and continued until a $500 overdraft limit was reached on Mr. Littlejohn's account.  The overdrafts caused Mr. Littlejohn to incur substantial bank penalties and fees.

166.    Under South Carolina law, the maximum interest rate that could have applied to any loan made to Mr. Littlejohn was 12% by a lender that, like American Web Loan, is not a "supervised lender" in South Carolina.

167.    At the time that Mr. Littlejohn took out his loan from American Web Loan, neither American Web Loan nor any other Defendant was licensed to make loans in the State of South Carolina as a supervised lender; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of American Web Loan or otherwise comply with laws applicable to supervised lenders in South Carolina.

168.    Mr. Littlejohn's loan was unlawful and void under South Carolina law, and the 597.35% interest rate charged was nearly 50 times greater than the maximum allowable interest rate.

## G.    PLAINTIFF LOMAGLIO'S LOAN FROM AMERICAN WEB LOAN

169.    An American Web Loan "pre-approval" notice was sent to Plaintiff Lomaglio via U.S. mail in approximately May 2017, informing Ms. Lomaglio that she had been "pre-approved" for a loan of $2,500.  The "pre-approval" notice indicated that the amount of Ms. Lomaglio's payment on the loan would "vary depending on if you choose a monthly or bi-monthly term."

170.    On or about May 23, 2017, Ms. Lomaglio went to the American Web Loan website and applied for a loan from American Web Loan in the amount of $2,500.  At the time she applied for the loan, Ms. Lomaglio was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of payments she would owe.  Ms. Lomaglio also was not advised of any purported choice of law or arbitration provisions that might apply to her loan.

171.    Minutes after Ms. Lomaglio completed the online loan application on May 23, 2017, she received a notification that her loan had been approved.  However, on next day, May 24, 2017, she received a telephone call from a representative from American Web Loan who told her that there was a problem with her loan application, specifically with respect to information regarding the frequency of Ms. Lomaglio's paychecks.  The American Web Loan representative

pressed Ms. Lomaglio for information about how frequently Ms. Lomaglio was paid in connection with a part-time job, specifically asking whether she was paid weekly or every two weeks.

172.    Ms. Lomaglio submitted additional information to American Web Loan in connection with her loan application on or around May 26, 2017.  Ms. Lomaglio again was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of payments she would owe.  Loan funds in the amount of $2,500 were deposited in Ms. Lomaglio's bank account on May 30, 2017, the next business day following the Memorial Day holiday.

173.    At the time she applied for the loan, Ms. Lomaglio understood that she would be required to repay the loan through monthly payments in the amount of $249.35.

174.    After receiving her loan, Ms. Lomaglio was shocked to learn that she was expected to make *weekly* payments of $249.35 to American Web Loan for 51 weeks, with an additional, final payment of $248.42 due in the 52nd and final week of the loan term.  As a result of this materially different loan repayment schedule, Ms. Lomaglio's loan repayment obligations would have been the equivalent of a monthly payment of approximately $1,080.44.

175.    After receiving her loan, Ms. Lomaglio was provided with a copy of her loan agreement.  She only received a copy of the loan agreement after calling to request it from American Web Loan.  Ms. Lomaglio had never seen this loan agreement before, and had not previously been informed that she was going to be charged an annual percentage rate of 481.60%, or that she would be expected to pay $10,465.27 in finance charges for a $2,500 loan.  Those and other key terms are shown in the following TILA Box that, while included in the loan agreement received from American Web Loan, was not provided to Ms. Lomaglio at any point during the loan application process.

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 481.60          % | $ 10,465.27 | $  2,500.00 | $ 12,965.27 |

176.     During the online loan application process, Ms. Lomaglio was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.  The $2,500 that Ms. Lomaglio borrowed was deposited into her bank account on May 30, 2017, the next business day after she submitted the additional information requested by American Web Loan, and one week after she initially submitted her online loan application.

177.     On or about June 1, 2017, an initial loan payment of $249.35 was automatically withdrawn from Ms. Lomaglio's bank account via ACH transfer.  This initial payment was withdrawn only one day after the loan funds were deposited in Ms. Lomaglio's bank account. Thereafter, ten additional payments of $249.35 were automatically debited from Ms. Lomaglio's checking account on June 8, June 15, June 29, July 6, July 13, July 20, July 27, August 3, August 10, and August 17, 2017.  The weekly automatic withdrawals of $249.35 were timed to match the frequency of the pay periods at Ms. Lomaglio's part-time job.

178.     In addition to the eleven payments made through weekly automatic withdrawals of $249.35, Ms. Lomaglio made two additional payments through the American Web Loan website to pay down the balance on her loan: a $300 payment on June 19, 2017 and a $600 payment on June 23, 2017.

179.    On August 21, 2017, Ms. Lomaglio sought to pay off the outstanding balance on her American Web Loan loan.  She logged in to her American Web Loan account on the site, https://myaccount.americanwebloan.com (which states that it is "powered by" Defendant GOLDPoint).  According to the "Loan Details" on the site, Ms. Lomaglio's loan then had a current balance of $250.56 with a "Current Pay Off Amount" of $264.26.  As shown in the following screenshot, Ms. Lomaglio's next scheduled payment was due on August 24, 2017.



180.    When Ms. Lomaglio clicked on the appropriate links to initiate the final payment and pay off her loan in full, she found that the payoff amount had *increased* to $271.11 from the amount that had been shown on the "Loan Details" page, $264.26.  Defendants' system did not allow Ms. Lomaglio to execute a payment in the amount of the "Current Pay Off Amount" as of the then-current date, August 21, 2017.  Rather, Defendants' system forced her payoff to be delayed until the final day in the current period, August 23, 2017 (the day before the next scheduled payment was due), resulting in an additional interest expense to Ms. Lomaglio of $6.85.



181.    On or about August 21, 2017, Ms. Lomaglio authorized a payment of $271.11 to pay off her loan from American Web Loan and close her account.  Ms. Lomaglio paid a total of $3,913.96 for a $2,500 loan (11 automatic withdrawals of $249.35, two additional payments totaling $900, and a final payment of $271.11).

182.    Under California law, the maximum annual interest rate that could have applied to any loan made to Ms. Lomaglio was 10%.  The 10% annual percentage rate cap applies to any loans that are not made by a licensed financial institution.

183.    At the time Ms. Lomaglio took out her loan from American Web Loan, neither American Web Loan nor any other Defendant was licensed to make loans in California; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of American Web Loan.

184.    Ms. Lomaglio's loan was unlawful and void under California law, and the 481.60% interest rate charged was more than 48 times greater than the maximum allowable interest rate.

## H.    PURPORTED ARBITRATION CLAUSES IN PLAINTIFFS' LOAN AGREEMENTS ARE VOID AND UNENFORCEABLE

185.    Because American Web Loan is not licensed to make loans in any state in which Plaintiffs and members of the Class reside and/or because the loans were made through an illegal scheme, the loan agreements that purport to govern any online payday loans made by American Web Loan were void *ab initio*.

186.    Plaintiffs' purported loan agreements with American Web Loan not only violate the usury laws or applicable interest rate caps in the borrowers' home states, they include unconscionable choice of law and arbitration provisions that unlawfully seek to disclaim the application of federal and state law and impose the law of the Tribe as the sole governing law.

187.    Plaintiffs were not informed about these purported choice of law and arbitration provisions during the loan application process or otherwise prior to taking out loans from American Web Loan.  Moreover, Plaintiffs were not provided with copies of their purported loan agreements (that include the purported choice of law and arbitration provisions) at the time they took our their loans, nor were copies of the loan agreements made available to Plaintiffs through the American Web Loan online account access system at the website https//myaccount.americanwebloan.com.  Plaintiffs first learned about these terms after they contacted American Web Loan to request copies of their loan documents, and were provided with copies of documents purporting to be their loan agreements, in approximately August 2017.

188.    The language in the purported form American Web Loan loan agreement states the following regarding the applicable governing law (emphasis added below):

> 23.  **Governing Law**: You understand that this Agreement is ***governed only by Tribal law*** and such federal law as is applicable under the Indian Commerce Clause of the United States Constitution.  We operate solely in the Indian country of the Otoe-Missouria Tribe of Indians and have no operations in any state.  As such, ***neither we nor this Agreement are subject to any other federal or state law or regulation***, nor the jurisdiction of any court, unless so stated in this Agreement.  If any provision of this Agreement is held unenforceable, including any provision of the Waiver of Jury Trial and Agreement to Arbitrate, the remainder of this Agreement shall remain in full force and effect.  The Lender may choose to voluntarily use certain federal laws as guidelines for the provision of services.  Such voluntary use does not represent acquiescence of the Tribe to any federal law unless found expressly applicable to the operations of the Tribe.  You and we agree that the transaction represented by this Agreement involves interstate commerce for all purposes.

189.    The purported American Web Loan loan agreement also includes a purported arbitration provision (paragraph 22 of the agreement), under the heading "WAIVER OF JURY TRIAL AND AGREEMENT TO ARBITRATE" (the "Purported Arbitration Clause").  The Purported Arbitration Clause also expressly disclaims the application of state and federal law.  In the subsection concerning the location of arbitration and the description of the borrower's option to have the arbitration conducted within thirty miles of his or her residence, the Purported

Arbitration Clause states (emphasis added): "this accommodation for you **shall not be construed in any way** (a) as a relinquishment or waiver of the sovereign status or immunity of the Tribe, or (b) **to allow for the application of any law other than Tribal Law**, or (c) to constitute a transaction of business in any place other than the Indian country of the Tribe."

190.    The Purported Arbitration Clause also includes a subsection describing the exclusive application of Tribal law and exclusive judicial review by a Tribal court (emphasis added below):

> **APPLICABLE LAW AND JUDICIAL REVIEW OF ARBITRATOR'S AWARD THIS AGREEMENT SHALL BE GOVERNED BY TRIBAL LAW. *The arbitrator shall apply Tribal Law and the terms of this Agreement,*** including this Agreement to Arbitrate and the waivers included herein. The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. The arbitrator shall make written findings and the arbitrator's award may be filed with a Tribal court. The arbitration award shall be supported by substantial evidence and ***must be consistent with this Agreement and Tribal Law, and if it is not, it may be set aside by a Tribal court upon judicial review***. During the arbitration, the amount of any settlement offer made by us or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled. ***The parties will have the right to judicial review in a Tribal court*** of (a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence and (b) whether the ***conclusions of law are erroneous under Tribal Law***. Judgment confirming an award in such a proceeding may be entered ***only if a Tribal court determines that the award is supported by substantial evidence and is not based on legal error under Tribal Law***.

191.    Additional language in the "EFT Authorization Agreement" that is included within the purported American Web Loan loan documents also states that Tribal law is the only law to be applied under that section. That section (paragraph 10 of the "EFT Authorization Agreement") is substantially identical to the Governing Law paragraph in the main loan agreement (paragraph 23, quoted above in ¶ 188).

192.    The Purported Arbitration Clause includes a section with the heading, "RIGHT TO OPT OUT," which describes specific procedures that a borrower would be required to follow if he or she were to seek to opt out of the Purported Arbitration Clause. This supposed opt-out "right"

is, however, completely illusory and unconscionable. Among other things, a borrower seeking to opt out of the Purported Arbitration Clause would need to provide written notification within 60 days of the "origination date" for the loan. Because borrowers were not notified of the choice of law and arbitration provisions in the loan agreements prior to or at the time of their taking out the loan from American Web Loan, they could not have been notified of this "right" unless they happened to request a copy of their loan agreements within the applicable time frame. Thus, for the vast majority of borrowers, the 60-day opt-out window likely would close without the borrower ever having seen this provision.

193.     The purported opt-out "right" also is illusory and unconscionable because the *sole* alternative available to the borrower (assuming that he or she receives notice of this "right" and takes the necessary steps within the opt-out period provided) is to have his or her claim heard by a Tribal judge, in a Tribal court, on Tribal land located in rural Oklahoma. The purported opt-out language states: "IN THE EVENT YOU OPT OUT OF THE AGREEMENT TO ARBITRATE, ANY DISPUTES SHALL NONETHELESS BE GOVERNED UNDER TRIBAL LAW AND MUST BE BROUGHT WITHIN THE COURT SYSTEM OF THE OTOE-MISSOURIA TRIBE."

194.     The Purported Arbitration Clause is unconscionable and unenforceable for the same reasons articulated by the U.S. Court of Appeals for the Fourth Circuit in *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016), and *Dillon v. BMO Harris Bank, N.A.*, No. 16-1362, 2017 WL 1903475, at *4 (4th Cir. 2017). Specifically, the Purported Arbitration Clause is invalid because it "purports to renounce wholesale the application of any federal law to plaintiffs' federal claims." *Hayes*, 811 F.3d at 673. Further, arbitration agreements like the Purported Arbitration

Agreement are invalid when they provide that an "arbitrator shall not allow for the application of any law other than tribal law." *Dillon*, 2017 WL 1903475, at *4.

195. Like the arbitration provision invalidated in *Hayes*, the Purported Arbitration Clause here was created by Defendants (including Defendants Curry, American Web Loan, MacFarlane Group, and SOL) in a deliberate attempt to avoid the application of federal and state law through the use of unconscionable choice of law and arbitration provisions. The use of arbitration as a means of circumventing the application of federal and state law, particularly in a law avoidance scheme like the one engaged in by Defendants here, is not permitted under controlling law in this judicial circuit.

196. Moreover, under controlling authority in this Circuit, no part of the unlawful Purported Arbitration Clause may be severed to preserve the remainder of Defendants' integrated scheme to contravene public policy. *See Hayes*, 811 F.3d at 675-76.

197. Plaintiffs are therefore entitled to a declaratory judgment that the governing law, forum selection, and Purported Arbitration Clause provisions of the American Web Loan loan agreements are unenforceable in their entirety.

## V. CLASS ALLEGATIONS

198. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure ("Rule") 23(a) and 23(b)(1), (b)(2), and (b)(3), as representatives of the following Class:

> All persons who took out loans from American Web Loan. Included in the Class are any persons who took out loans through the American Web Loan d/b/a entity known as Clear Creek Lending. The Class period begins on February 10, 2010 and continues through the present.

Plaintiffs reserve the right to redefine the Class prior to certification.

199.     This action is brought, and may properly be maintained, as a class action pursuant to Rule 23.   This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.   The members of the Class are readily ascertainable from records maintained by Defendants.

200.     <u>Numerosity</u>.  Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief, including information contained in the 2013 Middlemarch Presentation and other publicly available sources, Plaintiffs believe that there are likely tens of thousands of individuals who are members of the Class.   The exact number of Class members and their identities are known by Defendants or are readily ascertainable in Defendants' records.

201.     <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs' claims are based on the same facts and legal theories as each of the members of the Class.  Plaintiffs and all Class members were charged interest rates on online payday loans from American Web Loan that exceeded the lawful interest rate caps in their states of residence. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants in connection with the operation of the American Web Loan online payday lending scheme.

202.     <u>Adequacy</u>.  Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiffs have retained counsel that are competent and experienced in the prosecution of complex class action litigation and have experience with class action litigation involving tribal lending schemes.  Plaintiffs' counsel will undertake to vigorously protect the interests of the Class.

203.   <u>Commonality</u>.  Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual Class members.  The claims of all Class members originate from the same misconduct and violations of law perpetrated by Defendants.  The common questions include, but are not limited to:

a.   Whether the AWL Payday Lending Organization (defined below) is an enterprise under 18 U.S.C. § 1961(4);

b.   Whether Defendants Mark Curry, MacFarlane Group, SOL, and Medley, engaged and/or are engaging in the collection of unlawful debt in violation of 18 U.S.C. § 1962(c);

c.   Whether Defendants Medley, Middlemarch, DHI, and John Doe Defendants conspired with the AWL Payday Lending Organization in violation of 18 U.S.C. § 1962;

d.   Whether American Web Loan is an arm of the tribe of the Otoe-Missouria Tribe of Indians;

e.   Whether the purported arbitration agreement in Plaintiffs' and the Class' loan agreements is void and/or unenforceable.

f.   Whether Defendants are liable for the failure to disclose material loan terms to Plaintiffs and members of the Class before Plaintiffs and members of the Class took out loans from American Web Loan;

g.   Whether Defendants unlawfully required Plaintiffs and members of the Class to consent to the use of ACH transactions in connection with their loans;

h.   Whether Defendants are liable to Plaintiffs and members of the Class for disgorgement or other remedies and, if so, in what amount; and

Case 2:18-cv-02747-MSG Document 17-4 Filed 09/14/18 Page 93 of 110

      i.   Whether Defendants are liable to Plaintiffs and the Class for reasonable attorneys' fees and expenses.

204.   <u>Superiority</u>.  Under Rule 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would entail.  The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

205.   This action is also maintainable as a class action under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

206.   With respect to Rule 23(b)(1)(B), the prosecution of separate actions by each Class member would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

207.   Finally, class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

208.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c), COLLECTION OF UNLAWFUL DEBT
### (AGAINST DEFENDANTS AMERICAN WEB LOAN, CURRY, MACFARLANE
### GROUP, SOL, MEDLEY, BROOK TAUBE, and SETH TAUBE)

209.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

210.    At all relevant times, Defendants American Web Loan, Curry, MacFarlane Group, SOL, Medley, Brook Taube, and Seth Taube (the "RICO Defendants") were members and associates of an internet payday lending enterprise (the "AWL Payday Lending Organization"), whose members and associates engaged in the collection of unlawful debt.

211.    The AWL Payday Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact.  In addition to the RICO Defendants, the AWL Payday Lending Organization has included Defendants GOLDPoint, and John Does 1-100, as well as Non-Defendant Interested Parties the Tribe, Shotton, Moncooyea, Hopper, Geneva Roth Companies, Oakmont, Dinero, Chieftan, Dant, SHW, and the September 2016 Shell Corporations.

212.    The enterprise is engaged in, and its activities affect, interstate commerce.  The AWL Payday Lending Organization has leadership based in Mission, Kansas and San Juan, Puerto Rico, and operates throughout the United States, including the Eastern District of Virginia.

213.    The AWL Payday Lending Organization constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

214.    The AWL Payday Lending Organization is led, controlled, and/or managed by the RICO Defendants.

215. The purpose of the enterprise was and continues to be the enrichment of the RICO Defendants, and other members and associates of the AWL Payday Lending Organization through the collection of unlawful debt.

216. RICO defines an "unlawful debt" as debt incurred in connection with "the business of lending money or a thing of value at a usurious rate under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). The RICO Defendants have violated RICO through the "collection of unlawful debt" as that term is defined in RICO, 18 U.S.C. § 1962(c).

217. The means and methods by which the RICO Defendants and other members and associates conducted and participated in the conduct of the affairs of the AWL Payday Lending Organization was and continues to be the operation, direction, and control of the payday loan companies in the business of lending money at usurious rates under the laws of numerous states, including without limitation California, South Carolina, Virginia, and Nebraska, where the usurious rates were at least twice the enforceable rate.

218. In operating and conducting the affairs of the AWL Payday Lending Organization, the RICO Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the AWL Payday Lending Organization.

219. The RICO Defendants' leadership, management, and participation in the AWL Payday Lending Organization began at some point as early as February 2010, following the formation of Defendant American Web Loan, Inc. and continues to date to the detriment of individual consumers throughout the United States.

220.    The predicate acts of collection of unlawful debt are described herein and in particular in ¶¶ 138-184 herein.  The debts incurred by Plaintiffs and all other members of the Class are unlawful and unenforceable.

221.    As a result of the unlawful collection of illegal debt, Plaintiffs and members of the Class have been injured in their property in that they paid extortionate and illegal interest rates.

222.    As a direct and proximate cause of the RICO Defendants' violations of RICO, the RICO Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(d), RICO CONSPIRACY
### (AGAINST DEFENDANTS CURRY, AMERICAN WEB LOAN, MACFARLANE GROUP, SOL, MEDLEY, BROOK TAUBE, SETH TAUBE, GOLDPoint, and MIDDLEMARCH)

223.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

224.    Beginning as early as February 2010, the RICO Defendants, as defined in Count One, being persons employed by and associated with the AWL Payday Lending Organization, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate 18 U.S.C. § 1962(c)—that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the AWL Payday Lending Organization through the collection of unlawful debt.  In addition, Defendants Middlemarch and GOLDPoint knowingly entered into agreements to facilitate the RICO Defendants' participation and management of the affairs of the AWL Payday Lending Organization and engaged in overt acts in furtherance thereof.

225.    Specifically, the RICO Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c).

These agreements, include, *inter alia*: (a) agreements between and among Defendants Curry, MacFarlane Group and SOL and non-defendant interested parties including Shotton and Moncooyea, to create the necessary legal frameworks and entities to conduct the affairs of the AWL Payday Lending Operation; (b) agreements between and among Defendants Curry, MacFarlane Group, SOL, Medley, Brook Taube and Seth Taube (and other individuals and entities not presently known to Plaintiffs) to provide the necessary funds to conduct and expand the affairs of the AWL Payday Lending Operation; (c) agreements between and among Defendants Curry, MacFarlane Group, and SOL and Middlemarch to solicit investors to provide the necessary funds to conduct and expand the affairs of the AWL Payday Lending Operation; (d) agreements between and among Defendant GOLDPoint, MacFarlane Group, and American Web Loan (and/or other Defendants or non-defendant interested parties) for the purpose of creating online account access mechanisms through which borrowers' unlawful debts were collected in furtherance of the AWL Payday Lending Operation; (e) agreements between and among Defendant Curry, Defendants MacFarlane Group, SOL, and American Web Loan, and non-defendant interested parties including Shotton, Grant, and others, to purportedly arrange for the sham "acquisition" of Defendant MacFarlane Group by the Tribe in approximately October 2016 in an attempt to further insulate the AWL Payday Lending Operation from state and federal law.

226.   Each of the agreements identified in the above paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the enterprise.

227.   As a result of the RICO Defendants' participation in the enterprise and the violations of RICO, the RICO Defendants and Defendants Middlemarch and GOLDPoint are

jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE**
**VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT**
**(AGAINST DEFENDANTS CURRY, AMERICAN WEB LOAN, MACFARLANE GROUP, SOL, MEDLEY, BROOK TAUBE, SETH TAUBE, and GOLDPoint)**

228.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

229.    Defendants are "persons" as that term is defined in Section 1005 of Regulation E, 12 C.F.R. § 1005.2(j).

230.    Section 913(1) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693k(1), provides that no person may condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers.

231.    Section 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1), provides that "[n]o financial institution or other person may condition the extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account."

232.    The Official Interpretation of Regulation E, Section 1005.10(e)(1), 12 C.F.R. § 1005.10(e)(1)-1, Supp. I, provides that creditors may not require repayment of loans by electronic means on a preauthorized recurring basis.

233.    Under § 918(c) of the EFTA, 15 U.S.C. § 1693o(c), every violation of the EFTA and Regulation E constitutes a violation of the Federal Trade Commission ("FTC") Act.

234.    In connection with offering online payday loans to consumers, Defendants have conditioned the extension of credit on recurring preauthorized electronic fund transfers, thereby

violating § 913(1) of the EFTA, 15 U.S.C. § 1693k(1), and § 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1).

235. Defendants' violations of the EFTA are ongoing.

236. Defendants conditioned the online payday loans on the acceptance of "automated clearing house" ("ACH") electronic fund transfers as the transaction method. To the extent that borrowers were, in fact informed of their funding and payment options during the loan application process or immediately thereafter (and, as alleged herein, it is likely that they were not since borrowers were not provided with a full copy of their loan agreement prior to or promptly after receiving their loans), Defendants exploited borrowers' economic situation to compel their acceptance of ACH transfers.

237. As alleged herein, American Web Loan loans are marketed to consumers as a way to obtain needed cash fast, specifically touting how the "pre-approved" amount of money could be in the borrower's bank account "in as little as 1 day!" The only way for a person to obtain the needed funds this quickly without additional cost to the borrower, would be to enroll in electronic funds transfer via ACH.

238. While American Web Loan purported to offer borrowers the option to receive their loan funds promptly via wire transfer, the loan documents stated that the borrower "will be responsible for any fees incurred from your financial institution for receiving a wire transfer credit, if any." Incoming wire transfer charges vary at each financial institution, but many banks charge up to $20 for incoming wire transfers from a U.S. bank. This is not an insignificant amount for someone who finds him- or herself in desperate need of short-term cash. Moreover, unlike ACH authorization, which requires a borrower only to provide the ABA/routing number and account number from the bottom of an ordinary personal check, a wire transfer is not a transaction used by

ordinary consumers. Before electing to use a wire transfer, a borrower likely would need to take additional time and effort to obtain his or her bank's particular wire transfer instructions, inquire regarding applicable fees, and comply with the bank's paperwork or other administrative requirements associated with receiving a wire transfer. Taking such additional steps to receive a wire transfer would, compared to the relative simplicity of ACH authorization, add delay to the process of getting the needed funds deposited into the borrower's bank account.

239. American Web Loan also purports to offer borrowers the option of receiving their loan via paper check. If the loan recipient requests that their loan be provided via a paper check, the borrower could expect delivery of the check via U.S. Mail in 7-10 days. The American Web Loan loan documents indicate that interest begins accruing on the date that the lender issues the check. Depending on the payment terms of a borrower's loan, a borrower with weekly payments could have an amount due (including a payment of principal) before he or she actually receives the check. A borrower with payments due every two weeks could have their first payment due as little as two business days after receiving the check, with the first payment due date coming before the loan check can be deposited and cleared by the receiving bank.

240. The purported loan documents also include a significant late payment penalty of $20 for any payment not received by AWL by the due date. If a payment is received after the due date, the loan documents contemplate the debiting of the $20 late fee before application to the outstanding balance. Further, the loan documents contemplate that a late payment can provide a basis for AWL to deem the borrower in default as a result of a single missed payment, causing the borrower's entire balance, including any fees, penalties, and accrued interest ("all sums due under this agreement") to become due immediately.

241. To the extent that borrowers were provided with the terms of the loan agreement and its provisions regarding electronic funds transfer options, any choices with respect to opting for ACH or other methods were false choices, compelling the borrower to accept transfers by ACH, which is prohibited by the EFTA.

242. By engaging in the violations of the EFTA and Regulation E set forth herein, Defendants have violated the FTC Act.

243. As a result of Defendants' violations of the EFTA, Plaintiffs were damaged.

### COUNT FOUR
### VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(3)
### FAILURE TO DISCLOSE FINANCE CHARGE
### (AGAINST DEFENDANT AWL, INC.)

244. Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

245. The Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated from all other terms or information provided in connection with the transaction. Among these required disclosures is disclosure of the "finance charge." 15 U.S.C. §§ 1638(a)(3), 1638(b)(1).

246. TILA creates a system of strict liability with respect to the statute's disclosure requirements. If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

247. TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g). Because Defendant AWL, Inc.

is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

248.  As alleged herein, Defendant AWL, Inc. violated TILA by failing to make the required disclosure of the applicable "finance charge" prior to extending credit to Plaintiffs and members of the Class.  As further alleged herein, Plaintiffs were not provided with copies of their purported loan agreements during the loan application process or otherwise prior to the extension of credit.  Plaintiffs only were provided copies of their purported loan agreements, which include key loan terms required to be disclosed pursuant to TILA, *after* Plaintiffs took out their loans.

249.  As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(3) and disclose the applicable finance charge, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation.  *See* 15 U.S.C. § 1640(a).

## COUNT FIVE
### VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(4)
### FAILURE TO DISCLOSE FINANCE CHARGE EXPRESSED AS AN ANNUAL
### PERCENTAGE RATE
### (AGAINST DEFENDANT AWL, INC.)

250.  Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

251.  TILA, 15 U.S.C. § 1601, *et seq.*, requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated from all other terms or information provided in connection with the transaction.  Among these required disclosures is disclosure of the "finance charge expressed as an 'annual percentage rate,' using that term."  15 U.S.C. §§ 1638(a)(4), 1638(b)(1).

252.  TILA creates a system of strict liability with respect to the statute's disclosure requirements.  If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

253.    TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g).  Because Defendant AWL, Inc. is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

254.    As alleged herein, Defendant AWL, Inc. violated TILA by failing to make the required disclosure of the applicable "finance charge expressed as an 'annual percentage rate,' using that term," prior to extending credit to Plaintiffs and members of the Class.  As further alleged herein, Plaintiffs were not provided with copies of their purported loan agreements during the loan application process or otherwise prior to the extension of credit.  Plaintiffs only were provided copies of their purported loan agreements, which include key loan terms required to be disclosed pursuant to TILA, *after* Plaintiffs took out their loans.

255.    As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(4) and disclose the applicable finance charge expressed as an "annual percentage rate," using that term, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation.  *See* 15 U.S.C. § 1640(a).

## COUNT SIX
### VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(5)
### FAILURE TO DISCLOSE THE TOTAL OF PAYMENTS
### (AGAINST DEFENDANT AWL, INC.)

256.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

257.    TILA, 15 U.S.C. § 1601, *et seq.*, requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated

from all other terms or information provided in connection with the transaction. Among these required disclosures is disclosure of the "sum of the amount financed and the finance charge, which shall be termed the 'total of payments.'" 15 U.S.C. §§ 1638(a)(5), 1638(b)(1).

258.    TILA creates a system of strict liability with respect to the statute's disclosure requirements. If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

259.    TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g). Because Defendant AWL, Inc. is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

260.    As alleged herein, Defendant AWL, Inc. violated TILA by failing to make the required disclosure of the applicable "total of payments," calculated as the sum of the amount financed and the finance charge, prior to extending credit to Plaintiffs and members of the Class. As further alleged herein, Plaintiffs were not provided with copies of their purported loan agreements during the loan application process or otherwise prior to the extension of credit. Plaintiffs only were provided copies of their purported loan agreements, which include key loan terms required to be disclosed pursuant to TILA, *after* Plaintiffs took out their loans.

261.    As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(5) and disclose the applicable "total of payments," calculated as the sum of the amount financed and the finance charge, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation. *See* 15 U.S.C. § 1640(a).

**COUNT SEVEN**
**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(6)**
**FAILURE TO DISCLOSE NUMBER, AMOUNT, AND DUE DATES OR PERIOD**
**PAYMENTS SCHEDULED TO REPAY THE TOTAL OF PAYMENTS**
**(AGAINST DEFENDANT AWL, INC.)**

262.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

263.    TILA, 15 U.S.C. § 1601, *et seq.*, requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated from all other terms or information provided in connection with the transaction.  Among these required disclosures is disclosure of the "number, amount, and due dates or period of payments scheduled to repay the total of payments."  15 U.S.C. §§ 1638(a)(6), 1638(b)(1).

264.    TILA creates a system of strict liability with respect to the statute's disclosure requirements.  If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

265.    TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness."  15 U.S.C. § 1602(g).  Because Defendant AWL, Inc. is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

266.    As alleged herein, Defendant AWL, Inc. violated TILA by failing to make the required disclosure of the applicable "number, amount, and due dates or period of payments scheduled to repay the total of payments," prior to extending credit to Plaintiffs and members of the Class.  As further alleged herein, Plaintiffs were not provided with copies of their purported loan agreements during the loan application process or otherwise prior to the extension of credit.

Plaintiffs only were provided copies of their purported loan agreements, which include key loan terms required to be disclosed pursuant to TILA, *after* Plaintiffs took out their loans.

267.    As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(4) and disclose the applicable finance charge expressed as an "annual percentage rate," using that term, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation.  *See* 15 U.S.C. § 1640(a).

**COUNT EIGHT**
**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(1)**
**FAILURE TO DISCLOSE THE IDENTITY OF THE CREDITOR**
**(AGAINST DEFENDANT AWL, INC.)**

268.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

269.    TILA, 15 U.S.C. § 1601, *et seq.*, requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated from all other terms or information provided in connection with the transaction.   Among these required disclosures is disclosure of the "identity of the creditor required to make disclosure."  15 U.S.C. §§ 1638(a)(1), 1638(b)(1).

270.    TILA creates a system of strict liability with respect to the statute's disclosure requirements.   If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

271.    TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness."  15 U.S.C. § 1602(g).  Because Defendant AWL, Inc.

is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

272.    Here, given the nature of the unlawful online payday lending enterprise alleged herein, Defendant AWL, Inc. is not a "lender in fact," since it performs virtually no role in key lending functions, for example, the financing, marketing, origination, underwriting, servicing, or collection of loans made in the name of American Web Loan.   Moreover, as alleged herein, American Web Loan (including Defendant AWL, Inc.) is a sham front for the unlawful online payday lending enterprise described herein.   Defendant AWL, Inc., as the nominal lender on Plaintiffs' loans, and thus the nominal "creditor" as that term is defined under TILA, had an obligation to inform Plaintiffs and members of the Class who the actual lender(s)/creditor(s) were on their American Web Loan loans.   Defendant AWL, Inc. failed to make such a disclosure, or any disclosure of the true nature of the online payday lending enterprise, prior to extending credit to Plaintiffs and members of the Class.

273.    As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(1) and disclose the true creditor on the loans taken out by Plaintiffs and members of the Class, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation.   *See* 15 U.S.C. § 1640(a).

## COUNT NINE
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

274.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

275.    Defendants have been unjustly enriched by their continued possession of funds illegally taken from Plaintiffs and members of the Class who were experiencing financial

difficulties and taken advantage of through the American Web Loan online payday lending scheme.

276. In equity and good conscience, those funds should be returned to the people victimized by Defendants' unlawful scheme.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully seek the following relief:

A. Certification of this action as a class action and appointing Plaintiffs and their counsel (listed below) to represent the Class;

B. A declaration that loans made in the name of American Web Loan are unlawful, unenforceable, and void.

C. A finding that the Defendants have violated § 1962(c) of RICO through the collection of unlawful debt;

D. A finding that Defendants have violated § 1962(d) of RICO through their conspiracy to engage in the collection of unlawful debt under § 1962(c) of RICO;

E. A finding that Defendant AWL, Inc. violated TILA through the failure to disclose: (1) the "finance charge," 15 U.S.C. § 1638(a)(3); (2) the finance charge expressed as an "annual percentage rate," 15 U.S.C. § 1638(a)(4); (3) the "total of payments," 15 U.S.C. § 1638(a)(5); (4) the total, number, amount, and due dates or period of payments scheduled to repay the total of payments, 15 U.S.C. § 1638(a)(6); and (5) the identity of the creditor, 15 U.S.C. § 1638(a)(1).

F. Awarding Plaintiffs and the Class equitable relief to the extent permitted by the above claims, including but not limited to: an accounting; a return of all unlawful interest and finance charges paid in connection with the loan; disgorgement of profits; a constructive trust; restitution; and/or any other remedy the Court deems proper;

G.      Treble damages under 18 U.S.C. § 1964.

H.      An injunction against further violations of law;

I.      An order awarding attorneys' fees and costs; and

J.      An award of any such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Dated:  March 9, 2018            Respectfully submitted,

**MICHIE HAMLETT**

*/s/ David W. Thomas*
David W. Thomas
500 Court Square, Suite 300
P.O. Box 298
Charlottesville, VA 22902
Telephone: (434) 951-7200
Fax: (434) 951-7218
Email: dthomas@michiehamlett.com

**BERMAN TABACCO**
Kathleen M. Donovan-Maher (*pro hac vice*)
Steven J. Buttacavoli (*pro hac vice*)
Steven L. Groopman (*pro hac vice*)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Fax: (617) 542-1194
Email: kdonovanmaher@bermantabacco.com
       sbuttacavoli@bermantabacco.com
       sgroopman@bermantabacco.com

**GRAVEL & SHEA PC**
Matthew B. Byrne (*pro hac vice*)
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, VT 05402-0369
Telephone: (802) 658-0220
Fax: (802) 658-1456
Email: mbyrne@gravelshea.com

*Counsel for the Plaintiffs and the Class*

Case 2:18-cv-02747-MSG  Document 17-4  Filed 09/14/18  Page 110 of 110

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of March, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

*/s/ David W. Thomas*
David W. Thomas