# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRISTINA WILLIAMS and MICHAEL STERMEL**, on behalf of themselves and all others similarly situated,<br><br>**Plaintiffs,**<br><br>v.<br><br>**RED STONE, INC.**, as successor in interest to **MACFARLANE GROUP, INC., MEDLEY OPPORTUNITY FUND II, LP, MARK CURRY, BRIAN MCGOWAN, VINCENT NEY,** and other **JOHN DOE** persons or entities,<br><br>**Defendants.** | No. 2:18-cv-02747-MSG |

## MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION, TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION, AND TO DISMISS FOR FAILURE TO STATE A CLAIM BY DEFENDANT RED STONE, INC.[1]

Tamara S. Grimm
O'HAGAN MEYER
100 North 18th Street, Suite 700
Two Logan Square
Philadelphia, PA 19103
Telephone: (267) 386-4365
Facsimile: (215) 665-8300
tgrimm@ohaganmeyer.com

Charles K. Seyfarth (*pro hac vice*)
Elizabeth Scott Turner (*pro hac vice*)
O'HAGAN MEYER
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Telephone: (804) 403-7137
Facsimile: (804) 403-7110
cseyfarth@ohaganmeyer.com
eturner@ohaganmeyer.com

Thomas L. Strickland (*pro hac vice*)
Jonathan E. Paikin (*pro hac vice*)
Daniel S. Volchok (*pro hac vice*)
Matthew C. Celestin
Molly M. Jennings (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
thomas.strickland@wilmerhale.com
jonathan.paikin@wilmerhale.com
daniel.volchok@wilmerhale.com
matthew.celestin@wilmerhale.com
molly.jennings@wilmerhale.com

---

[1] Red Stone files this motion for the sole and limited purpose of arguing that this Court should stay these proceedings and compel the parties to undertake arbitration or, in the alternative, dismiss this case, either for lack of jurisdiction because Red Stone is immune from suit as an arm of the Otoe-Missouria Tribe, or for failure to state a claim.  By moving to compel arbitration and to dismiss for failure to state a claim, Red Stone does not waive its immunity from suit.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... iii

BACKGROUND ....................................................................................... 3

   A.   The Otoe-Missouria Tribe................................................... 3

   B.   The Tribe's Economic-Development Efforts........................ 4

   C.   The Formation And Expansion Of AWL............................. 5

   D.   Plaintiffs' Loans And Agreements To Arbitrate.................. 6

GOVERNING STANDARDS................................................................... 8

ARGUMENT ............................................................................................ 9

  I.   This Court Should Compel Arbitration Of Plaintiffs' Claims ................. 9

   A.   Plaintiffs Agreed To Arbitrate Their Claims ................... 9

    1.   Plaintiffs' Loan Agreements Contain Valid Agreements To Arbitrate These Claims .................. 9

    2.   Plaintiffs Agreed To Delegate Questions Of Arbitrability To The Arbitrator .................. 12

   B.   Red Stone May Enforce Plaintiffs' Arbitration Agreements With AWL .................. 13

    1.   Equitable Estoppel Permits Non-Signatory Defendants To Enforce Arbitration Agreements Against Signatory Plaintiffs .................. 13

    2.   Red Stone Has The "Close Relationship" Necessary To Enforce The Arbitration Agreements, Particularly Given The Agreements' Broad Scope .................. 14

    3.   A Sufficient Nexus Exists Between Plaintiffs' Claims And Their Loan Agreements .................. 15

   C.   This Court Should Rule On The Motion To Compel Before Reaching Red Stone's Immunity And Merits Defenses Discussed Below .................. 16

  II.   This Court Should Dismiss Plaintiffs' Claims Because Red Stone Enjoys Sovereign Immunity .................. 17

A.   Consistent With Principles Of Tribal Self-Governance, Sovereign Immunity Extends To An "Arm Of The Tribe" ........................................17

B.   Red Stone Is An Arm Of The Otoe-Missouria Tribe Entitled To Sovereign Immunity ................................................................................18

1.   The Tribal Council Created Red Stone Under Otoe-Missouria Law ................................................................................19

2.   Red Stone's Purpose Is To Facilitate Activities That Fund Essential Government Programs ......................................................20

3.   The Tribe Controls Red Stone ......................................................20

4.   The Tribe Intended To Share Its Immunity With Red Stone .........21

5.   Red Stone's Only Financial Relationship Is With The Tribe ........22

6.   Recognizing Red Stone's Immunity Protects Tribal Self-Determination And Promotes Tribal Economic Development ................................................................................22

III.   This Court Should Dismiss Plaintiffs' Claims Because They Have Failed To Plead Any Actionable Conduct By MacFarlane Group Or Red Stone ...........23

CONCLUSION ...........................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allen v. Gold Country Casino,*
464 F.3d 1044 (9th Cir. 2006) ............................................................................18

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451 (2006).............................................................................................25

*Arthur Andersen LLP v. Carlisle,*
556 U.S. 624 (2009).............................................................................................14

*AT&T Technologies, Inc. v. Communications Workers of America,*
475 U.S. 643 (1986).............................................................................................17

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)...............................................................................................9

*Booth v. BMO Harris Bank, N.A.,*
2014 WL 3952945 (E.D. Pa. Aug. 11, 2014) ...........................................15, 16

*Bowers v. National Collegiate Athletic Association,*
346 F.3d 402 (3d Cir. 2003)................................................................................17

*Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort,*
629 F.3d 1173 (10th Cir. 2010) ..............................2, 18, 19, 20, 21, 22, 23

*Buck v. Hampton Township School District,*
452 F.3d 256 (3d Cir. 2006).................................................................................9

*Buckeye Check Cashing, Inc. v. Cardegna,*
546 U.S. 440 (2006)........................................................................................10, 11

*California v. Cabazon Band of Mission Indians,*
480 U.S. 202 (1987).............................................................................................18

*Choice Hotels International, Inc. v. BSR Tropicana Resort, Inc.,*
252 F.3d 707 (4th Cir. 2001) ................................................................................2

*Constitution Party of Pennsylvania v. Aichele,*
757 F.3d 347 (3d Cir. 2014).................................................................................8

*Cook v. AVI Casino Enterprises, Inc.,*
548 F.3d 718 (9th Cir. 2008) .............................................................................22

*Cotton Petroleum Corp. v. New Mexico,*
490 U.S. 163 (1989).............................................................................................11

*County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,*
    502 U.S. 251 (1992)....................................................................................................4

*Devon Drive Lionville, LP v. Parke Bancorp, Inc.,*
    2018 WL 3585069 (E.D. Pa. July 26, 2018)..........................................................25

*Dillon v. BMO Harris Bank, N.A.,*
    856 F.3d 330 (4th Cir. 2017) ................................................................................12

*Dillon v. Yankton Sioux Tribe Housing Authority,*
    144 F.3d 581 (8th Cir. 1998) ................................................................................19

*Dodds v. Pulte Home Corp.,*
    909 A.2d 348 (Pa. Super. Ct. 2006)................................................................14, 15

*Epic Systems Corp. v. Lewis,*
    138 S. Ct. 1612 (2018)........................................................................................1, 16

*Falat v. County of Hunterdon,*
    2013 WL 1163751 (D.N.J. Mar. 19, 2013)............................................................24

*First Options of Chicago, Inc. v. Kaplan,*
    514 U.S. 938 (1995)..............................................................................................12

*Gavle v. Little Six, Inc.,*
    555 N.W. 2d 284 (Minn. 1996)........................................................................20, 21

*Griswold v. Coventry First LLC,*
    762 F.3d 264 (3d Cir. 2014)..................................................................................14

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.,*
    716 F.3d 764 (3d Cir. 2013)..................................................................................10

*Haas v. Pittsburgh National Bank,*
    526 F.2d 1083 (3d Cir. 1975)................................................................................25

*Hagen v. Sisseton-Wahpeton Community College,*
    205 F.3d 1040 (8th Cir. 2000) ..............................................................................18

*Hartig Drug Company Inc. v. Senju Pharmaceutical Company,*
    836 F.3d 261 (3d Cir. 2016)....................................................................................9

*Hayes v. Delbert Services Corp.,*
    811 F.3d 666 (4th Cir. 2016) ................................................................................12

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
    139 S. Ct. 524 (2019)........................................................................................8, 13

*Howard v. Plain Green, LLC*,
  2017 WL 3669565 (E.D. Va. Aug. 7, 2017), *report and recommendation*
  *adopted*, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017) .....................................................21

*In re Flonase Antitrust Litigation*,
  610 F. Supp. 2d 409 (E.D. Pa. 2009) ..................................................................................25

*In re Money Center of America, Inc.*,
  565 B.R. 87 (D. Del. Bankr. 2017) .....................................................................................19

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3d Cir. 2012) ...................................................................................................8

*J.L. Ward Associates, Inc. v. Great Plains Tribal Chairmen's Health Board*,
  842 F. Supp. 2d 1163 (D.S.D. 2012) ..................................................................................21

*Jackson v. Payday Financial, LLC*,
  764 F.3d 765 (7th Cir. 2014) ...............................................................................................12

*Johnson v. Pennsylvania National Insurance Companies*,
  594 A.2d 296 (Pa. 1991) ......................................................................................................14

*Kelly v. Business Information Group, Inc.*,
  2017 WL 2720173 (E.D. Pa. June 22, 2017) ........................................................................9

*Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*,
  523 U.S. 751 (1998) ..............................................................................................................18

*Lauro Lines S.R.L. v. Chasser*,
  490 U.S. 495 (1989) ..............................................................................................................17

*Lloyd v. HOVENSA, LLC*,
  369 F.3d 263 (3d Cir. 2004) ...................................................................................................2

*MacDonald v. CashCall, Inc.*,
  883 F.3d 220 (3d Cir. 2018) .................................................................................................12

*Mayer v. Belichick*,
  605 F.3d 223 (3d Cir. 2010) ...................................................................................................9

*Memphis Biofuels, LLC v. Chickasaw Nation Industries, Inc.*,
  585 F.3d 917 (6th Cir. 2009) ...............................................................................................18

*Michigan v. Bay Mills Indian Community*,
  134 S. Ct. 2024 (2014) ......................................................................................................4, 18

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
  460 U.S. 1 (1983) ........................................................................................................1, 8, 16

*Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Authority*,
   207 F.3d 21 (1st Cir. 2000) ........................................................................18

*Parm v. National Bank of California*,
   835 F.3d 1331 (11th Cir. 2016) .................................................................12

*Parnell v. CashCall, Inc.*,
   804 F.3d 1142 (11th Cir. 2015) .................................................................13

*Parnell v. Western Sky Financial, LLC*,
   664 F. App'x 841 (11th Cir. 2016) ............................................................13

*Pennachietti v. Mansfield*,
   2017 WL 6311646 (E.D. Pa. Dec. 11, 2017) .............................................8

*Private Solutions, Inc. v. SCMC, LLC*,
   2016 WL 2946149 (D.N.J. May 20, 2016) ................................................19

*Rent-A-Center West, Inc. v. Jackson*,
   561 U.S. 63 (2010) ...............................................................................12, 13

*Ruhrgas AG v. Marathon Oil Company*,
   526 U.S. 574 (1999) ...................................................................................17

*Santa Clara Pueblo v. Martinez*,
   436 U.S. 49 (1978) ..........................................................................3, 17, 18

*Sinochem International Company v. Malaysia International Shipping Corp.*,
   549 U.S. 422 (2007) ...................................................................................16

*Somerlott v. Cherokee Nation Distributors, Inc.*,
   686 F.3d 1144 (10th Cir. 2012) .................................................................19

*Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering*,
   476 U.S. 877 (1986) .............................................................................17, 18

*Torres v. CleanNet, U.S.A., Inc.*,
   90 F. Supp. 3d 369 (E.D. Pa. 2015) ..........................................................14

*United States v. Bryant*,
   136 S. Ct. 1954 (2016) ................................................................................3

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
   515 U.S. 528 (1995) ...................................................................................17

*Weeks Construction, Inc. v. Oglala Sioux Housing Authority*,
   797 F.2d 668 (8th Cir. 1986) .....................................................................19

*White v. University of California*,
  2012 WL 12335354 (N.D. Cal. Oct. 9, 2012)....................................................22

*Williams v. Lee*,
  358 U.S. 217 (1959).........................................................................................17

*Worcester v. Georgia*,
  31 U.S. 515 (1832)...........................................................................................17

*Wright v. Colville Tribal Enterprise Corp.*,
  147 P.3d 1275 (Wash. 2006).............................................................................19

## STATUTES, RULES, AND REGULATIONS

9 U.S.C. §2.............................................................................................................8

25 U.S.C.
  §2210..................................................................................................................4
  §2711................................................................................................................23

41 Pa. Stat. §201 ...................................................................................................24

Pub. L. No. 106-464, 114 Stat. 2012 (Nov. 7, 2000)...........................................23

## OTHER AUTHORITIES

Decision No. 2002-07-16-011, Oklahoma Tax Commission (July 16, 2002),
  https://www.ok.gov/tax/documents/2002-07-16-011.pdf.....................................4

Fletcher, Matthew, L.M., *In Pursuit of Tribal Economic Development as a
  Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759 (2004) ................4

Merjian, Armen H., *An Unbroken Chain of Injustice:  The Dawes Act, Native
  American Trusts, and* Cobell v. Salazar, 46 Gonz. L. Rev. 609 (2011) ..............4

Struve, Catherine T., *Tribal Immunity and Tribal Courts*, 36 Ariz. St. L. J. 137
  (2004)................................................................................................................18

Zimmermann, Anne, *Taxation of Indians: An Analysis and Comparison of New
  Mexico and Oklahoma State Tax Laws*, 41 Tulsa L. Rev. 91 (2005) ..................5

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRISTINA WILLIAMS and MICHAEL STERMEL, on behalf of themselves and all others similarly situated,**<br><br>       **Plaintiffs,**<br><br>   **v.**<br><br>**RED STONE, INC., as successor in interest to MACFARLANE GROUP, INC., MEDLEY OPPORTUNITY FUND II, LP, MARK CURRY, BRIAN MCGOWAN, VINCENT NEY, and other JOHN DOE persons or entities,**<br><br>       **Defendants.** | **No. 2:18-cv-02747-MSG** |

### MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION, TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION, AND TO DISMISS FOR FAILURE TO STATE A CLAIM BY DEFENDANT RED STONE, INC.

Plaintiffs' claims against specially-appearing Defendant Red Stone, Inc. suffer from three fundamental flaws. *First*, both named plaintiffs entered into loan agreements providing that any claims arising under the agreement, including their claims here, must be arbitrated. Consistent with these binding agreements to arbitrate—and with what the Supreme Court has repeatedly called the Federal Arbitration Act's "'liberal federal policy favoring arbitration,'" *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983))—this Court should stay these proceedings and direct the parties to proceed to arbitration (where plaintiffs can raise their various defenses to arbitration, defenses that the arbitration agreement says must be resolved by the arbitrator).

Alternatively, the Court should reject plaintiffs' defenses to arbitration, stay the case, and direct the parties to arbitrate the merits of plaintiffs' claims.[2]

*Second*, this Court lacks jurisdiction to hear any claims against Red Stone. Red Stone has always been 100% "owned by and formed under the laws of the Otoe-Missouria Tribe of Indians." Am. Compl. ¶51. The Tribe itself is immune from suit in federal court, and that immunity extends to Red Stone because: (1) the Tribe created it pursuant to tribal law, (2) its purpose is to fund essential tribal programs, (3) the Tribe controls it, (4) the Tribe intended for it to have sovereign immunity, (5) the Tribe depends on it for essential revenue and benefits, and (6) finding it immune protects tribal self-determination and promotes tribal economic development. *See Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1181 (10th Cir. 2010) (adopting these as the relevant factors). If the Court does not compel arbitration, therefore, it should dismiss all claims against Red Stone because it lacks jurisdiction to hear them.

*Third*, plaintiffs have failed to state an actionable claim against Red Stone. Plaintiffs' claims are based on three loans that plaintiffs took out from AWL, Inc. in 2017: one each on January 17, April 25, and July 28. Am. Compl. ¶¶57, 65, 72. But Red Stone had no direct involvement with those loans. It is, as plaintiffs allege, the successor-in-interest to MacFarlane Group, Inc., an entity that "ceased to exist" "on or about October 3, 2016," *id.* ¶51, i.e., over three months before the first loan at issue here was taken out. Three days later, Red Stone assigned all the assets it had acquired from MacFarlane to AWL, another company owned by the Tribe—and the one from which plaintiffs took out their loans. Shotton Decl. Ex. 8. Not surprisingly, then,

---

[2] The Third Circuit has held that a stay is the only remedy available under section three of the FAA (9 U.S.C. §3). *See Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004). Red Stone submits that the appropriate rule, however, is that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable," *Choice Hotels International, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-710 (4th Cir. 2001). Red Stone preserves this point for further review.

plaintiffs never allege that Red Stone (or MacFarlane Group) took *any* action in connection with their loans.  Nor do they allege that any of the purported participants in their supposed rent-a-tribe scheme is a director, officer, or employee of Red Stone, or that any of those participants otherwise receive any money from Red Stone.  In short, Red Stone's only involvement in the loans that underlie this case is that months before the first of those loans was made, Red Stone held MacFarlane Group's assets for three days as part of a corporate transaction that culminated in those assets being placed in AWL.  That is insufficient.  Plaintiffs' failure to plead any facts meaningfully linking Red Stone to plaintiffs' loans requires dismissal.

## BACKGROUND

### A.     The Otoe-Missouria Tribe

The Otoe-Missouria Tribe is a "'separate sovereign[] pre-existing the Constitution.'" *United States v. Bryant*, 136 S. Ct. 1954, 1962 (2016) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).  Its lineage traces to two tribes, the Otoe and the Missouria, that settled in the lower Missouri River Valley in the 16th century.  Shotton Decl. ¶8.

During the 1800s, the Tribe entered into treaties with the United States, giving up certain land in exchange for a government-to-government relationship defined by friendship, protection, and just and proper treatment.  Shotton Decl. ¶12.  The U.S. government soon backpedaled, however, confining the Tribe to a reservation in southeast Nebraska in order to accommodate settlers seeking farmland west of the Mississippi. *Id.* ¶13.  The Tribe's historic way of life, hunting buffalo, was also forcibly ended by the federal government, which wanted the Tribe to pursue an agricultural economy.  *Id.*  The Tribe attempted to learn the agrarian lifestyle, but it struggled to keep non-Indian settlers off its reservation land.  *Id.*  In 1881, the Otoe-Missouria were again relocated, this time to their current lands in Red Rock, Oklahoma. *Id.* ¶14.

Around the turn of the 20th century, Congress attempted to assimilate Indians by opening tribal lands—including the Otoe-Missouria's—for non-Indian settlement.  Shotton Decl. ¶15; *see also County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 253-254 (1992) (discussing the assimilation policy).  Tribal members were "allotted" a certain number of acres, usually from the least-desirable areas, with the "surplus," i.e., desirable, land made available for sale to non-Indians.  *See* Merjian, *An Unbroken Chain of Injustice:  The Dawes Act, Native American Trusts, and* Cobell v. Salazar, 46 Gonz. L. Rev. 609, 616-617 (2011).  This process robbed the Otoe-Missouria of large portions of their land, leaving its members with a collection of allotted plats held in trust for their benefit by the United States.  Shotton Decl. ¶15.

## B.      The Tribe's Economic-Development Efforts

The Tribe's geographic isolation and other factors have long resulted in significant economic hardship; tribal members experience high unemployment rates and a lack of access to fundamental resources.  Shotton Decl. ¶19.  Alcohol, opioid, and other substance abuses are also chronic problems on tribal lands.  *Id.*

The Tribe's ability to address these problems via tax revenue is limited.  Shotton Decl. ¶20. Even high tax rates would yield insufficient revenue because "'there is no stable tax base on most reservations,'" *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024, 2044-2045 (2014) (Sotomayor, J., concurring) (quoting Fletcher, *In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759, 774 (2004)).  That includes the Otoe-Missouria's.  Shotton Decl. ¶20.  Furthermore, much of the property within the Tribe's jurisdiction is held in trust and therefore tax-exempt.  *See* 25 U.S.C. §2210.  Finally, Oklahoma taxes most tribal members' salaries, further eroding the Tribe's small tax base.  *See* Decision No. 2002-07-16-011, Oklahoma Tax Commission (July 16, 2002), https://www.ok.gov/tax/documents/2002-

07-16-011.pdf; *see also* Zimmermann, *Taxation of Indians:  An Analysis and Comparison of New Mexico and Oklahoma State Tax Laws*, 41 Tulsa L. Rev. 91, 106-110 (2005).

Given these constraints, the Tribe has long pursued commercial options to raise revenue. They have had some success building and operating casinos, but the gaming industry is fiercely competitive, making casino revenue highly variable.  Shotton Decl. ¶22.  The Tribe has thus looked to diversify their revenue sources by establishing new commercial enterprises—including AWL, a company that makes short-term installment loans over the internet.  *Id.* ¶23.

### C.      The Formation And Expansion Of AWL

The Otoe-Missouria Tribal Council, the Tribe's governing body, established AWL pursuant to Tribal law in 2010 as a "sub-agency of the Tribal Council and an agency of the Tribe," "for the purpose of providing revenues with which the Tribe may address … pressing matters of public health, safety, and welfare, or other tribal purposes."  Shotton Decl. Ex. 2, §§201, 202.

At that time, the Tribe lacked the experience to build a consumer-lending operation from scratch, and necessarily relied on outside guidance and funding.  Shotton Decl. ¶25.  The Tribe had similarly relied on outside expertise as they grew their gaming operations.  *Id.* ¶¶21, 25.  To launch AWL, the Tribe contracted with MacFarlane Group, a third-party vendor the owner of which, Mark Curry, had both access to capital and experience running lending businesses.  *Id.* ¶¶26, 34.  While AWL originated all loans, MacFarlane Group provided various necessary services to the business, including human resources, loan servicing, and underwriting guidance.  *Id.* ¶¶26-27.

Over time, as the Tribe gained experience in the lending industry, the Tribal Council considered steps it could take to increase the revenue the Tribe received from AWL.  After deliberation, the Council concluded that the Tribe's interests would be best served if the Tribe

purchased MacFarlane Group and brought the services MacFarlane Group was providing in-house, thereby boosting the revenues retained by the Tribe.  Shotton Decl. ¶¶27-28.

In October 2016, the Tribe finalized a deal to acquire MacFarlane Group.  Shotton Decl. ¶30.  To facilitate the transaction, the Tribal Council created Red Stone and agreed to a merger between it and MacFarlane Group, out of which Red Stone was the surviving company.  *Id.*; Shotton Decl. Ex. 5.  Three days after the merger, Red Stone assigned all of MacFarlane Group's assets to AWL.  Shotton Decl. Ex. 8.  Once it did so, Red Stone was a holding company, with no operations or business activities of its own.  Shotton Decl. ¶33.  Lending activity was carried out by AWL.  *Id.*

The October 2016 transaction gave the Tribe a highly profitable business, one that provides the Tribe with a steady stream of revenue.  Each month since acquiring MacFarlane Group and transferring its assets to AWL, the Tribe has received at least $500,000 from AWL—all of which is used for critical tribal social-services programs, such as housing assistance, child care, and cultural-preservation efforts.  Shotton Decl. ¶¶37-38.  AWL's value has also increased dramatically, further improving the Tribe's financial position.  *Id.* ¶37.  And in a few years, once the Tribe has paid off the debt they incurred to purchase MacFarlane Group, AWL's expenses will decrease significantly, allowing for even greater benefits to the tribal community.  *Id.* ¶41.

### D.     Plaintiffs' Loans And Agreements To Arbitrate

Plaintiffs allege that, between them, they took out three loans from AWL.  Am. Compl. ¶¶57-78.  Christina Williams borrowed twice; once on or about January 17, 2017, and once on or about April 25, 2017.  *Id.* ¶¶57, 65.  And Michael Stermel borrowed once, on or about July 28, 2017.  *Id.* ¶72.  As plaintiffs admit, all three of these loans post-date MacFarlane Group's merger with Red Stone, when MacFarlane Group ceased to exist.  *Id.* ¶51.  The amended complaint makes

no allegations concerning Red Stone's involvement in the origination or servicing of the named plaintiffs' loans—either in its own capacity or as the successor in interest to MacFarlane Group.

Plaintiffs' loan agreements are attached as Exhibits A-C.  The three contain materially identical provisions (frequently in prominent typeface, such as bolding, underlining, and/or capitalization) that require the borrower to arbitrate all claims arising out of the loan agreement.[3]

The loan agreements provide that before initiating arbitration, a borrower must call or email AWL to give it an opportunity to address the borrower's issue.  *See* Ex. A at 15.  AWL, in turn, must investigate and respond to the borrower.  If the matter remains unresolved, the borrower may send a notice of dispute to AWL and begin arbitration.  Ex. A at 15.  The amended complaint does not allege that either plaintiff sent the required notices or otherwise used this dispute-resolution process (and in fact neither did).

Borrowers who initiate arbitration may choose one of two prominent arbitration organizations to arbitrate their dispute:  the American Arbitration Association ("AAA") and JAMS, the Resolution Experts ("JAMS").  Ex. A at 16.  The arbitrator must apply Otoe-Missouria tribal law as well as "the terms of this Agreement."  Ex. A at 17.  Those terms include a choice-of-law clause providing that the loan agreement is governed by both tribal law and "such federal law as is applicable under the Indian Commerce Clause."  Ex. A at 18.

The arbitration agreement contains numerous features favorable to borrowers.  For example, AWL is obligated to "advance or reimburse filing fees and other costs or fees of arbitration for all non-frivolous claims."  Ex. A at 16.  Additionally, borrowers may opt for arbitration "within thirty (30) miles of [his or her] then current residence."  Ex. A at 17.  Finally,

---

[3] Stermel's loan agreement is Exhibit A, while Exhibits B and C are the loan agreements for Williams.  The arbitration provisions are found at Ex. A at 15-18, Ex. B at 14-17, and Ex. C at 14-17.  Because the three agreements are materially identical, this motion will cite only to Exhibit A.

borrowers may opt out of arbitration entirely by writing or emailing AWL within 60 days of the loan-origination date. Ex. A at 15. Those who do so agree to have any disputes governed by Otoe-Missouria law and resolved within the Tribe's court system. *Id*. The amended complaint does not allege that either plaintiff exercised this opt-out right (and in fact neither did).

## GOVERNING STANDARDS

Under the Federal Arbitration Act (FAA), "[a] written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. "The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25. "When the parties' contract delegates the arbitrability question to an arbitrator, a court … possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

Motions to dismiss based on tribal sovereign immunity are properly brought under Rule 12(b)(1). *Pennachietti v. Mansfield*, 2017 WL 6311646, at \*2 (E.D. Pa. Dec. 11, 2017). The process for resolving such a motion depends on whether the motion mounts a "facial" or a "factual" challenge to the amended complaint's allegations. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). When, as here, the challenge is factual (i.e., one that argues "the facts of the case … do not support the asserted jurisdiction"), the court may "weigh and 'consider evidence outside the pleadings.'" *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (citation omitted). With such a challenge, moreover, "no presumptive truthfulness attaches to [the] plaintiff's allegations," and "the plaintiff [has] the

burden of proof that jurisdiction does in fact exist." *Hartig Drug Company Inc. v. Senju Pharmaceutical Company*, 836 F.3d 261, 268 (3d Cir. 2016) (citation omitted).

When deciding a Rule 12(b)(6) motion to dismiss, the court "accept[s] as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Hartig*, 836 F.3d at 268. The court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In resolving the motion, the court may consider, in addition to the complaint's allegations, "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## ARGUMENT

### I.   THIS COURT SHOULD COMPEL ARBITRATION OF PLAINTIFFS' CLAIMS

Each plaintiff here entered into a valid arbitration agreement that encompasses the claims at issue—as well as any disputes regarding whether claims must in fact be arbitrated. This Court should therefore stay the case and compel plaintiffs to arbitrate their claims (and any challenges they wish to bring regarding whether their claims are indeed arbitrable).[4]

#### A.   Plaintiffs Agreed To Arbitrate Their Claims

##### 1.   *Plaintiffs' Loan Agreements Contain Valid Agreements To Arbitrate These Claims*

By entering into loan agreements with AWL, both plaintiffs agreed to arbitrate "*any* dispute … related to" those agreements. Ex. A at 15 (emphasis added). "Dispute," in turn, is defined as

---

[4] Plaintiffs' agreements to arbitrate are contained within their loan agreements (attached as Exhibits A-C), which may be considered on this motion because they are heavily referenced throughout the amended complaint and "integral to [plaintiffs'] claim[s]." *Buck v. Hampton Township School District*, 452 F.3d 256, 260 (3d Cir. 2006); *see also Kelly v. Business Information Group, Inc.*, 2017 WL 2720173, at *2 (E.D. Pa. June 22, 2017) (collecting cases).

"any claim or controversy of any kind between [the borrower and AWL] or otherwise involving this Agreement or the Loan." *Id.* Plaintiffs' claims fall squarely within this language, as they all flow from the allegedly usurious interest rates imposed on their loans by the loan agreements.

In their response to Red Stone's Rule 12 letter, however, plaintiffs contend that discovery is necessary to resolve this motion. ECF No. 73 at 3. That is not so. The Third Circuit has held that, in order to "appropriately foster[] the FAA's interest in speedy dispute resolution," courts should compel arbitration, without discovery, when arbitrability "'is apparent on the face of a complaint (or … documents relied upon in the complaint).'" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773-774 (3d Cir. 2013) (omission in original). To overcome this interest in expediency, an opponent of arbitration must "come forth with reliable evidence that is more than a 'naked assertion … that it did not intend to be bound' by the arbitration agreement, even though on the face of the pleadings it appears that it did." *Id.* at 774 (omission in original) (citation omitted). Far from contending they have such reliable evidence, plaintiffs do not identify any factual *questions* that the arbitration agreements (which are cognizable given their integral role in plaintiffs' claims) leave unanswered; the "new facts" plaintiffs identify all pertain to whether Red Stone is immune from suit. This does not come close to showing a basis for discovery.

On the merits, there is no sound reason why plaintiffs should not have to honor their agreement to arbitrate. Although the amended complaint alleges that plaintiffs' *loans* were "void and unenforceable," Am. Compl. ¶¶17, 21, 25, 27, 30, 34, these allegations do not invalidate their *agreements to arbitrate*. The Supreme Court unanimously held as much in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), which rejected a similar challenge to an arbitration agreement in a check-cashing contract, a challenge based on the theory that the entire contract was invalid because it contained an allegedly usurious finance charge, *id.* at 444-446. The

Court explained that because any purported usury would infect the entire loan agreement, and "not specifically its arbitration provisions," those provisions were "enforceable apart from the remainder of the contract." *Id.* at 446. Plaintiffs' allegations here of excessive interest rates suffer from the same flaw; they apply to the loan agreements as a whole rather than the arbitration provision specifically. As in *Buckeye Check Cashing*, therefore, the interest rate on AWL's loans offers no justification for disregarding the arbitration agreements plaintiffs signed.

Plaintiffs are also wrong in contending that the arbitration agreement is unenforceable because it "expressly disavows the application of all relevant federal and state law to any dispute and specifically forbids an arbitrator from applying any of the federal or state laws governing a consumer's claims," ECF No. 73 at 2. The choice-of-law clause in plaintiffs' loan agreements specifies that the agreements are governed by tribal law and "such federal law as is applicable under the Indian Commerce Clause." Ex. A at 18. And the choice-of-law provision of the arbitration agreement directs the arbitrator to "apply Tribal law and the terms of this Agreement," terms that include the choice-of-law clause just quoted. *Id.* at 17. Hence, the agreement by its terms requires rather than disavows the application of federal law.

In fact, it requires the arbitrator to apply the exact same body of federal law that would apply in litigation. In litigation, the only federal law that could apply to Red Stone is "such federal law as is applicable under the Indian Commerce Clause." That clause, the Supreme Court has explained, is the constitutional provision by which Congress makes federal laws applicable to Indian entities, such as AWL or Red Stone. *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989). Hence, if a certain law is inapplicable under the Indian Commerce Clause, then it is just as inapplicable in litigation as in arbitration. Pursuing their claims in arbitration therefore does not cause plaintiffs to waive any federal remedies they would otherwise have in court.

The out-of-circuit cases that plaintiffs principally rely on—*Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016), and *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017)—do not support plaintiffs' argument because the language in the loan agreement in each of those cases was materially different from the language here.  In particular, the agreement in each case expressly prevented the arbitrator from applying any federal law.  The agreement in *Hayes*, for example, provided that it was "subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement."  811 F.3d at 670.  The language in *Dillon* similarly said that no "federal law or regulation shall apply to this Agreement."   856 F.3d at 332.  And neither agreement expressly adopted applicable federal law, as the agreement here does.

Finally, plaintiffs cite (ECF No. 73 at 2) five cases that refused to enforce arbitration agreements involving tribal lending entities.  But those holdings all rested on a conclusion that the prescribed arbitral forum was illusory.  *See, e.g.*, *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 232 (3d Cir. 2018); *Parm v. National Bank of California*, 835 F.3d 1331, 1338 (11th Cir. 2016); *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 778-779 (7th Cir. 2014).  Plaintiffs' agreement, which identifies two prominent arbitration organizations as arbitrators, does not have this concern.

> ### 2.      *Plaintiffs Agreed To Delegate Questions Of Arbitrability To The Arbitrator*

If plaintiffs do argue prospective waiver, or otherwise dispute whether their claims are subject to arbitration, those disputes must themselves be resolved by the arbitrator.

In a typical arbitration agreement, the court answers "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate … a particular controversy," *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010), while the arbitrator decides the merits of the "disputes … that the parties have agreed to … arbitrat[e]," *First Options of Chicago, Inc. v.*

*Kaplan*, 514 U.S. 938, 943 (1995). But "who decides arbitrability is itself a question of contract," and parties may "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions." *Henry Schein*, 139 S. Ct.at 527. Such "delegation provision[s]," *Rent-A-Center West*, 561 U.S. at 68, are enforceable if there is "'clear and unmistakable' evidence" that the parties intended to "delegate threshold arbitrability questions to the arbitrator," *Henry Schein*, 139 S. Ct. at 530.

The delegation provision in plaintiffs' agreements satisfies this standard. As explained, plaintiffs agreed "that *any* dispute … related to this agreement will be resolved by binding arbitration." *E.g.*, Ex. A at 15 (emphasis added). "Dispute," in turn, encompasses "any issue concerning the validity, enforceability, or scope of this … Agreement to Arbitrate." *Id.* at 16. The Eleventh Circuit has held that materially identical language satisfied the "clear and unmistakable evidence" standard. *See Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1148 (11th Cir. 2015). This Court should do the same regarding the language here.[5]

**B.     Red Stone May Enforce Plaintiffs' Arbitration Agreements With AWL**

The fact that Red Stone is not a party to plaintiffs' arbitration agreements with AWL does not preclude it from enforcing those agreements here. Under the doctrine of equitable estoppel, plaintiffs may not rely on their loan agreements as a basis for relief (even against a non-signatory) without abiding by the terms of those agreements, including the arbitration provision.

*1.     Equitable Estoppel Permits Non-Signatory Defendants To Enforce Arbitration Agreements Against Signatory Plaintiffs*

"[A] litigant who was not a party to the relevant arbitration agreement may" enforce the

_____

[5] In a subsequent appeal, the Eleventh Circuit held that the delegation provision in question was unenforceable because it delegated to an illusory forum. *See Parnell v. Western Sky Financial, LLC*, 664 F. App'x 841, 844 (11th Cir. 2016) (per curiam). Plaintiffs here make no allegation that the designated forum is illusory—rightly so, especially given that multiple arbitrations with AWL customers have taken place in the past year.

agreement "if the relevant state contract law allows him to enforce the agreement." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009).  And "Pennsylvania law embraces the theory of equitable estoppel," which "enables a non-signatory to compel a signatory to arbitrate." *Torres v. CleanNet, U.S.A., Inc.*, 90 F. Supp. 3d 369, 379 (E.D. Pa. 2015); *see also Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014).  In particular, "non-signatories to an arbitration agreement can enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties." *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006).  This rule exists because "it seems inequitable to permit [a litigant] to pick and choose those contract provisions she prefers while not granting the same latitude to the" litigant's opponent. *Johnson v. Pennsylvania National Insurance Companies*, 594 A.2d 296, 299 (Pa. 1991).  Applying *Dodds*, another judge in this district has held that "for equitable estoppel to apply, a non-signatory must establish that: (1) a close relationship exists between the entities involved; and (2) the claims against it are 'intimately founded in and intertwined with the underlying contractual obligations.'" *Torres*, 90 F. Supp. 3d at 379.  Both criteria are met here.

> 2.   *Red Stone Has The "Close Relationship" Necessary To Enforce The Arbitration Agreements, Particularly Given The Agreements' Broad Scope*

As explained, Red Stone is a holding company created in 2016 by the Otoe-Missouria Tribal Council to facilitate AWL's acquisition of MacFarlane Group.  *See supra* p.6.  Specifically, Red Stone merged with MacFarlane Group, emerged as the surviving entity, and then assigned its entire interest to AWL, leaving Red Stone a holding company without any of its own operations.  These close corporate relationships underscore the overlapping interests between Red Stone and AWL; *Dodds* relied on similar overlap between a defendant parent corporation who was not a signatory to an arbitration agreement and a signatory subsidiary who was not party to the litigation

in holding that the non-signatory parent could enforce the agreement against a plaintiff signatory. *See* 909 A.2d at 352.  This Court should hold likewise here.

The arbitration agreements' capacious scope buttresses the point.  The agreements provide that borrowers "agree that any dispute … related to this agreement will be resolved by binding arbitration."  Ex. A at 15.  And they define "dispute" as "any claim or controversy of any kind between you and us *or otherwise* involving this Agreement or the Loan."  Ex. A at 15 (emphasis added).  The italicized language demonstrates that the arbitration agreements were intended to apply to disputes beyond those between "you and us," i.e., borrowers and AWL, so long as the dispute "involv[ed] this Agreement or the Loan."  This "intent" of the parties to include non-signatories (like Red Stone) within the arbitration agreements further supports a finding that the "close relationship" criterion is satisfied.  *See Booth v. BMO Harris Bank, N.A.*, 2014 WL 3952945, at *5 (E.D. Pa. Aug. 11, 2014) (citing *Dodds*, 909 A.2d at 351).

3.    *A Sufficient Nexus Exists Between Plaintiffs' Claims And Their Loan Agreements*

Plaintiffs' claims against Red Stone all flow from the alleged illegality of their loans from AWL; all five counts of the amended complaint are viable only if plaintiffs' loan agreements with AWL charged a usurious interest rate.  Had those loans never existed, defendants would have neither charged nor collected allegedly unlawful debt from the plaintiffs.  This makes plaintiffs' claims "intimately founded in and intertwined with" their loan agreements, *Torres*, 90 F. Supp. 3d at 379, and hence Red Stone can hold plaintiffs' to their obligation to arbitrate.

*Booth* makes this clear.  In that case, the plaintiff entered into three short-term loan agreements with three different lenders, each of which contained an arbitration provision similar to the one here.  *See* 2014 WL 3952945, at *1-3.  But the plaintiff did not sue the lenders; she sued three financial institutions that allegedly facilitated the repayment of the loans.  *Id.* at *1.  The

- 15 -

Court granted the defendants' motion to compel arbitration, holding that the plaintiff's claims were sufficiently intertwined with the loan agreements. *Id.* at *6. It explained that "all of Plaintiff's claims rely on the terms of the Loan Agreements being illegal because of allegedly usurious interest rates," leading to "the natural conclusion … that Plaintiff's claims are intertwined with the Loan Agreements that contain both the usurious interest rates and the arbitration provisions." *Id. Booth* is on all fours with this case, and the same result should obtain here.[6]

### C.   This Court Should Rule On The Motion To Compel Before Reaching Red Stone's Immunity And Merits Defenses Discussed Below

This Court can and should first resolve Red Stone's request to compel arbitration, and address Red Stone's arguments for dismissal only if it denies that request. The FAA codified "Congress's judgment" that arbitration frequently offers "quicker, more informal, and often cheaper resolutions for everyone involved." *Epic Systems*, 138 S. Ct. at 1621. "Congress's clear intent" was thus "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone*, 460 U.S. at 22. It would frustrate that intent (and undermine judicial efficiency and economy) not to address the arbitration request before the other defenses—defenses that will not need to be resolved at all if arbitration is compelled.

That one of Red Stone's defenses challenges this Court's subject-matter jurisdiction does not change the analysis. To be sure, "a federal court generally may not rule on the *merits* of a case without first determining that it has jurisdiction." *Sinochem International Company v. Malaysia International Shipping Corp.*, 549 U.S. 422, 430-431 (2007) (emphasis added). But whether to compel arbitration is not a merits issue. Indeed, the Supreme Court has expressly said that "in deciding whether the parties have agreed to … arbitration, a court is *not* to rule on the potential

---

[6] *Booth* also rebuts plaintiffs' claim (ECF No. 73 at 2) that Red Stone cannot enforce the arbitration agreement because plaintiffs' complaint contains "claims external to the contract." *Booth* likewise involved such claims, yet equitable estoppel was held available. *Booth*, 2014 WL 3952945, at *1.

merits of the underlying claims." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986) (emphasis added).  That is because arbitration clauses are "a subset of foreign forum selection clauses," *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 534 (1995), and a ruling on whether to enforce a forum-selection clause "is not a decision on the merits," *Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495, 498 (1989).

Because "there is no mandatory 'sequencing of [non-merits] issues,'" *Sinochem*, 549 U.S. at 431 (quoting *Ruhrgas AG v. Marathon Oil Company*, 526 U.S. 574, 584 (1999)), this Court may compel arbitration before deciding if Red Stone is immune from suit—just as "a court may reserve judgment on Eleventh Amendment issues even when advanced by a state where it can resolve the case on other grounds and the prevailing party on the merits would be the same as the prevailing party if immunity were recognized," *Bowers v. National Collegiate Athletic Association*, 346 F.3d 402, 418 (3d Cir. 2003).  As discussed, ruling on arbitration first is the better course.

## II.  This Court Should Dismiss Plaintiffs' Claims Because Red Stone Enjoys Sovereign Immunity

### A.  Consistent With Principles Of Tribal Self-Governance, Sovereign Immunity Extends To An "Arm Of The Tribe"

The Supreme Court has long recognized Indian tribes as "distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial."  *Worcester v. Georgia*, 31 U.S. 515, 519 (1832).  Tribes thus possess an inherent sovereignty that predates the Constitution, sovereignty they exercise by enacting laws and regulations, fostering relationships with other sovereigns (states and the federal government), preserving cultural identity, and improving their economies and the well-being of their citizens. *See generally Williams v. Lee*, 358 U.S. 217 (1959); *Santa Clara Pueblo*, 436 U.S. at 55-56.

One bedrock component of tribal sovereignty is immunity from suit, "a necessary corollary to Indian sovereignty and self-governance."  *Three Affiliated Tribes of the Fort Berthold*

*Reservation v. Wold Engineering*, 476 U.S. 877, 890 (1986).  Unconsented suit against a tribe interferes with the tribal government's authority, threatening its "ability to govern itself according to its own laws," *id.* at 891, and its economic well-being, *Santa Clara Pueblo*, 436 U.S. at 71.

Tribal immunity extends to tribes' commercial as well as governmental actions, and to both on- and off-reservation activities.  *See Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 755 (1998); *see also Bay Mills*, 134 S. Ct. at 2031.  It also extends beyond tribes themselves, to "arms of the tribe," i.e., tribal entities created to facilitate economic development or carry out other tribal functions.  *See Breakthrough*, 629 F.3d at 1183; *Memphis Biofuels, LLC v. Chickasaw Nation Industries, Inc.*, 585 F.3d 917, 920-921 (6th Cir. 2009); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006); *Hagen v. Sisseton-Wahpeton Community College*, 205 F.3d 1040, 1043 (8th Cir. 2000); *Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Authority*, 207 F.3d 21, 29 (1st Cir. 2000).

The extension of tribal immunity to arms of the tribe is consistent with the immunity's purposes.  Tribal business operations "are critical to the goals of tribal self-sufficiency because such enterprises … 'may be the only means by which a tribe can raise revenues.'"  *Bay Mills*, 134 S. Ct. at 2043 (Sotomayor, J., concurring) (quoting Struve, *Tribal Immunity and Tribal Courts*, 36 Ariz. St. L. J. 137, 169 (2004)).  Indeed, federal policy for the past few decades has been to encourage tribal economic development, with the goal of decreasing tribal dependence on federal funding.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 217 n.20 (1987) ("It is important to the concept of self-government that tribes reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government.").

**B.      Red Stone Is An Arm Of The Otoe-Missouria Tribe Entitled To Sovereign Immunity**

To determine whether an entity is an arm of a tribe and shares its sovereign immunity,

many courts—including in this circuit—have used a six-factor test adopted by the Tenth Circuit in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*. *See Private Solutions, Inc. v. SCMC, LLC*, 2016 WL 2946149, at *5 (D.N.J. May 20, 2016); *In re Money Center of America, Inc.*, 565 B.R. 87, 97-100 (D. Del. Bankr. 2017). That test considers six factors: (1) the entity's method of creation; (2) its purpose; (3) its structure, ownership, and management, including the amount of control the tribe has over it; (4) whether the tribe intended it to have tribal immunity; (5) the financial relationship between it and the tribe; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity. *Breakthrough*, 629 F.3d at 1181.

Applying these factors leaves no doubt that Red Stone is an arm of the Tribe—that is, that "the relationship between the tribe and [Red Stone] is sufficiently close to properly permit [Red Stone] to share in the tribe's immunity," *Breakthrough*, 629 F.3d at 1183.

### 1.     *The Tribal Council Created Red Stone Under Otoe-Missouria Law*

The first *Breakthrough* factor concerns the "method of creation" of the entity at issue. *See* 629 F.3d at 1191. Where a tribe creates an entity "under tribal law," the factor favors immunity. *Id.* If instead the entity was created under state law, then this factor cuts against immunity because the entity "voluntarily subject[ed]" itself "to the authority of another sovereign." *Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1149 (10th Cir. 2012); *accord Wright v. Colville Tribal Enterprise Corp.*, 147 P.3d 1275, 1280 (Wash. 2006).

Red Stone was created under tribal law. The Otoe-Missouria Tribal Council created it by resolution under the Tribe's Corporation Act. Shotton Decl. Exs. 6, 7. Because Red Stone was "established by a tribal council pursuant to its powers of self-government," it is "an arm of tribal government … [and] possesses attributes of tribal sovereignty." *Weeks Construction, Inc. v. Oglala Sioux Housing Authority*, 797 F.2d 668, 670-671 (8th Cir. 1986); *accord Dillon v. Yankton*

*Sioux Tribe Housing Authority*, 144 F.3d 581, 583 (8th Cir. 1998).  This factor therefore favors immunity.

> 2.   *Red Stone's Purpose Is To Facilitate Activities That Fund Essential Government Programs*

The second *Breakthrough* factor is the putatively immune entity's purpose.  *See* 629 F.3d at 1191.  If the entity was "created for the financial benefit of the [t]ribe and to enable it to engage in … governmental functions," then the factor "weighs strongly in favor of immunity."  *Id.* at 1192; *see Gavle v. Little Six, Inc.*, 555 N.W. 2d 284, 294 (Minn. 1996).  That is the situation here.

Red Stone's founding documents make clear that its animating purpose is to fund and otherwise strengthen the Tribe.  The Tribal Council established Red Stone to "provid[e] revenues with which the [Tribe] may address … pressing matters of public health, safety, and welfare, or other Tribal purposes."  Shotton Decl. Ex. 7, art. 2.  Red Stone's articles of incorporation similarly contemplate that it will assist in providing revenues to the Tribe—by, for example, "stimulat[ing] the economy of the Tribe" and "work[ing] cooperatively with other chartered corporations or entities of the Tribe."  *Id.*  Red Stone's role in facilitating the Tribe's acquisition of MacFarlane Group makes clear that it has accomplished this purpose:  That transaction has already generated millions of dollars of revenue for the Tribe's government, and is expected to generate significantly more in the years to come.  Shotton Decl. ¶¶37, 41.

> 3.   *The Tribe Controls Red Stone*

The third *Breakthrough* factor considers indicia of tribal control, such as the "structure, ownership, and management" of the entity claiming immunity.  629 F.3d at 1193.  These indicia can be found in tribal laws, the entity's constitutive documents, or other sources that set out the entity's governance structures.  *See id.*

There is no question that the Tribe controls Red Stone.  Red Stone's board of directors

"shall be the currently serving Tribal Council," with members losing their seat on the board when their Council term expires.  Shotton Decl. Ex. 7, art. 4(a).  This ensures that the Tribe's elected officials always have direct oversight of Red Stone's activities, and that Red Stone is "accountable to the [tribe] and tribal members," *J.L. Ward Associates, Inc. v. Great Plains Tribal Chairmen's Health Board*, 842 F. Supp. 2d 1163, 1176-1177 (D.S.D. 2012).  This board structure alone would be sufficient to demonstrate the Tribe's control over Red Stone, *see Gavle*, 555 N.W.2d at 295 (information about board composition sufficient to establish a "close link between the [tribe] and the management of [the entity]"), but the Tribe has gone further, appointing its Vice-Chairman, Ted Grant, as Red Stone's President, Shotton Decl. ¶31, and providing by law that Red Stone's only share "at all times will be wholly-owned by the Tribe," Shotton Decl. Ex. 7, art. 3.

4.      *The Tribe Intended To Share Its Immunity With Red Stone*

The fourth *Breakthrough* factor is whether a tribe intended to share its sovereign immunity with the tribal entity.  *See* 629 F.3d at 1193-1194.  In considering this factor, courts typically look to tribal ordinances or the entity's articles of incorporation.  One court, for example, found this factor "unequivocally" met where the articles of organization expressly conferred sovereign immunity on a lending entity.  *Howard v. Plain Green, LLC*, 2017 WL 3669565, at *4 (E.D. Va. Aug. 7, 2017), *report and recommendation adopted*, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017).

The Otoe-Missouria Tribe has consistently expressed its intent that Red Stone share the Tribe's sovereign immunity—beginning with the 2016 ordinance creating Red Stone, which provides that Red Stone "shall be possessed of all the privileges and immunities of the Tribe, including but not limited to the sovereign immunity of the Tribe," Shotton Decl. Ex. 6.  The Tribal Council reaffirmed this intent in a recent amendment to the Tribe's Corporation Act, which makes clear that a corporation wholly owned by the Tribe and incorporated under tribal law "shall be considered an arm and instrumentality of the Tribe, and shall be vested with all attributes of tribal

- 21 -

sovereignty."  Shotton Decl. Ex. 4 §1301.  The Tribe has thus "clearly expressed its belief that [Red Stone is] a division of the Tribe that [is] entitled to its immunity from suit," satisfying the fourth factor.  *Breakthrough*, 629 F.3d at 1194.

> 5.    *Red Stone's Only Financial Relationship Is With The Tribe*

The fifth *Breakthrough* factor concerns "the financial relationship between the Tribe and the entit[y]," 629 F.3d at 1194, specifically, how much of the overall economic value of the entity flows to the tribe as opposed to third parties.  This factor favors immunity where the Tribe is entitled to the company's profits and "the Tribe, as the sole shareholder, enjoys all of the benefits of an increase in [the entity's] value."  *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 726 (9th Cir. 2008).  Again, that is the situation here.

Red Stone's articles of incorporation, adopted by the Tribal Council, state that one of its purposes is "distribution of … profit to the government of the Tribe," Shotton Decl. Ex. 7, art. 2(b), that the Tribe is Red Stone's sole owner, *id.* art. 3, and that "[n]o individual or entity other than the Tribe or a subdivision thereof shall acquire any ownership interest in Red Stone," *id.*  Tribal law thus ensures that the Tribe alone can receive any profits from Red Stone (although Red Stone has no profits, because as discussed it is a holding company with no actual operations).  Nor does Red Stone "receive financial support from non-tribal entities," further demonstrating that it "cannot fairly be seen as a vehicle for other interests" beyond the Tribe's.  *White v. University of California*, 2012 WL 12335354, at *7 (N.D. Cal. Oct. 9, 2012), *aff'd*, 765 F.3d 1010 (9th Cir. 2014).

> 6.    *Recognizing Red Stone's Immunity Protects Tribal Self-Determination
> And Promotes Tribal Economic Development*

The final *Breakthrough* factor considers "the policies underlying tribal sovereign immunity and its connection to tribal economic development"—namely, "protection of the tribe's monies …

as well as 'preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians'"—and, in addition, "whether those policies are served by granting immunity to the economic entities."  629 F.3d at 1187-1188 (citation omitted).  This factor favors immunity here because Red Stone was instrumental in allowing the Tribe to acquire MacFarlane Group and thus expand its ability to service the loans issued by AWL.

Congress has recognized that achieving tribal economic self-sufficiency requires partnership with the "private market, adequate capital, and technical expertise."  Native American Business Development, Trade Promotion, and Tourism Act of 2000, Pub. L. No. 106-464, 114 Stat. 2012 (Nov. 7, 2000).  Indeed, it is an "obligation" of the United States to "encourage investment from outside sources" in Indian businesses and to "facilitate economic ventures with outside entities that are not tribal entities."  *Id.*  In the gaming context, Congress similarly contemplated and endorsed tribes contracting with non-tribal third parties to obtain the capital and expertise necessary to manage their casinos.  *See* 25 U.S.C. §2711(d)(9).  As explained, Red Stone was created to further precisely these purposes—and achieved them, by facilitating the Tribe's acquisition of MacFarlane Group and the concomitant expansion of its lending business.

## III.   THIS COURT SHOULD DISMISS PLAINTIFFS' CLAIMS BECAUSE THEY HAVE FAILED TO PLEAD ANY ACTIONABLE CONDUCT BY MACFARLANE GROUP OR RED STONE

Plaintiffs have not alleged a single action that Red Stone (or MacFarlane Group) took in connection with their loans.  That is because MacFarlane Group ceased to exist in October 2016, Am. Compl. ¶51, and Red Stone has been only a holding company (one that does not engage in any lending activity) since long before any of plaintiffs' loans were issued.  Plaintiffs' failure to connect Red Stone to the alleged illegal activity is fatal to each of their claims against Red Stone.

To start, each of plaintiffs' state-law claims (counts I-IV) requires them to plead that Red Stone (or MacFarlane Group) took a particular action connected to their loans. Pennsylvania's usury law, for example (count I), prohibits charging interest of more than "six per cent per annum" on a loan of less than $50,000. 41 Pa. Stat. §201. But plaintiffs' amended complaint nowhere alleges that Red Stone was responsible for their loans. The lender for each loan is instead (correctly) alleged to be AWL. Am. Compl. ¶¶57, 65, 72. Likewise, although the amended complaint acknowledges that the Pennsylvania Unfair Trade Practices and Consumer Protection Law (count II) requires a showing that Red Stone extended loans at an unlawful interest rate, serviced or collected on loans bearing an unlawful rate, or otherwise misrepresented the nature of the loans plaintiffs received, *id.* ¶¶92-103, plaintiffs have not pled any such activity with regard to their loans by Red Stone (again, because AWL was the lender for those loans), *id.* ¶¶57, 65, 72. Counts III (Pennsylvania Fair Credit Extension Uniformity Act) and IV (Pennsylvania Credit Services Act) against Red Stone fail for similar reasons. The former relies on allegations that "Defendants" collected or attempted to collect unlawful interest, falsely represented the legal status of the outstanding debt, and made threats to take unlawful action related to that debt. *Id.* ¶¶104-106. And the latter depends on alleged misrepresentations by "Defendants" about interest on the loans extended to plaintiffs, failure to disclose a financial interest in those loans, failure to provide certain documentation associated with those loans, and other unspecified deceptive conduct. *Id.* ¶¶107-113. But there is no allegation that Red Stone (a holding company) or MacFarlane Group (which ceased to exist months before plaintiffs took out their loans) was actually involved in the marketing, servicing or collection of the loans. Plaintiffs' "impermissibly vague group pleading," *Falat v. County of Hunterdon*, 2013 WL 1163751, at *3 (D.N.J. Mar. 19, 2013), does not suffice to state a claim against Red Stone on any of the state-law claims.

Plaintiffs' RICO claims (count V) also fail.  Plaintiffs allege that MacFarlane Group violated 18 U.S.C. §1962(c) and §1962(d)—and that its liability can be imputed to Red Stone as successor-in-interest—because what plaintiffs characterize as the "American Web Loan, Inc. and AWL, Inc. Enterprise" extended unlawful debt to them.  As this Court has explained, however, RICO liability exists only if "the defendant's RICO violation [was] the proximate cause of the plaintiff's injury"; "but for" causation does not suffice.  *Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, 2018 WL 3585069, at *5 (E.D. Pa. July 26, 2018), *appeal docketed*, No. 18-2862 (3d Cir. Aug. 22, 2018); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).  The amended complaint's RICO claims against Red Stone do not clear this bar.  Again, plaintiffs have not pled that either MacFarlane Group or Red Stone was involved in the origination or servicing of their loans; therefore, neither entity can be the proximate cause of the injury alleged.

Plaintiffs cannot salvage their claims against Red Stone by alleging that an unnamed putative class member obtained a loan from AWL during the time that MacFarlane Group existed. A plaintiff "may not maintain an action on behalf of a class against a specific defendant if the plaintiff is unable to assert an individual cause of action against that defendant."  *Haas v. Pittsburgh National Bank*, 526 F.2d 1083, 1096 n.18 (3d Cir. 1975).  In other words, "at least one named Plaintiff must have a cause of action on a claim for that claim to survive a motion to dismiss."  *In re Flonase Antitrust Litigation*, 610 F. Supp. 2d 409, 414 (E.D. Pa. 2009).  That is not the case here.

## CONCLUSION

This Court should compel arbitration or, in the alternative, dismiss plaintiffs' claims against Red Stone.

Date: February 11, 2019

Respectfully submitted,

RED STONE, INC., successor in interest to
MACFARLANE GROUP, INC.

By Counsel


_____/s/_____

Tamara S. Grimm, Esquire
O'HAGAN MEYER
100 North 18th Street, Suite 700
Two Logan Square
Philadelphia, PA 19103
Telephone: (267) 386-4365
Facsimile: (215) 665-8300
tgrimm@ohaganmeyer.com

Charles K. Seyfarth (*pro hac vice*)
Elizabeth Scott Turner (*pro hac vice*)
O'HAGAN MEYER
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Telephone: (804) 403-7137
Facsimile: (804) 403-7110
cseyfarth@ohaganmeyer.com

Thomas L. Strickland (*pro hac vice*)
Jonathan E. Paikin (*pro hac vice*)
Daniel S. Volchok (*pro hac vice*)
Matthew C. Celestin
Molly M. Jennings (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
thomas.strickland@wilmerhale.com
jonathan.paikin@wilmerhale.com
daniel.volchok@wilmerhale.com
molly.jennings@wilmerhale.com
matthew.celestin@wilmerhale.com

*Counsel for Specially-Appearing Defendant*
*Red Stone, Inc., successor in interest to*
*MacFarlane Group, Inc.*

- 26 -