# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

CHRISTINA WILLIAMS and MICHAEL :
STERMEL, on behalf of themselves and all :
others similarly situated, :  CASE NO. 2:18-cv-02747-MSG
 :
   Plaintiffs, :
 :
  vs. :
 :
RED STONE, INC., as successor in interest :
to MACFARLANE GROUP, INC., :
MEDLEY OPPORTUNITY FUND II, LP, :
MARK CURRY, BRIAN MCGOWAN, :
VINCENT NEY, and other JOHN DOE :
Persons or entities, :
 :
   Defendants. :

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO MOTIONS TO COMPEL ARBITRATION

---

Matthew W. H. Wessler, Esq.
(*Pro Hac Vice*)
GUPTA WESSLER PLLC
1900 L Street, Suite 312
Washington, D.C. 20036
(202) 888-1741
matt@guptawessler.com

Michael J. Quirk, Esq.
(PA I.D. No. 204677)
BEREZOFSKY LAW GROUP, LLC
40 West Evergreen Avenue, Suite 104
Philadelphia, PA 19118-3324
(856) 667-0500
mquirk@eblawllc.com

*Counsel for Plaintiffs and the Putative Class*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES……………………………………………………..iii

INTRODUCTION…………………………………………………………...1

BACKGROUND………………………………………………………….4

    1.    The AWL tribal lending scheme………………………………………4

    2.    The plaintiffs' loans……………………………………………...6

    3.    Financial regulators begin to crack down on the lending scheme…………7

    4.    Ms. Williams and Mr. Stermel sue the defendants…………………………8

    5.    The defendants' attempt to shield their scheme from scrutiny…………….8

ARGUMENT…………………………………………………………11

I.    The arbitration agreement is unenforceable because, by its terms,
it forbids the application of state and federal law…………………………11

    A.    The contract is invalid under the FAA because it prospectively
waives a consumer's state and federal statutory rights…………………...11

    B.    The choice-of-law clause, standing alone, does not save the
contract…………………………………………………………...18

    C.    The offending provisions cannot be severed…………………………..22

II.    The non-tribal defendants' effort to enforce this arbitration contract
demonstrates that it is designed to game the entire system………………...24

CONCLUSION…………………………………………………………..25

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013)……………………4, 11, 12

*Banks v. CashCall, Inc.*, 188 F. Supp. 3d 1296 (M.D. Fla. 2016)………………………...3

*Cash Am. Net of Nev., LLC v. Commonwealth of Pa.*, 978 A.2d 1028
    (Pa. Commw. Ct. 2009)………………………………………………………………5

*Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017)…………………...*passim*

*Gibbs v. Plain Green, LLC*, 2018 U.S. Dist. LEXIS 149518
    (E.D. Va. Aug. 31, 2018)……………………………………………………………14

*Gingras v. Rosette*, 2016 U.S. Dist. LEXIS 66833 (D. Vt. May 18, 2016)………………3

*Graham Oil Co. v. ARCO Prods. Co.,* 43 F.3d 1244 (9th Cir. 1994)………...13, 16, 19, 22

*Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016)………………………*passim*

*Inetianbor v. CashCall, Inc.*, 768 F.3d 1346 (11th Cir. 2016)……………………………2

*In re CashCall, Inc.*, No. 12-308, 2013 WL 3465250
    (N.H. Banking Dept. June 4, 2013)………………………………………………...5-6

*In re Great Plains Lending, LLC* (Conn. Dept. of Banking Jan. 6, 2015)………………...8

*Jackson v. Payday Fin., LLC*, 764 F.3d 765 (7th Cir. 2014)…………………...2, 16, 18, 20

*MacDonald v. CashCall, Inc.*, 2017 U.S. Dist. LEXIS 64761
    (D.N.J. April 28, 2017), *affirmed* 883 F>3d 220 (3d Cir. 2018)………3, 20, 21, 23

*McNulty v. H&R Block, Inc.*, 843 A.2d 1267 (Pa. Super. Ct. 2004)……………………..21

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)…………………………………………………………..12, 19

*Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191 (3d Cir. 2010)…………………………...22

*Pa. Dept. of Banking v. NCAS of Del., LLC*, 948 A.2d 752 (Pa. 2008) ……………..19, 20

iii

*Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054 (11th Cir. 1998)……………..22

*Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677
        (W.D. Pa. 2013)……………………………………………………………..19

*Parm v. Nat'l Bank of Cal.*, 835 F.3d 1331 (11th Cir. 2016)……………………..2, 15, 17

*Parnell v. Western Sky Fin. LLC*, 664 Fed. App'x 841 (11th Cir. 2016)……………..2, 15

*Rideout v. CashCall, Inc.*, 2018 U.S. Dist. LEXIS 37908
        (D. Nev. Mar. 8, 2018)……………………………………………...2-3, 23-24

*Ryan v. Delbert Servs. Corp.*, 2016 U.S. Dist. LEXIS 121246
        (E.D. Pa. Sept. 8, 2016)……………………………………………..3, 24

*Smith v. Western Sky Fin. LLC*, 168 F. Supp. 3d 778 (E.D. Pa. 2016)……………...*passim*

*Solomon v. Am. Web Loan*, 2019 U.S. Dist. LEXIS 49518
        (E.D. Va. Mar. 20, 2019)…………………………………………*passim*

*Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010)……………………17

*Titus v. ZestFinance, Inc.*, 2018 U.S. Dist. LEXIS 179380
        (W.D. Wa. Oct. 18, 2018)…………………………………………...2, 23

**FEDERAL AND STATE STATUTES**

9 U.S.C. §§ 201 *et seq.*…………………………………………………………...21

9 U.S.C. § 202………………………………………………………………………21

7 Pa. Stat. § 6214(B)…………………………………………………………………5

**MISCELLANEOUS**

N.Y. State, *Cuomo Administration Demands 35 Companies Cease and Desist
        Offering Illegal Online Payday Loans That Harm New York Consumers*
        (Aug. 6, 2013)…………………………………………………………...7

Heather L. Petrovich, *Circumventing State Consumer Protection Laws: Tribal Immunity and Internet Payday Lending*, 91 N.C. L. Rev. 326 (2012)…………5, 8

*Usury Laws by State*…………………………………………………………………….5

Plaintiffs Christina Williams and Michael Stermel oppose the Motions to Compel Arbitration by Defendant Red Stone, Inc. (Doc. 78), joined by Defendant Curry (Doc. 84), and by Defendants McGowan and Ney (Doc. 87), and state in opposition as follows.

## INTRODUCTION

The plaintiffs are Pennsylvania residents who were lured into obtaining payday loans from AWL—an online lending website created and run by the defendants. Even though Pennsylvania caps interest on loans at 6% APR, the plaintiffs' loans carried triple-digit interest rates that ranged from 230% to over 700%. All told, under the defendants' lending scheme, Ms. Williams's $3,000 in loans put her on the hook for over $15,000— more than five times what she borrowed. For Mr. Stermel, it was much the same. Although regulators have informed the defendants that their lending violates state laws, they continue to offer illegal loans to Pennsylvania residents.

The motion now before this Court concerns the defendants' effort to contract their way out of legal accountability. To evade courts and regulators, they did their lending over the Internet and sought to cloak themselves in immunity from all federal and state law through a tribal-arbitration contract that, by its terms, expressly disavows the application of federal and state law to any dispute and specifically forbids an arbitrator from applying any of the federal or state laws governing a consumer's claims. This type of contract has been called an "integrated scheme to contravene public policy" and a "brazen" attempt to avoid federal and state lending and consumer-protection laws. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674, 676 (4th Cir. 2016). And it is invalid under

1

the Federal Arbitration Act: An arbitration contract that "attempt[s] to apply tribal law to the exclusion of federal and state law" is "unenforceable as a matter of law." *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017).

The defendants nevertheless insist that the arbitration contract must be enforced. They claim that it is "entirely innocuous" and "reflect[s] language that scores of courts routinely enforce," and so there is "no sound reason" for refusing to enforce it here. [Doc. 87-1 at 2]; [Doc. 79 at 10]. That is wrong. "[E]very Court of Appeals that has considered" a tribal-arbitration contract has found it entirely unenforceable and "refused to dismiss the case or compel arbitration." *Smith v. Western Sky Fin. LLC*, 168 F. Supp. 3d 778, 781 (E.D. Pa. 2016). The Fourth Circuit has twice labeled these sorts of tribal-arbitration contracts a "farce," designed specifically "to avoid state and federal law," and deployed by lenders "to game the entire system." *Hayes*, 811 F.3d at 674, 676; *Dillon*, 856 F.3d at 337. And other circuits have likewise refused to enforce them multiple times. *See Parnell v. Western Sky Fin. LLC*, 664 Fed. App'x 841 (11th Cir. 2016); *Parm v. Nat'l Bank of Cal.*, 835 F.3d 1331 (11th Cir. 2016); *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1354 (11th Cir. 2014); *Jackson v. Payday Fin., LLC*, 764 F.3d 765 (7th Cir. 2014).

There is more. Since the Fourth Circuit's path-marking decision in *Hayes*, the federal district courts have (with one cursory exception) *unanimously* invalidated these contracts under the Federal Arbitration Act because they would strip a consumer's federal and state statutory rights. *See Titus v. ZestFinance, Inc.*, 2018 U.S. Dist. LEXIS 179380 (W.D. Wa. Oct. 18, 2018); *Rideout v. CashCall, Inc.*, 2018 U.S. Dist. LEXIS 37908 (D.

2

Nev. Mar. 8, 2018); *MacDonald v. CashCall, Inc.*, 2017 U.S. Dist. LEXIS 64761 (D.N.J.

Apr. 28, 2017), *affirmed* 883 F.3d 220 (3d Cir. 2018); *Ryan v. Delbert Servs. Corp.*, 2016

U.S. Dist. LEXIS 121246 (E.D. Pa. Sept. 8. 2016); *Gingras v. Rosette*, 2016 U.S. Dist.

LEXIS 66833 (D. Vt. May 18, 2016); *Smith*, 168 F. Supp. 3d at 784–85; *but see Banks v.*

*CashCall, Inc.*, 188 F. Supp. 3d 1296 (M.D. Fla. 2016) (failing to even cite *Hayes*).

Significantly, the only other court to confront *this* tribal arbitration contract did the

very same thing: It held that this contract is "virtually indistinguishable from those in

*Hayes* and *Dillon*," and is therefore entirely "unenforceable." *Solomon v. Am. Web Loan*,

2019 U.S. Dist. LEXIS 49518, at *67 (E.D. Va. Mar. 20, 2019).

This Court, too, should reject the defendants' effort to force claims against them

into arbitration. The defendants cannot seriously dispute that the loans at issue violate a

host of state and federal lending laws—indeed, a "quick glance" at the contract suggests

the defendants are "keenly aware of the dubious nature of [the] trade." *Hayes*, 811 F.3d at

669. That leaves only one reason they seek to enforce this contract: it would shield them

from federal and state law and free them from any meaningful accountability. Such an

effort is, to say the least, not "on the up-and-up," *id.* at 676, and it exposes the arbitration

contract's purpose for what it is: an attempt "not to create a fair and efficient means of

adjudicating [a consumer's] claims, but to manufacture a parallel universe in which state

and federal law claims are avoided entirely." *Smith*, 168 F. Supp. 3d at 785.

The defendants' contract here cannot be enforced. Doing so would require

departing from the Fourth Circuit and the near-uniform consensus of the district courts

3

since *Hayes*. And it would also require holding that an arbitration contract requiring consumers to prospectively waive their rights must be enforced. But under the Federal Arbitration Act, "courts will not enforce" a set of provisions "forbidding the assertion of certain statutory rights," whether "in an arbitration agreement or any other contract." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236, 241 (2013). The FAA may indeed be designed to facilitate legitimate dispute resolution, but it does not tolerate a party "underhandedly convert[ing]] a choice of law clause into a choice of no law clause." *Hayes*, 811 F.3d at 675. Because the contract was drafted "in a calculated attempt to avoid the application of state and federal law," the "entire arbitration agreement is unenforceable"—it "contravene[s] public policy" and takes a step "forbidden" by the FAA. *Dillon*, 856 F.3d at 334, 337. The motions to compel arbitration should be denied.

## **BACKGROUND**

*1. **The AWL tribal lending scheme.*** AWL is a nominal online lender that sells low-dollar, high-interest loans over the internet to consumers across the country. *See* First Am. Compl. ("FAC"), ¶ 40. Typically, a consumer borrows several hundred dollars but has to repay at triple-digit interest rates that can easily end up tripling or more the facial amount of the loan. *See, e.g.*, *Hayes*, 811 F.3d at 668–69 (describing the basic tribal lending strategy). AWL holds itself out as a tribal entity associated with the Otoe-Missouria Tribe of Indians. But AWL is a front—the consumer-facing website of a lending scheme that is the brainchild of a long-time non-tribal payday lender—Defendant Mark Curry. FAC ¶¶ 33-56; *see generally Solomon*, 2019 U.S. Dist. LEXIS 49518, at *4-

4

5; *see also* Heather L. Petrovich, *Circumventing State Consumer Protection Laws: Tribal Immunity and Internet Payday Lending*, 91 N.C. L. Rev. 326 (2012).

Curry's first foray into online payday lending was an entity based in Kansas called Geneva-Roth Ventures, Inc. FAC ¶¶ 22-29. Geneva-Roth operated on the fringe of consumer lending: to avoid complying with state usury and consumer-protection laws, it made extremely high-interest payday loans remotely through a website. Compl. ¶ 24.

But Curry had a problem: Because payday loans often trap consumers in a "no-exit cycle of debt," *Cash Am. Net of Nev., LLC v. Commonwealth of Pa.*, 978 A.2d 1028, 1040 (Pa. Commw. Ct. 2009) (Leavitt, J. dissenting), most states require lenders making small-dollar short-term loans to be licensed. Curry could not, however, obtain a license in Pennsylvania, or anywhere else, to make this type of loan. *See* 7 Pa. Stat. § 6214(B). That was unsurprising: the loans carried staggeringly high interest rates—some of Curry's loans assessed rates of over 1,300%—that vastly exceeded state usury laws, which typically cap interest rates at somewhere between 7% and 24%. *See* Usury Laws by State, *available at* http://www. loanback.com/category/usury-laws-by-state. By 2010, Alaska, Arkansas, California, Connecticut, Maine, Oregon, and Washington had barred Geneva-Roth from lending in their states.  FAC ¶¶ 30-31.

In response, Curry turned to the burgeoning world of tribal payday lending. In this now-familiar scheme, a non-tribal lender creates an "intentionally complicated and sham" lending structure that purports to offer loans through a tribal entity but in reality is "nothing more than a front" to enable the non-tribal lender "to evade licensure by state

5

agencies and to . . . shield its deceptive business practices from prosecution by state and federal regulators." *In re CashCall, Inc.*, No. 12-308, 2013 WL 3465250, at *3 (N.H. Banking Dept. June 4, 2013).

In 2010, Curry replaced his original lending model with a tribal lending one. Through a new company he founded—the MacFarlane Group—Curry forged a relationship with the Otoe-Missouria Tribe to circumvent state payday lending and usury laws and "insulate [himself] from the consequences of his otherwise illegal actions." *Solomon*, 2019 U.S. Dist. LEXIS 49518, at *37.

As alleged in the Complaint, the defendants' lending structure looks like this: At Curry's direction, the Otoe-Missouria Tribe—a federally recognized tribe located in Red Rock, Oklahoma—created a wholly-owned tribal entity, American Web Loan (AWL), which began making loans online to consumers around the country. FAC ¶¶ 33-44. But although AWL purportedly made the loans, Curry provided the infrastructure to market, fund, underwrite, and collect on the loans. *Id.* ¶¶ 41-44. The tribe received only a very small percentage of the profits from the lending activities. *Id.* ¶ 46.

**2. *The plaintiffs' loans.*** In 2017, Ms. Williams obtained several payday loans from nominal lender AWL over the internet from her home in Philadelphia. The first was for $1,400 which required that she pay a total of $6,005.94, four times what she received, at an interest rate of 520.09% APR. *Id.* ¶¶ 58, 60. She made three bi-weekly payments and then paid off the remaining balance. *Id.* ¶¶ 62-63. She had the loan open for just 46 days, during which she paid over $800 in interest for a $1,400 loan. *Id.* ¶ 64. Ms.

Williams' second loan carried an even higher cost. Although the loan was for $1,600, AWL required that she ultimately pay $9,388.03, almost six times what she received, at an interest rate of 714.88% APR.  *Id.* ¶¶ 66, 68.

Plaintiff Michael Stermel's loan with AWL was similar. The loan was for $1,000 but required him to pay a total of $4,260.96, over four times the amount he received, at an interest rate of 496.55% APR.  *Id.* ¶¶ 72-75.  He made two bi-weekly payments of $213.08, which were credited entirely to interest.  *Id.* ¶ 77.  He had the loan open for at least 34 days, during which he paid $426.13 in interest for a $1,000 loan, representing annual interest over 457%.  *Id.* ¶ 78.

**3. _Financial regulators crack down on the lending scheme._** In the years since its inception, financial regulators have attempted to crack down on the defendants' illegal lending scheme. In 2013, New York issued a cease-and-desist order to AWL "for offering illegal payday loans to New Yorkers." N.Y. State, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013).[1] Although the state had never authorized AWL to lend to New York consumers, regulators found that it was charging them interest rates "in excess of 400, 600, 700, or even 1,000 percent" and attempting to "skirt New York's prohibition on payday lending by offering loans over the Internet." *Id*. Soon after,

---

[1] Available at www.governor.ny. gov/news/Cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-loans-that-harm-new-york-consumers.html.

the Otoe-Missouria tribe was hit with additional cease-and-desist orders for similar efforts to circumvent state lending laws. *See, e.g.*, *In re Great Plains Lending, LLC*, Order to Cease and Desist (Conn. Dept. of Banking Jan. 6, 2015).[2]

*4. **Ms. Williams and Mr. Stermel sue the defendants.*** In an effort to curtail the defendants' unlawful conduct in Pennsylvania, Ms. Williams and Mr. Stermel brought a putative class action against Red Stone, Curry, and several others. *See* FAC ¶¶ 6-10. They asserted violations of various Pennsylvania and federal laws related to the illegal loans offered by the defendants. *See id.* ¶¶ 86-124. They seek damages, reimbursement, and injunctive relief on behalf of themselves and several classes of consumers who received similar loans. *See* FAC Counts I-V.

*5. **The defendants' attempt to shield their scheme from scrutiny.*** Like other tribal lending schemes, the defendants' scheme is predicated on a contractual web of liability shields—an integrated (and sometimes inconsistent) set of choice-of-law provisions, forum-selection clauses, and arbitration requirements—deployed, as the Fourth Circuit put it, to "game the entire system." *Hayes*, 811 F.3d at 676. And although there is no "serious[] dispute" that these sorts of loans "violate[] a host of state and federal laws," *Hayes*, 811 F.3d 669, the defendants (like other tribal lending enterprises) premise their scheme on the avoidance of liability by cloaking their activity in tribal immunity. *See generally* Petrovich, *Circumventing State Consumer Protection Laws*, *supra.*

---

[2] Available at https://portal.ct.gov/DOB/Enforcement/Consumer-Credit-2015-Orders/Great-Plains-Lending-Order-to-Cease-and-Desist.

To begin, the defendants' contract expressly requires borrowers to relinquish their rights under state and federal law. The contract contains several clauses purporting to establish complete tribal jurisdiction for, and require the exclusive application of tribal law over, any claims arising out of an American Web Loan transaction. It states that "THIS AGREEMENT SHALL BE GOVERNED BY TRIBAL LAW" and that any loan is "SUBJECT TO AND GOVERNED BY TRIBAL LAW AND NOT THE LAW OF YOUR RESIDENT STATE." *See* Dkt. No. 79-2 (Red Stone Ex. B-Williams 1/17/2017 Loan Agreement) (hereafter, "Williams Loan Agr.") at 1 and 12, § 22. It also states that, "for purposes of this Agreement," a consumer "irrevocably consent[s] to the exclusive jurisdiction of the Tribal courts." *Id.* at 12, § 22. And another clause likewise provides:

> **Governing Law.** You understand and agree that this Agreement is governed only by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the United States Constitution. We operate solely in the Indian country of the Otoe-Missouria Tribe of Indians and have no operations in any state. As such, neither we nor this Agreement are subject to any other federal or state law or regulation, nor to the jurisdiction of any court, unless so stated in this Agreement.

*Id.* at 13, § 23.

These exclusive tribal-law and tribal-forum requirements are coupled with a demand that any dispute over the legality of the loans be resolved in arbitration, not court. The contract says that "ANY DISPUTE YOU HAVE RELATED TO THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION." *Id.* at 10, § 22. And the terms of the relevant arbitration clause provide that, although a party may "choose" either the American Arbitration Association (AAA) or JAMS, any arbitrator

9

(regardless of forum) is expressly forbidden from applying any rules or law that would "contradict this Agreement to Arbitrate or Tribal Law." *Id.* at 11, § 22 ("To the extent the arbitration firm's rules and procedures are different than the terms of this Agreement to Arbitrate, the terms of this Agreement to Arbitrate will apply."); *see also id.* at 12, § 22 (explaining that any "arbitration under this Agreement" may not "allow for the application of any law other than Tribal law"); *see also id.* (instructing that the "arbitrator shall apply Tribal law and the terms of this Agreement").

The arbitration clause also states that it covers "any claim or controversy of any kind between you and us or otherwise involving this Agreement or the Loan" and includes "all federal, state or Tribal Law claims or demands." *Id.* at 10, § 22 It also purports to cover "any issue concerning the validity, enforceability, or scope of this Agreement or this Agreement to Arbitrate." *Id*. In addition, the arbitration clause prohibits class actions, permits a party to opt-out in writing, and purports to cover a wide range of related third parties and affiliated entities. *Id.* at 12, § 22.

Based on these provisions, the defendants have now moved to force this case into arbitration. *See* Dkt. Nos. 78 (Red Stone), 84 (Curry), and 87 (McGowan-Ney).

10

## ARGUMENT

**I.**   **The arbitration agreement is unenforceable because, by its terms, it forbids the application of state and federal law.**

The defendants' effort to compel arbitration fails for one simple reason: by its terms, their contract ensures that, no matter who the arbitrator is or where the arbitration occurs, the federal and state law governing a consumer's claims cannot be applied. That is forbidden. Although the FAA has a broad reach, "courts will not enforce a prospective waiver" of statutory rights, "whether in an arbitration agreement or any other contract." *Am. Express*, *supra*, 570 U.S. at 236, 241. Over the past two years, this rule has been consistently applied by both federal courts of appeal and district courts alike to invalidate virtually indistinguishable efforts by tribal lenders to deploy contractual arbitration and choice-of-law provisions designed "to avoid state and federal law and to game the entire system." *Hayes*, 811 F.3d at 676. These courts have delivered an unmistakable message: When a lender drafts an arbitration contract "in a calculated attempt to avoid the application of state and federal law," the "entire arbitration agreement is unenforceable." *Dillon*, 856 F.3d at 336. Under this rule, the defendants' contract is invalid and the motions to compel must be denied.

### A.   **The contract is invalid under the FAA because it prospectively waives a consumer's state and federal statutory rights.**

As the Supreme Court has repeatedly made clear, a contract that operates "as a prospective waiver of a party's right to pursue statutory remedies" is unenforceable. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19

(1985); *see Am. Express*, 570 U.S. at 236. Under this "prospective waiver" doctrine, courts will not enforce a contract that "would prevent a litigant from vindicating federal substantive statutory rights." *Dillon*, 856 F.3d at 334. An arbitration contract is invalid under this "fundamental" rule if it undertakes a "categorical rejection of the requirements of state and federal law." *Hayes*, 811 F.3d at 668, 673; *see Dillon*, 856 F.3d at 334.

The defendants' contract here straightforwardly violates this prohibition. It provides that any dispute shall be "subject to and governed by tribal law" and that the contract itself "shall be governed by tribal law." Dkt. No. 79-2 (Williams Loan Agr.) at 1 and 12, § 22. And it requires that *any* arbitrator "shall apply" this mandate as written. *Id.* at 12, § 22 (instructing that the arbitrator "shall apply Tribal law and the terms of this Agreement"). The contract, in short, forbids any arbitrator to "allow for the application of any law other than Tribal law." *Id.* Because that language renounces "the application of federal or state law" to a consumer's claims and directs that "the arbitrator shall not allow for the application of any law other than tribal law," the "entire agreement is unenforceable." *Dillon*, 856 F.3d at 335-37 (internal quotations omitted); *see also Hayes*, 811 F.3d at 669-71, 675 (holding that a tribal arbitration contract is unenforceable under the FAA where it "names a tribal forum and then purports to disavow the authority of all state or federal law").[3]

---

[3] Other clauses in the contract reinforce the point. For instance, another provision provides that "neither [the lender] nor this Agreement are subject to any other federal or state law or regulation, nor to the jurisdiction of any court." Dkt. No. 79-2 (Williams Loan Agr.) at 13, § 23. The same was true in *Hayes*: the contract there contained a similar disclaimer providing that "[n]either this Agreement nor the Lender is subject to the laws

The relevant language here is "virtually indistinguishable" in substance from that in other tribal arbitration cases. *Solomon*, 2019 U.S. Dist. LEXIS 49518, at *67. In *Hayes*, for instance, the tribal loan contract included a choice-of-law provision stating that it "shall be governed by the law of the Cheyenne River Sioux Tribe," 811 F.3d at 670, and elsewhere stated that it was "subject solely to the exclusive laws and jurisdiction of [the Tribe]." *Id.* at 669. That language was then coupled with an arbitration clause that disclaimed the application of "any law other than the law of the Cheyenne River Sioux Tribe of Indians" and required the arbitrator to "apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement" to any claims. *Id.* And in *Dillon*, a different tribal arbitration contract stated that it "shall be governed by the law of the Otoe-Missouria Tribe of Indians" and required any arbitrator to "apply the laws of the Otoe-Missouria Tribe of Indians and the terms of this Agreement." 856 F.3d at 334.

The Fourth Circuit invalidated these contracts in their entirety. Tribal arbitration contracts that reject the requirements of state and federal law and forbid an arbitrator from even applying the applicable law constitute a "brazen" attempt "to achieve through arbitration what Congress has expressly forbidden." *Id.* at 334 (quoting *Graham Oil Co. v. ARCO Prods. Co.,* 43 F.3d 1244, 1249 (9th Cir. 1994)). As the Fourth Circuit explained, the FAA does not permit a company to "free" itself of the strictures of federal

---

of any state of the United States" and "that no United States state or federal law applies to this Agreement." 811 F.3d at 669-70. Here, as in *Hayes*, the defendants' attempt to free themselves from the strictures of state and federal law is "brazen" and unambiguous.

and state law. *Id.* To the contrary, an arbitration agreement may not, "[w]ith one hand," offer "an alternative dispute resolution procedure in which aggrieved persons may bring their claims," and "with the other, [] proceed[] to take those very claims away." *Hayes*, 811 F.3d at 673–74. Were it otherwise, the "just and efficient system of arbitration intended by Congress when it passed the FAA" would be made to "play host" to arbitration schemes designed "to game the entire system." *Id.* at 674–75.[4]

And make no mistake: the very contract the defendants seek to enforce here has been categorically invalidated under this straightforward rule. *See Solomon*, 2019 U.S. Dist. LEXIS 49518, at *67-70 (discussing *Hayes* and *Dillon*). Confronting the terms of *this* contract, the court explained that, just like other tribal-lending contracts, it uses a choice of law provision coupled with a forum-selection clause to prospectively waive a borrower's statutory remedies by "renounc[ing] wholesale" the application of federal and state law. *Id.* at *73 (holding that contract was "analogous" to those considered in *Hayes* and *Dillon*). Because the contract here compels claimants to surrender their statutory rights—it forbids an arbitrator from "allow[ing] for the application of any law other than

---

[4] This gamesmanship extends even to the defendants' effort to ensure that the FAA itself applies. Consider: If the contract states that it is exclusively subject to the laws of the Tribe, then a federal court would not have jurisdiction under the FAA to even issue an order compelling arbitration and an arbitrator would not have any authority under the FAA to decide threshold questions of arbitrability or conduct an arbitration. *Gibbs v. Plain Green, LLC*, 2018 U.S. Dist. LEXIS 149518, at *14 (E.D. Va. Aug. 31, 2018) (noting the tribal payday lender's "attempts to have it both ways" by arguing that the Court "lacks subject matter jurisdiction over the controversy as a whole, but somehow retains subject matter jurisdiction for the limited purpose of compelling arbitration" and finding such a position "contrary" to Supreme Court precedent "and to common sense").

Tribal law," Dkt. No. 79-2 (Williams Loan Agr.) at 12, § 22—it operates as an integrated scheme to contravene public policy and is invalid in its entirety. *Hayes*, 811 F.3d at 670, 675 (holding that tribal arbitration contract that disavows "the application of all state and federal law" to a consumer's claims takes the "plainly forbidden" step of prospectively waiving statutory rights and so is "simply unenforceable").

And the presence of a delegation clause—a provision designed to allow an arbitrator to decide certain threshold questions concerning the contract's enforceability—does not change this result. A contract that contains an FAA-prohibited prospective waiver is unenforceable in its entirety, delegation clause included. "In practical terms, enforcing the delegation provision would place an arbitrator in the impossible position of deciding the enforceability of the agreement *without* authority to apply any applicable federal or state law." *Smith*, 168 F. Supp. 3d at 786 (emphasis in original). As a result, any delegation clause here is unenforceable for the same reason the rest of the arbitration contract is unenforceable. *See Solomon*, 2019 U.S. Dist. LEXIS 49518, at *73 (invalidating entire arbitration contract, delegation clause included); *Parm*, 835 F.3d at 1338 (invalidating *both* delegation clause *and* underlying arbitration agreement because the contract violates the FAA and is "integral to the parties' agreement to arbitrate"); *Parnell*, 664 Fed. App'x at 843–44 (same); *Hayes*, 811 F.3d at 671 n.1 (same).

Nor can the defendants try to run from the contract's plain language. In pressing their view that the tribal arbitration contract is enforceable, the defendants claim that it actually "requires rather than disavows the application of federal law." Dkt. No. 79 (Red

15

Stone Brief) at 11. Because the contract incorporates "such federal law as is applicable under the Indian Commerce Clause," they say the "exact same body of federal law" would apply regardless of whether this dispute is in arbitration or court. *Id.*

No court has accepted this weak argument. The contract's plain language unambiguously forbids an arbitrator from "allow[ing] for the application of any law other than Tribal law". Dkt. No. 79-2 (Williams Loan Agr.) at 12, § 22; *see Solomon*, 2019 U.S. Dist. LEXIS 49518, at *70-73 (rejecting this exact argument as applied to this exact contract). Indeed, the tribal arbitration contracts in virtually all of these cases—including both *Hayes* and Dillon—contained similar references to the Indian Commerce Clause, yet that made no difference. *See Dillon*, 856 F.3d at 334; *Hayes*, 811 F.3d at 675; *see also Jackson*, 764 F.3d at 769 (rejecting any reliance on this "irrelevant constitutional provision"). This does not save the contract because what matters isn't whether the contract carves out a narrow exception for *some particular* law; it is, instead, whether it precludes the application of the *specific* "statutory rights" at issue in the case. *Hayes*, 811 F.3d at 675. Were it otherwise, a drafter could easily slip the prohibition by voluntarily complying with a single, even irrelevant, law—like including a statement of compliance with certain provisions of the Internal Revenue Code. *See, e.g.*, *Graham Oil*, 43 F.3d at 1247 (explaining that the relevant inquiry is whether the arbitration contract "purports to forfeit" the specific "statutorily-mandated rights" held by the plaintiff).

Here, then, the relevant inquiry is whether the contract forbids the assertion of claims under RICO and Pennsylvania law. *See Dillon*, 856 F.3d at 334 (invalidating the

16

contract because it refused to permit the arbitration of either the federal RICO or state-law claims in the case). The contract undoubtedly does, and the defendants make no effort to claim otherwise. As a result, because the contract does not "create a fair and efficient means of adjudicating Plaintiff's claims," but instead "manufacture[s] a parallel universe in which state and federal law claims are avoided entirely," it contravenes public policy and is unenforceable as a matter of law as to *all* claims, state and federal alike. *Smith*, 168 F. Supp. 3d at 785 (categorically refusing to enforce tribal-arbitration clause in case alleging federal- and state-law claims).

Ultimately, the "only reasonable way to interpret" the contract is that tribal law applies to the *exclusion* of any relevant federal and state law. *Id.* Contracts must be "enforced according to their terms." *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotations omitted). Although "there is [a] presumption in favor of arbitration, '[t]he courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties.'" *Parm*, 835 F.3d at 1335. In every one of these tribal-arbitration cases, as *Hayes* and *Dillon* make clear, the plain terms of the contract left no room for doubt. And that is all that's needed to "accomplish[]" a forbidden waiver. *Dillon*, 856 F.3d at 335 (holding that provision that loan agreement "shall be governed by the Otoe-Missouria Tribe of Indians," coupled with a requirement that the arbitrator apply that tribal law, represents "an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*"). A contract that

17

"names a tribal forum" and then waives a potential claimant's rights "through the guise of a choice of law" is invalid in its entirety. *Hayes*, 811 F.3d at 669, 675.[5]

Because the FAA "does not protect" tribal arbitration contracts that name a tribal forum and then purport to disavow the authority of the relevant state or federal law, the entire arbitration agreement is unenforceable. *See Dillon*, 856 F.3d at 335-36 (refusing to order arbitration of both federal RICO and state usury and consumer-lending law claims).

### B.   The choice-of-law clause, standing alone, does not save the contract.

Falling back, the defendants argue that the tribal choice-of-law provisions reflect little more than a choice to allow some foreign law to govern the agreements. *See* Dkt. No. 87-1 (McGowan-Ney Brief) at 3 (contract simply "select[s] the laws of the Otoe-Missouria Tribe"). But no court facing a tribal arbitration contract has bought this theory, and for good reason: these contracts go well beyond the mere choice of foreign law.

In *Hayes*, the defendants pressed the same theory—that their contract reflected nothing more than a choice to be bound by Tribal, not federal or state, law—and the

---

[5] Some defendants have suggested that courts should defer ruling on the legality of tribal arbitration contracts until after an arbitration has occurred. *See, e.g.*, *Dillon*, 856 F.3d at 335 (explaining that the defendants "urge[] us to defer consideration of the prospective waiver doctrine until after the arbitrator construes the choice of law provision and decides whether any federal remedies remain available"). But waiting until the award enforcement stage is only appropriate where there is "uncertainty regarding the effect of the choice of law provision." *Id.* When it comes to these tribal arbitration contracts, "there is no uncertainty." *Id.* The contract here "effects an unambiguous and categorical waiver of federal statutory rights" and so it "is unenforceable" at the threshold. *Id.*; *see also Jackson*, 764 F.3d at 779 (refusing to defer consideration until after arbitration because the contract "provides that a decision is to be made under a process that is a sham from stem to stern").

Fourth Circuit rejected it. "[P]arties are free within bounds to use a choice of law clause in an arbitration agreement to select which local law will govern the arbitration," the court explained, "[b]ut a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Hayes*, 811 F.3d at 675.

To be effective, a foreign choice-of-law clause cannot "wholly [] displace American law even where it otherwise would apply." *Mitsubishi Motors*, 473 U.S. at 637 n.19. Instead, all it may do is "select[] the law of a certain jurisdiction to govern the agreement." *Hayes*, 811 F.3d at 675 (emphasis added). Under this settled approach, so long as the arbitration agreement does not explicitly eliminate a claimant's right to bring a statutory claim, its choice of foreign law should not be disturbed. *Compare Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 690 (W.D. Pa. 2013) ("The parties do not contest that the choice-of-law clause is enforceable and applies to Panthera's breach of contract claims."); *with Pa. Dept. of Banking v. NCAS of Del., LLC*, 948 A.2d 752, 759 (Pa. 2008) ("[T]he choice-of-law provision in Appellant's contracts cannot bind the Department in this action to enforce Pennsylvania public policy.").

But the flip side of this rule is just as true: a choice-of-law clause that "expressly forfeits" a claimant's statutory rights is unenforceable as a matter of law. *Graham Oil*, 43 F.3d at 1247. That is precisely what the contract here seeks to do: "instead of selecting the law of a certain jurisdiction to govern the agreement, as is normally done with a choice of law clause, this arbitration agreement uses its 'choice of law' provision to

19

waive all of a potential claimant's federal rights." *Hayes*, 811 F.3d at 675. The tribal-choice-of-law-clause is therefore unenforceable.

That is why the substance of the tribe's law does not affect the application of this rule. As *Dillon* makes clear, a contract that "attempt[s] to apply tribal law to the exclusion of federal and state law" is unenforceable "as a matter of law," regardless of any alternative remedies that might be available under tribal law. *Dillon*, 856 F.3d at 336. A contract, in other words, that does not allow an arbitrator "to consider *any* of the claims that [a consumer] asserts in her Complaint since the arbitrator would be prohibited from applying the relevant law" is invalid because, on its face, it "gut[s]" the laws that "would otherwise control." *Smith*, 168 F. Supp. 3d at 785. And here, the law that controls the plaintiffs' substantive claims is *not* tribal law. *See, e.g.*, *Jackson*, 764 F.3d at 783 (rejecting any suggestion that a contractual tribal-forum-selection clause can confer tribal-subject-matter jurisdiction over a nonmember's consumer-protection claims); *MacDonald*, 2017 U.S. Dist. LEXIS 64761, at *10-14 (rejecting any effort to apply tribal law to a consumer's state consumer-protection and usury claims).

Indeed, Pennsylvania courts *would not* enforce the contract's tribal-choice-of-law provisions, even assuming those provisions were valid. For instance, the Pennsylvania Supreme Court has squarely held, in a case involving alleged violations of the state's usury laws brought on behalf of Pennsylvania residents, that a choice-of-law provision selecting foreign law is invalid. *See Pa. Dept. of Banking v. NCAS*, 948 A.2d at 759. And Pennsylvania courts have likewise refused to enforce arbitration clauses that would deny

state citizens remedies for consumer protection violations. *See*, *e.g.*, *McNulty v. H&R Block, Inc.*, 843 A.2d 1267, 1273 (Pa. Super. Ct. 2004). And, as other courts facing similar efforts have explained, the application of tribal law to the illegal lending and interest-rate claims of non-tribal consumers easily satisfies the Restatement's requirements for refusing enforcement of the choice-of-law provisions. That is because the tribe's law—which does not prohibit the usurious lending engaged in by the defendants here and does not authorize a remedy consistent with Pennsylvania or federal law—is "contrary" to a state's "fundamental public policy of protecting its citizens from usurious loans and unlicensed lenders." *MacDonald*, 2017 U.S. Dist. LEXIS 64761, at *20. For states, like Pennsylvania, with strong consumer-protection and lending laws, "[t]here is little question that [the state] has a strong public policy" against "usurious interest rates like the [triple-digit] interest rate charged under [the] Loan Agreement." *Id.*

Finally, the defendants also suggest that FAA Chapter 2, 9 U.S.C. §§ 201 *et seq.*, which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, supports a contrary conclusion. *See* Dkt. No. 87-1 (McGowan-Ney Brief) at 3 n.3 (arguing that "unbroken" line of cases allows arbitration agreements to "apply foreign laws"). But that argument is foreclosed because this contract is not governed by Chapter 2 or the Convention. *See* 9 U.S.C. § 202 (establishing conditions for application). It thus is not subject to the Convention's framework for evaluating enforceability of foreign law Chapter 2 contracts. *See*, *e.g.*, *Dillon*, 856 F.3d at 334 (holding this argument inapplicable).

## C.     The offending provisions cannot be severed.

Nor can the offending provisions be severed from the rest of the contract. An arbitration agreement "does not, in the context of litigation, become [an] opening bid in a negotiation . . . over the agreement's unconscionable terms." *Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191, 205 (3d Cir. 2010). Instead, where a company drafts the agreement, it is "saddled with the consequences of the [contract] as drafted." *Id.* (internal quotations omitted). And where an agreement's illegal provisions constitute the "primary" or "essential" purpose of the arbitration, *id.* at 206 (quoting the Restatement), courts will not reward that illegality by enforcing a stripped-down version of the agreement. *See, e.g.*, *Graham Oil*, 43 F.3d at 1248–49 (holding that multiple illegal provisions tainted the entire purpose of the arbitration agreement); *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998) (holding that where the challenged provisions defeat basic remedial purposes of federal law, the arbitration agreement cannot be enforced). When it comes to these tribal-arbitration contracts, because the choice-of-law provisions are "essential to the purpose of the arbitration agreement," any attempt to "consent" to the application of federal or state law "would defeat the purpose of the arbitration agreement in its entirety." *Dillon*, 856 F.3d at 336.

So it is here. Because this contract, like the others, requires the application of tribal law to the exclusion of federal and state law, the only way it can pass muster under the FAA is to ignore or sever those offending provisions. But doing that would require a court to "rewrite the unenforceable foreign choice of law provision in order to save" it.

22

*Dillon*, 856 F.3d at 336. The FAA does not permit this. As the Fourth Circuit explained, it is "untenable" to rewrite a tribal arbitration contract to allow for the application of federal or state law because the exclusive tribal-choice-of-law provisions are "purposefully drafted" by the defendants "to avoid the application of state and federal consumer protection laws." *Dillon*, 856 F.3d at 336; *see also Hayes*, 811 F.3d at 767 (refusing to sever because the "offending provisions go to the core of the arbitration agreement" and observing that it would be "farcical" to allow the defendant to "unilaterally and retroactively decide what portions of a contract may be enforced").

These basic points are reinforced by what has happened since *Hayes*. Courts that have confronted similar contracts have, with near unanimity, refused to enforce them in their entirety. "It is difficult to imagine," one court within this circuit remarked, "a more transparent attempt to hijack the FAA to deprive aggrieved parties of an opportunity to meaningfully adjudicate their claims" than by employing a tribal-arbitration contract that—by its terms—repeatedly "ensures that no matter who the arbitrator is . . . federal and state law may not be applied." *MacDonald*, 2017 U.S. Dist. LEXIS 64761, at *13.

Other courts have reached the same conclusion, including as to the very contract at issue here. *See Solomon*, 2019 U.S. Dist. LEXIS 49518, at *67 (invalidating entire clause); *see also Titus*, 2018 U.S. Dist. LEXIS 179380, at *20 (refusing to sever because the "'offending provisions' of this arbitration agreement in this case go to the essence of the contract and are intended to 'achieve through arbitration what Congress has expressly forbidden'"); *Rideout*, 2018 U.S. Dist. LEXIS 37908, at *17 (refusing to enforce tribal-

23

arbitration clause because it "has chosen the only type of forum—tribal law—that exists in all states that could effect a waiver of federal statutory rights"); *Ryan*, 2016 U.S. Dist. LEXIS 37908, at *17 ("[T]he wholesale waiver of federal and state law . . . dooms both the delegation provision and the arbitration clauses."); *Smith*, 168 F. Supp. 3d at 785 (holding arbitration agreement completely unenforceable because its "purpose" is not "to create a fair and efficient means of adjudicating Plaintiff's claims, but to manufacture a parallel universe in which state and federal law claims are avoided entirely"). Consistent with this weight of authority, this Court should invalidate the contract in its entirety.

## II.     __The non-tribal defendants' effort to enforce this arbitration contract demonstrates that it is designed to game the entire system.__

In their separate motions to compel arbitration, the non-tribal defendants—the real architects of the lending scheme—make clear that this tribal arbitration contract was specifically drafted with them in mind. There is "little doubt," they say, that arbitration contract should apply to cover any claims against them. Dkt. No. 87-1 (McGowan-Ney Brief) at 4. But because the agreement expressly purports to deprive consumers of the availability of federal and state law, it is unenforceable across the board—including as it applies to any third parties like the non-tribal defendants in this case. Suffice to say that, like here, *Hayes* and *Dillon* both involved third parties unsuccessfully seeking to cloak themselves in the protections of a tribal arbitration agreement.

Still, these non-tribal defendants' effort to force the claims against them into tribal arbitration affords a clear picture of the tribal lending scheme's true design. Like every other tribal lender, none of the non-tribal defendants can seriously dispute that the loans

24

at issue in this case violate a host of state and federal lending laws—indeed, states have long told these defendants that these sorts of loans violate state law, and Curry's move to establish a tribal arbitration business followed right on the heels of his prior online lending scheme being shut down by state regulators.

But the tribal lending strategy only works if every related entity can circumvent state payday lending and usury laws. Here, the non-tribal defendants, despite being intimately involved in the enterprise, make no formal "claim of tribal affiliation." *Hayes*, 811 F.3d at 673. And they do not "attempt to ground [their] renunciation of federal law" on the theory that they are tribal entities "and therefore not subject to the authority of federal law." *Id.* That leaves only one reason for seeking to enforce this contract: it would free them from federal and state law and allow them "to game the entire system." *Hayes*, 811 F.3d at 676. Such an effort exposes the tribal-arbitration contract's purpose for what it is: an attempt "not to create a fair and efficient means of adjudicating Plaintiff[s'] claims, but to manufacture a parallel universe in which state and federal law claims are avoided entirely." *Smith*, 168 F. Supp. 3d at 785. This is prohibited under the FAA, and the defendants' arbitration contract should not be enforced.

## <u>CONCLUSION</u>

For all of the reasons set forth, the Court should deny Defendants' motions to compel arbitration.

<u>Dated</u>: April 10, 2019

Respectfully submitted,

/s/ *Michael J. Quirk*
Michael J. Quirk (PA I.D. No. 204677)
BEREZOFSKY LAW GROUP, LLC
40 West Evergreen Avenue, Suite 104
Philadelphia, PA 19118-3324
(856) 667-0500
mquirk@eblawllc.com

Sarah T. Hansel, Esq. (PA I.D. No. 319224)
BEREZOFSKY LAW GROUP, LLC
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002-1163
(856) 667-0500
shansel@eblawllc.com

Robert C. Cocco, Esq. (PA I.D. No. 61907)
LAW OFFICES OF ROBERT P. COCCO, P.C.
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
(215) 351-0200
rcocco@rcn.com

Matthew W.H. Wessler, Esq. (*Pro Hac Vice*)
GUPTA WESSLER PLLC
1900 L Street, Suite 312
Washington, D.C. 20036
(202) 888-1741
matt@guptawessler.com

*Counsel for Plaintiffs and the Putative Class*

26

## <u>CERTIFICATE OF SERVICE</u>

I here by certify that on this 10th day of April 2019, I electronically filed the foregoing Memorandum of Law in Opposition to Motions to Compel Arbitration with the Clerk using the Court's CM/ECF system, and thereby served it upon all counsel of record for Defendants.

<u>Dated</u>:          April 10, 2019

/s/ *Michael J. Quirk*
Michael J. Quirk
*Counsel of Record for Plaintiffs*
*and the Putative Class*
